No. 25-1078

# United States Court of Appeals
## For The Tenth Circuit

NATIONAL CREDIT SYSTEMS, INC.,

*Appellant,*

v.

ROBBIN WARD,

*Appellee.*

From The United States District Court for the District of Colorado
Cause No. 1:21-cv-02597-NYW-JPO
The Honorable Nina Y. Wang, Presiding

## APPELLANT'S BRIEF

John W. Bowdich
Texas State Bar No. 00796233
Bowdich & Associates, PLLC
8150 N. Central Espy., Suite 500
Dallas, Texas 75206
Telephone (214) 307-9500
Facsimile (214) 307-5137

*Attorney for Appellant National Credit Systems, Inc.*

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................2

TABLE OF AUTHORITIES ...........................................................6

RULE 28.2(C)(3) – STATEMENT OF RELATED CASES ............................10

STATEMENT OF JURISDICTION ................................................10

STATEMENT OF ISSUES PRESENTED FOR REVIEW .............................11

STATEMENT OF THE CASE ......................................................12

STATEMENT OF FACTS ...........................................................13

SUMMARY OF THE ARGUMENT .................................................16

ARGUMENT ........................................................................17

I.     The Tenth Circuit should follow its sister circuits in adopting
       the "objectively and readily verifiable" standard for
       evaluating disputes under the FCRA......................................17

       A.    Before evaluating the reasonableness of an FCRA
             investigation, a plaintiff must establish that the
             information furnished was inaccurate or incomplete. .................18

       B.    The FCRA gives the term "accuracy" its ordinary
             meaning. ...................................................................19

       C.    The ordinary meaning of "accuracy" contains a
             standard of objectivity. .................................................20

       D.    Throughout the FCRA, the term "accuracy" is used
             to mean *objective* accuracy..........................................21

       E.    Prevailing case law interprets "accuracy" to mean
             "objectively verifiable accuracy." .................................23

II.    Ward failed to make a prima facie showing that the disputed
       information was "inaccurate" under the FCRA. ......................27

A.  NCS preserved the threshold "inaccuracy" issue for appeal by asking the trial court to first determine whether the information NCS furnished was inaccurate...................................................................28

B.  Information and documents available to NCS at the time of its investigations..............................................30

C.  Additional evidence admitted at trial related to the dispute and investigations of the dispute.....................32

D.  Ward did not meet his burden to show that the information furnished to the CRAs was *objectively* and *readily* verifiable.................................................33

III.  The trial court erroneously submitted the case to the jury because the Texas judgment conclusively proved Ward's liability for the debt and that the information NCS reported to the CRAs was accurate. ..............................................39

IV.  The trial court erred because Ward's dispute required a subjective evaluation of his credibility and was, therefore, not *objectively* or *readily* verifiable as a matter of law. ................................40

A.  Ward's denial of responsibility for the debt depended solely on his veracity, which was not *objectively* verifiable as a matter of law. ......................................41

B.  Ward's subjective denial of responsibility for the debt was not *readily* verifiable information as a matter of law. ..........................................................................46

C.  The trial court erroneously denied NCS's motion for judgment notwithstanding the verdict based on the wrongful conclusion that the jury had "implicitly" decided the facts regarding the lease in Ward's favor. ..............................................................................48

D.  The trial court's reliance on the distinguishable case of *Paulino* was misplaced............................................51

V.    Ward's dispute was also an impermissible collateral attack on the validity of the debt and was, therefore, not objectively and readily verifiable. ..................................................................... 53

VI.   Even if Ward established that the information furnished by NCS was inaccurate, the trial court erred by not finding that Ward failed to satisfy the required causation element on the issue of the reasonableness of NCS's investigation. ............................... 55

        A.    To prevail on an FCRA § 1681s-2(b) claim, the plaintiff must establish causation, specifically that had the furnisher conducted a reasonable investigation, the result would have been different. .................. 55

        B.    NCS's investigation was reasonable as a matter of law, because Ward failed to establish what reasonable investigative action NCS should have completed that would have led to the discovery that the information reported was inaccurate. .............................................. 57

        C.    NCS's investigation was reasonable as a matter of law, because it was not required to act as the judicial arbiter of the validity of Ward's debt with the landlord. ..................................................................... 61

VII.  While the trial court erred by allowing the jury to determine the issue of the reasonableness of NCS's investigation, it also erred by failing to include a proper jury instruction on the causation requirement to determine reasonableness. ............................... 65

CONCLUSION .................................................................................. 69

RULE 28.2(C)(2) – STATEMENT REGARDING ORAL ARGUMENT ................................................................................... 69

RULE 32(g) CERTIFICATE OF COMPLIANCE ........................... 70

CERTIFICATE OF SERVICE ......................................................... 70

RULE 28.2 APPENDIX

A.  ORDER  [on NCS's MSJ] (Doc. 76)               APP A
B.  FINAL JURY INSTRUCTIONS (Doc. 128)     APP B
C.  VERDICT FORM (Doc. 130)                   APP C
D.  FINAL JUDGMENT (Doc. 131)                 APP D
E.  ORDER ON POST TRIAL MOTIONS (Doc. 153)  APP E

# TABLE OF AUTHORITIES

## Cases

*Advanced Recovery Sys. v. Am Agencies*, 923 F.3d 819 (10th Cir. 2019) ................................................................................................69

*Alston v. United Collections Bureau, Inc.*, No. DKC 13-0913, 2014 U.S. Dist. LEXIS 27124 (D. Md. Mar. 4, 2014) ......................................18

*Bueno v. Univ. of Miami,* 22-22831-Civ-Scola, 2023 U.S. Dist. LEXIS 72958 (S.D. Fla. Apr. 26, 2023)............................................................23

*Butler v. Experian Info. Sols. Inc.,* 1:23-cv-02519-ELR-LTW, 2023 U.S. Dist. LEXIS 154386 (N.D. Ga. Aug. 25, 2023) ...............................23

*Cahlin v. General Motors Acceptance Corp.,* 936 F. 2d 1151 (11th Cir. 1991)............................................................................. 23, 40

*Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876 (9th Cir. 2010) ............................................................................ 54, 63, 64, 65

*Dalton v. Capital Associated Indus.*, 257 F. 3d 409 (4th Cir. 2001) ....................................................................................................23

*Daniels v. Nat'l Credit Sys., Inc.*, 719 F. Supp. 3d 1165 (D. Colo. 2024) ............................................................................... 62, 64, 65

*DeAndrade v. Trans Union LLC*, 523 F.3d 61 (1st Cir. 2008)................... 54, 55, 63

*Denan v. Trans Union LLC*, 959 F.3d 290 (7th Cir. 2020) ....................... 54, 55, 63

*Doyle v. Trans Union*, 638 F. App'x 559 (8th Cir. 2016) ......................................40

*Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305 (11th Cir. 2018) ............................................................................. 44, 56, 57, 68

*Frazier v. Dovenmuehle Mortg., Inc.*, 72 F4th 769 (7th Cir. 2023) ....................................................................................................56

*Gross v. CitiMortgage, Inc.*, 33 F.4th 1246 (9th Cir. 2022)................. 18, 19, 28, 48

*Hampton v. Barclays Bank Del*., 478 F. Supp. 3d 1113 (D. Kan. 2020) ................................................................................................60

*Holden v. Holiday Inn Club Vacations Inc*., 98 F.4th 1359 (11th Cir. 2024) ................................................. 19, 25, 38, 50, 56

*IBP, Inc. v. Alvarez,* 546 U.S. 21 (2005) ..................................................................20

*Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426 (4th Cir. 2004) ...........................42

*Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977 (10th Cir. 2019) ................................................................................................66

*Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173 (10th Cir. 2013) ................................................................................ 17, 27

*Mader v. Experian Info. Sols., Inc*., 56 F.4th 264 (2d Cir. 2023)19, 24, 26, 50, 51, 54

*Maiteki v. Marten Transp. Ltd*., 828 F.3d 1272 (10th Cir. 2016)......... 17, 57, 60, 67

*Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017) ................................................................................................19

*Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212 (11th Cir. 2023) ................................................................................................56

*Momou v. SSM Healthcare of Wis., Inc.*, No. 23-3167, 2024 U.S. App. LEXIS 12140 (10th Cir. May 21, 2024)..................................................39

*Paulino v. W. Funding II Inc*., 737 F. Supp. 3d 1338 (S.D. Fla. 2024) ................................................................................................52

*Peoples v. Equifax Info. Sols*.,3:23-cv-495-MOC-DCK, 2023 U.S. Dist. LEXIS 187444 (W.D. N.C. Oct. 18, 2023) ......................................23

*Race v. JPMorgan Chase Bank, N.A*., No. 24-cv-01989-REB-KAS, 2025 U.S. Dist. LEXIS 85627 (D. Colo. 2025)................... 18, 19, 28, 48

*Remaly v. Wyndham Resort Dev. Corp*., 2021 U.S. Dist. LEXIS 226267 (D. Colo. Nov. 23, 2021) ........................................................17

*Reyes v. Equifax Info. Servs., L.L.C*., No. 24-40415, 2025 U.S. App. LEXIS 14672 (5th Cir. 2025) ......................................... 19, 26, 27, 50, 54

*Roberts v. Carter-Young, Inc*., 131 F.4th 241 (4th Cir. 2025)19, 27, 38, 42, 43, 47, 50, 54, 55, 56

*Romero v. Monterey Fin. Servs., LLC*, No. 19cv1781 JM (KSC), 2021 U.S. Dist. LEXIS 15934 (S.D. Cal. 2021)..................................61

*Rozov v. Bank of Am., N.A*., No. 24-13034, 2025 U.S. App. LEXIS 14033 (11th Cir. 2025) ....................................... 36, 44, 45, 46

*Saunders v. Branch Banking & Tr. Co*., 526 F.3d 142 (4th Cir. 2008) ................................................................................20

*Sepulvado v. CSC Credit Servs*., 158 F. 3d 890 (5th Cir. 1998).............................23

*Sessa v. Trans Union, LLC* ,74 F. 4th 38 (2nd Cir. 2023) ................................. 25, 26

*Shimon v. Equifax Info. Servs., LLC*, 994 F. 3d. 88 (2nd Cir. 2021) ................................................................................24

*Suluki v. Credit One Bank, NA*., 138 F.4th 709 (2d Cir. 2025) ............ 18, 43, 44, 50

*Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 132 S. Ct. 1997, 182 L. Ed. 2d 903 (2012)..........................................................19

*Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993)................................41

Tilley v. Global Payments, Inc., 603 F. Supp. 2d 1314 (D. Kan. 2009) ................................................................................49

*United States v. Thomas*, No. 1:22-cr-00462-DHU, 2022 U.S. Dist. LEXIS 138460 (D.N.M. 2022) ....................................................41

*Ware v. Unified Sch. Dist.*, 881 F.2d 906 (10th Cir. 1989) .....................................50

*Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232 (10th Cir. 2015) ............................................................... 18, 48, 54, 62, 63, 64

*Zamora v. Mt. Am. Credit Union*, No. 1:22-cv-89, 2023 U.S. Dist. LEXIS 13612 (D. Utah Aug. 3, 2023) .......................................56

*Zuchel v. Denver*, 997 F.2d 730 (10th Cir. 1993)....................................................40

**Federal Statutes**

15 U.S.C. § 1681d .................................................................................22

15 U.S.C. § 1681i ................................................................. 17, 20, 65

15 U.S.C. § 1681n .................................................................................17

15 U.S.C. § 1681o .................................................................................17

15 U.S.C. § 1681p .................................................................................10

15 U.S.C. § 1681s-2 ............................................. 10, 17, 20, 21, 22, 64

15 U.S.C. §1681e .................................................................................20

28 U.S.C. § 1331 ..................................................................................10

29 U.S.C. § 1291 ..................................................................................10

**Other Authorities**

Accuracy, Merriam-Webster.com Dictionary, Merriam-
    Webster, https://www.merriam-
    webster.com/dictionary/accuracy (last visited July 14, 2025)..........................21

Readily, Merriam-Webster.com Dictionary, Merriam-Webster,
    https://www.merriam-webster.com/dictionary/readily    (last
    visited July 19, 2025)..........................................................................47

Webster's Third International Dictionary at 13-14 (1961)............................... 20, 47

**Regulations**

12 C.F.R. 1022.41 ........................................................................ 19, 20

12 C.F.R. 1022.43 ..................................................................................19

## RULE 28.2(C)(3) – STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

### District Court's Jurisdiction

The district court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." Plaintiff's suit against NCS was based upon the alleged violation of the Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681s-2(b). (App. Vol. 1 at 033.) "An action to enforce any liability created under [the FCRA] may be brought in any appropriate United States district court, without regard to the amount in controversy…." 15 U.S.C. § 1681p.

### Court of Appeals Jurisdiction

This Court has jurisdiction over this appeal pursuant to 29 U.S.C. § 1291 because the judgment below (App. Vol. 2 at 102) is a final judgment of the United States District Court.

### Timeliness of Appeal

The district court judgment was signed on June 25, 2024. (App. Vol. 2 at 103). NCS filed a Motion for Judgment Notwithstanding the Verdict pursuant to Rule 50, and alternatively, Motion for New Trial and alternatively, Motion for Remittitur,

both pursuant to Rule 59 and for Rule 59(e) Amendment of Judgment on July 23, 2024. (App. Vol. 2 at 104). The trial court denied NCS's post-trial motions by order entered on February 3, 2025. (App. Vol. 3 at 154). Plaintiff filed its Notice of Appeal on March 4, 2025. (App. Vol. 3 at 197).

**Final Judgment**

This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the trial court erred by failing to apply the objectively and readily verifiable standard to evaluate Ward's disputes under the FCRA. (Raised: App. Vol. 2 at 121-123) (Ruled: App. Vol. 3 at 162-163).

2. Whether the trial court erred by failing to determine whether Ward made a prima facie showing that the disputed credit information furnished by NCS was inaccurate under the FCRA, i.e., that it was objectively and readily verifiable. (Raised: App. Vol. 1 at 93; Vol. 2 at 35; Vol. 10 at 42; Vol. 1 at 261; Vol. 10 at 256; Vol. 2 at 111) (Ruled: App. Vol. 1 at 107; Vol. 2 at 37; Vol. 2 at 22; Vol. 10 at 43-44; Vol. 11 at 2-10; Vol. 3 at 157).

3. Whether the trial court erred when it refused to grant NCS judgment as a matter of law due to Ward's failure to show that the information NCS furnished to the consumer reporting agencies was inaccurate. (Raised: App. Vol. 2 at 111) (Ruled: App. Vol. 3 at 157).

4. Whether the trial court erred when it refused to grant NCS judgment as a matter of law when the Texas state court judgment against Ward for the debt conclusively establishes that the information NCS reported to the consumer reporting agencies was accurate. (Raised: App. Vol. 2 at 118-122) (Ruled: App. Vol. 3 at 159-160).

5.  Whether the trial court erred when it refused to grant NCS judgment as a matter of law when Ward's dispute necessarily required NCS to make a subjective determination based on Ward's veracity in the absence of objectively and readily verifiable information. (Raised: App. Vol. 2 at 121-123; Vol. 10 at 256) (Ruled: App. Vol. 11 at 2-10; Vol. 3 at 162-163).

6.  Whether the trial court erred when it refused to grant NCS judgment as a matter of law based on Ward's failure to establish the causation element necessary to prevail on his claim under the FCRA that NCS failed to conduct a reasonable investigation of his dispute. (Raised: App. Vol. 2 at 128) (Ruled: App. Vol. 3 at 169-170).

7.  Whether the trial court erred when it refused to include a proper jury instruction and/or question on the causation element necessary to prevail on his claim under the FCRA that NCS failed to conduct a reasonable investigation of his dispute. (Raised: App. Vol. 10 at 42; Vol. 1 at 261) (Ruled: App. Vol. 10 at 43-44; Vol. 2 at 22).

## STATEMENT OF THE CASE

This FCRA case involves Appellee Robbin Ward's denial that he provided his personal identifying information and a copy of his Colorado driver's license to his daughter, Quen Green, for the purpose of helping her obtain a rental house in Dallas, Texas for her and Ward's granddaughter. (App. Vol. 3 at 213-237). A delinquent debt from that rental was provided by the landlord to Appellant National Credit Systems, Inc. ("NCS") for collection. (App. Vol. 3 at 202). Following Ward's disputes to the consumer reporting agencies ("CRAs") regarding that debt in his credit file, NCS verified the information in Ward's credit file. (App. Vol. 3 at 202-208 [at each code "RPC23"]). Ward thereafter filed suit against the CRAs and NCS for violating the FCRA by failing to conduct a reasonable investigation of his

dispute. (App. Vol. 1 at 33). The CRAs settled before trial. NCS obtained a partial summary judgment on the issue of any willful violation of the FCRA (App. Vol. 1 at 107) and Ward's economic damages (App. Vol. 1 at 100), with the remaining claim – negligent violation of FCRA § 1681s-2(b) for non-economic damages proceeding to trial (App. Vol. 1 at 100-107).

After a four-day jury trial, the jury returned a verdict, finding NCS liable under the FCRA and awarding $500,000 in non-economic damages. (App. Vol. 2 at 98). NCS appeals the Final Judgment (App. Vol. 2 at 102) adopting the jury's findings and appeals the trial court's Order on Post Trial Motions (App. Vol. 3 at 154). APP at D, E.

## STATEMENT OF FACTS

In January 2019, Ward's daughter, Quen Green, used Ward's personal information and a copy of his driver's license to apply for and obtain a rental home in Ward's name from Main Street Renewal, LLC (the "landlord"). (App. Vol. 2-017; Vol. 5 at 110-117, 216-234). When completing the application, Green submitted her Neiman Marcus paystubs but using Ward's name and Colorado address (App. Vol. 3 at 210, 216, 222), used her own telephone as Ward's telephone number (App. Vol. 3 at 216, 222; Vol. 5 at 110), included herself as Ward's emergency contact (App.

Vol. 5 at 111) and created a Social Security benefits letter with Ward's name and address (App. Vol. 3 at 209).

In June 2019, due to non-payment on the account, the landlord filed for an eviction and obtained a Texas state court judgment against Ward for possession and monetary damages. (App. Vol. 5 at 169-173; Vol. 10 at 179, 184-85). In December 2019, the landlord placed the account with NCS for collection. (App. Vol. 3 at 202). As part of the collection process, NCS began furnishing information on the account to the CRAs in February 2020. (*Id*. at 2/21/2020 entry).

From June to September 2020, Ward made a series of direct disputes to NCS, as well as indirect disputes (disputes made to the CRAs) (App. Vol. 3 at 201-208, 213-237; Vol. 4 at 2-3, 24-29; Vol. 5 at 235-265), regarding the account. Following NCS's verifications of the account in response to the indirect disputes (App. Vol. 3 at 202-208; Vol. 5 at 262 -each RPC or Response Code "23"), Ward filed suit against the CRAs and NCS for allegedly failing to conduct a reasonable investigation of Ward's disputes. The CRAs settled before trial.

The trial court, in ruling on NCS's Motion for Summary Judgment, denied Ward's claim for willful violation of FCRA § 1681s-2(b) under FCRA § 1681n, thus extinguishing Ward's claim for statutory and punitive damages. (App. Vol. 1 at 107). The trial court also disposed of any claim for economic damages, ruling that Ward failed to establish any economic damages. (App. Vol. 1 at 100). However, the court

denied the motion (a) on the issue whether a legal dispute barred Ward's claim (whether Ward established that the account information was inaccurate) (App. Vol. 1 at 107-115), and (b) finding that a fact issue existed as to Ward's claim for a negligent violation of § 1681s-2(b) under FCRA § 1681o, and if successful on liability, whether Ward could establish any emotional distress (non-economic) damages. (App. Vol. 1 at 116).

The facts detailed in Section II.B. detail the information provided to NCS, and the facts detailed in Section VI.B outline the details of NCS's investigations. Those investigations included an examination of all documents and information provided by Ward, the CRAs, and the landlord, as well as NCS's three verification communications with the landlord, and examination of the matching driver's licenses in the landlord's file and from Ward's disputes. While fraud on the landlord may have been evident from the investigations, Ward's participation – whether he was the victim of familial fraud by his daughter, or whether he was complicit in the fraud, required accepting the subjective veracity of Ward's denial. NCS verified the account in response to all disputes.

## SUMMARY OF THE ARGUMENT

NCS urges the Tenth Circuit to adopt the standard recently embraced by the Second, Fourth, Fifth, and Eleventh Circuits: that disputed credit information must be "objectively and readily verifiable" to be actionable. Applying this standard here, Ward cannot establish inaccuracy in the information NCS furnished because his identity theft claim was neither objectively nor readily verifiable for several reasons:

1. The information available to NCS was not objectively or readily verifiable;

2. The dispute required NCS to weigh Ward's credibility against documentary evidence supporting his liability—a subjective determination;

3. A Texas judgment conclusively established Ward's liability for the debt; and

4. The dispute amounted to an improper collateral attack on the validity of that debt.

Moreover, even if the reported information were inaccurate, NCS conducted a reasonable investigation as a matter of law because Ward failed to show causation—specifically, that a reasonable investigation would have produced a different outcome. Finally, even if the court erred in denying judgment on the causation issue, it also committed reversible error by failing to instruct the jury on the proper standard for reasonableness, including the required causation element.

# ARGUMENT

## I. The Tenth Circuit should follow its sister circuits in adopting the "objectively and readily verifiable" standard for evaluating disputes under the FCRA.

The FCRA requires furnishers, such as NCS, to report accurate information to the CRAs. *See* 15 U.S.C. § 1681s-2(a). The FCRA allows consumers to dispute the accuracy of information contained in their consumer reports by submitting a dispute to the CRAs which should be forwarded to the furnisher of the information for investigation. *See* 15 U.S.C. § 1681i(a)(2), § 1681s-2(b). If a data furnisher receives a dispute from a CRA (which is forwarded as an automated consumer dispute verification or "ACDV"), "the furnisher must take the following steps:

> (1) investigate the disputed information; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable."

*Maiteki v. Marten Transp. Ltd*., 828 F.3d 1272, 1275 (10th Cir. 2016). The FCRA gives consumers a private right of action for violations of this obligation. *See* 15 U.S.C. § 1681n(a), § 1681o. The standard against which a furnisher's investigation is measured is one of "reasonableness," not whether the results of the investigation were accurate. *See Maiteki* at 1275 (citations omitted); *Remaly v. Wyndham Resort Dev. Corp*., 2021 U.S. Dist. LEXIS 226267, at *24 (D. Colo. Nov. 23, 2021)

("Courts look to the procedures employed by the furnisher rather than the results of the investigation."); *Alston v. United Collections Bureau, Inc.*, No. DKC 13-0913, 2014 U.S. Dist. LEXIS 27124, at *24 (D. Md. Mar. 4, 2014) ("the FCRA does not require perfection, only a reasonable response."); *Suluki v. Credit One Bank, NA.*, 138 F.4th 709, 714 (2d Cir. 2025) (The FCRA does not require furnishers to conduct perfect investigations—it requires only that furnishers conduct reasonable investigations).

### A. Before evaluating the reasonableness of an FCRA investigation, a plaintiff must establish that the information furnished was inaccurate or incomplete.

Before evaluating whether the furnisher performed a reasonable investigation, the consumer must establish that the information furnished was inaccurate or incomplete. To maintain an FCRA claim, the plaintiff is required to prove the information furnished was inaccurate or incomplete as a threshold matter. *See Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015) (holding that proof of "inaccuracy of the report" is essential to prevail on a § 1681i(a) claim); *Race v. JPMorgan Chase Bank, N.A.*, No. 24-cv-01989-REB-KAS, 2025 U.S. Dist. LEXIS 85627, at *11 (D. Colo. 2025) (An FCRA plaintiff must first "must make a prima facie showing of inaccuracy" to maintain a claim under the FCRA. (quoting *Gross v. CitiMortgage, Inc*., 33 F.4th 1246, 1251 (9th Cir. 2022)). "This order of

proof makes sense: if there is no inaccuracy, then the reasonableness of the investigation is not in play." *Race* at *11 (quoting *Gross*, 33 F.4th at 1251).

The Tenth Circuit has not specifically addressed the standard for determining whether disputed information is "inaccurate" under the FCRA. The Tenth Circuit should follow the recent opinions from the Second, Fourth, Fifth, and Eleventh Circuits holding that the information forming the basis of a consumer's FCRA dispute must be "objectively and readily verifiable information" to trigger a furnisher's liability for failing to perform a reasonable investigation of that dispute.[1]

## B. The FCRA gives the term "accuracy" its ordinary meaning.

Although "accuracy" is the linchpin of the FCRA, the statute leaves it undefined. "When a term goes undefined in a statute, we give the term its ordinary meaning." *Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1225 (10th Cir. 2017) (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566, 132 S. Ct. 1997, 182 L. Ed. 2d 903 (2012)). Dictionary definitions can help courts determine ordinary meaning.[2] *Medina*, 877 F.3d at 1213. Identical words used in different parts

---

[1] *See Mader v. Experian Info. Sols., Inc*., 56 F.4th 264, 269 (2d Cir. 2023)*; Roberts v. Carter-Young, Inc*., 131 F.4th 241, 252 (4th Cir. 2025); *Reyes v. Equifax Info. Servs., L.L.C*., No. 24-40415, 2025 U.S. App. LEXIS 14672, at *17 (5th Cir. 2025); *Holden v. Holiday Inn Club Vacations Inc*., 98 F.4th 1359, 1369 (11th Cir. 2024).

[2] The Code of Federal Regulations defines "accuracy," but in a different context not applicable here. 12 C.F.R. 1022.41(a)(1) defines the term "accuracy" in the context of direct disputes from consumers to data furnishers. *See*, 12 C.F.R. 1022.43 ("direct dispute"). The text of the FCRA further confirms that the regulation only applies to direct

of a statute are generally presumed to have the same meaning. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).

Importantly, the definition of "accuracy" bears the same meaning when applied to CRAs and data furnishers, such as NCS. The statute does not distinguish between the standard of "accuracy" used to measure a CRA's obligations and the standard of "accuracy" used to measure a furnisher's obligations. *Compare,* 15 U.S.C. §1681e, § 1681i with § 1681s-2(b). Courts have acknowledged the same standard as applying to both CRAs and furnishers. *See e.g., Saunders v. Branch Banking & Tr. Co*., 526 F.3d 142, 148 (4th Cir. 2008). "Accuracy" has the same meaning whether used in the context of a furnisher's obligations or a CRA's obligations.

## C. The ordinary meaning of "accuracy" contains a standard of objectivity.

The word "accuracy" is defined as "a: freedom from mistake or error . . .b: conformity to truth or to some standard or model." Webster's Third International Dictionary at 13-14 (1961). The definition has not materially changed over the past 60 years, to wit, "1: freedom from mistake or error . . . 2a: conformity to truth or to

---

disputes. 15 U.S.C. § 1681s-2(a)(8)(A) ("The Bureau…shall jointly prescribe regulations…based on the direct request of a consumer."). By its own terms, the definition of "accuracy" applies only to Subpart E and Appendix E of the Regulation. 12 C.F.R. 1022.41(a)(1). Neither Subpart E nor Appendix E are involved in the *indirect* dispute process which is the basis of Ward's claims under § 1681s-2(b). ("indirect dispute").

a standard or model . . .b: degree of conformity of a measure to a standard or a true value." Accuracy, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/accuracy (last visited July 14, 2025). Both definitions refer to a "standard," a "model," and to "truth" against which something is to be measured. The "standard," "model," or "truth" is fixed in nature and serves as the constant of "correctness" against which a thing is to be compared. By its terms, the meaning of "accuracy" involves the exercise of measurement against something certain, something *objective.* A thing cannot be "accurate" if the "standard" or "truth" against which it is measured is not certain or cannot be known. The ordinary meaning of the word "accuracy" therefore means *objective* accuracy when used in the FCRA.

### D. Throughout the FCRA, the term "accuracy" is used to mean *objective* accuracy.

Use of "accuracy," "accurate," and "inaccurate "throughout the FCRA is consistently objective. For example, the statute prohibits data furnishers from reporting information to a CRA if a consumer notifies the data furnisher that the information is inaccurate and "the information is, in fact, inaccurate." 15 U.S.C. § 1681s-2(a)(1)(B). It is not sufficient that a consumer subjectively believes the information to be inaccurate. Instead, the information must actually be inaccurate. The phrase "in fact" serves as the "standard" or "truth" against which the reported

information is measured and clearly indicates that it must be objectively based on measurable fact. It is a direct reference to the objective nature in which the statute refers to the accuracy of information.

The statute also provides specific objective criteria to determine the accuracy of information on consumer reports relating to defaulted student loans. 15 U.S.C. § 1681s-2(a)(E). There, removal of defaulted student loan information from a consumer's credit file will not be considered inaccurate if (1) the financial institution offers a loan rehabilitation program, (2) that program requires monthly on-time payments, and (3) the payments are made. 15 U.S.C. § 1681s-2(a)(E). These steps provide a "standard or model" against which to measure the accuracy (or its opposite, inaccuracy) of a consumer report which omits student loan information. Again, the statute's reference to the accuracy of information contained in a credit file is measured by three verifiable and objective criteria.

An additional signpost contained in the FCRA which points to the meaning of the word "accuracy" is found in the section of the FCRA which discusses public records. 15 U.S.C. § 1681d(d)(3). A CRA may publish an investigative consumer report containing information that is a "matter of public record and that relates to an arrest, indictment, conviction, civil judicial action tax lien or outstanding judgment" only if the CRA has first verified the accuracy of the information. 15 U.S.C. § 1681d(d)(3). Arrests, indictments, convictions, tax liens, and judgments can all be

verified to confirm the correctness of an investigative consumer report. Each of these pieces of information is objectively verifiable. The word "accuracy" is used consistently throughout the statute to mean objective accuracy.

**E. Prevailing case law interprets "accuracy" to mean "objectively verifiable accuracy."**

Courts throughout the country agree that "accuracy" must mean objective accuracy. For example:

- *Dalton v. Capital Associated Indus*., 257 F. 3d 409, 415 (4th Cir. 2001); (citing *Sepulvado v. CSC Credit Servs*., 158 F. 3d 890, 895 (5th Cir. 1998) (A credit "report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse [] effect.'")).

- *Cahlin v. General Motors Acceptance Corp.,* 936 F. 2d 1151, 1158 (11th Cir. 1991) ("Thus, the standard of accuracy embodied in Section 607(b) is an objective measure that should be interpreted in an evenhanded manner toward the interests of both consumers and potential creditors in fair and accurate credit reporting.");

- *Peoples v. Equifax Info. Sols*.,3:23-cv-495-MOC-DCK, 2023 U.S. Dist. LEXIS 187444, at *6 (W.D. N.C. Oct. 18, 2023) ("Plaintiff's subjective belief is not sufficient to plead an inaccuracy: 'the standard of accuracy embodied in [the FCRA] is an objective measure'");

- *Butler v. Experian Info. Sols. Inc.,* 1:23-cv-02519-ELR-LTW, 2023 U.S. Dist. LEXIS 154386, at *3 (N.D. Ga. Aug. 25, 2023) ("Plaintiff's subjective 'beliefs' about tradelines are not enough to state an FCRA claim. The FCRA's accuracy standard 'is an objective measure.'"); adopted by *Butler v. Experian Info. Sols. Inc.,* 1:23-cv-02519-ELR, Docket Entry 13 (N.D. Ga. Sept. 15, 2023); and

- *Bueno v. Univ. of Miami,* 22-22831-Civ-Scola, 2023 U.S. Dist. LEXIS 72958, at *8 (S.D. Fla. Apr. 26, 2023) ("The Plaintiff fails to identify

an actual, objective inaccuracy with this credit report to support his FCRA claim against the University.").

These holdings consistently instruct that to be "inaccurate" the information must be "patently," i.e., clearly and without a doubt, incorrect. To be "patently incorrect" means that the thing does not conform to the clear standard of correctness.

The Second Circuit addressed the meaning of "accuracy" and twice held that disputed information must be "objectively and readily verifiable" to be actionable under the FCRA. In *Mader v. Experian Info., Sols. Inc*., the court relied on the definition of "accuracy" as "freedom from mistake or error" and "conformity to truth or to some standard or model"—and concluded that accuracy required a focus on objectively and readily verifiable information. 56 F.4th 264, 269 (2nd Cir. 2023). This conclusion is consistent with that court's prior precedent that an inaccuracy must be "patently incorrect or …misleading." *Id.* (citing *Shimon v. Equifax Info. Servs., LLC*, 994 F. 3d. 88, 91 (2nd Cir. 2021)). A dispute that evades objective verification or is not sufficiently objectively verifiable is not a dispute which challenges the "accuracy" of information contained in a consumer report. *Id.* Therefore, the dispute was not about an inaccuracy under the FCRA. *Id.*

Shortly after *Mader*, the Second Circuit confirmed that a dispute must be "objectively and readily verifiable" to be actionable under the FCRA. In *Sessa*, the court adopted *Mader's* reasoning that an FCRA claim alleges an inaccuracy only "so long as the challenged information is objectively and readily verifiable." *Sessa v.*

*Trans Union, LLC* ,74 F. 4th 38, 40 (2nd Cir. 2023). The Second Circuit again concluded, "in determining whether a claimed inaccuracy is potentially actionable under [the FCRA], a court must determine…whether the information in dispute is 'objectively and readily verifiable.'" *Id*. at 43. If a consumer's dispute does not challenge the accuracy of information contained in a credit file in a way that is objectively verifiable, then the FCRA does not apply.

The Eleventh Circuit adopted the objectively and readily verifiable standard in *Holden v. Holiday Inn Club Vacations Inc*., 98 F.4th 1359, 1369 (11th Cir. 2024). There, the plaintiffs and original creditor/data furnisher disagreed on the plaintiffs' liability under timeshare purchase agreements, specifically whether they could be canceled without further obligation. *Id.* at 1364. The court, relying on the ordinary meaning of "accuracy," adopted the standard in *Sessa*, holding that "in determining whether a claimed inaccuracy is potentially actionable under [§ 1681s-2b], a court must determine, *inter alia*, whether the information in dispute is "objectively and readily verifiable." *Id.* at 1369 (citing *Sessa* quoting *Mader*). In applying the standard, the court found that "the alleged inaccurate information is not objectively and readily verifiable because it stems from a contractual dispute without a straightforward answer." *Id.* at 1368.

The Fifth Circuit in *Reyes v. Equifax* most recently adopted the "objectively and readily verifiable" standard to determine whether the plaintiff presented a valid

FCRA claim. In *Reyes*, the plaintiff sued Equifax, alleging that it violated the FCRA by continuing to report a delinquent credit card account after she disputed the underlying charges, claiming identity theft by her mother and failure to conduct a reasonable investigation by Equifax. *Reyes v. Equifax Info. Servs., L.L.C.*, 2025 U.S. App. LEXIS 14672, 140 F. 4th 279 (5th Cir. 2025). Equifax moved for summary judgment on the basis that, among other things, there was no inaccuracy in its reporting. *Id*. at *7-8.

Reyes argued that when a CRA cannot, for whatever reason, verify the accuracy of disputed information, the FCRA requires the consumer reporting agency to delete the information because it "cannot be verified." *Id*. at *15. Explaining its rejection of that argument, the *Reyes* court adopted the Second Circuit's reasoning in *Mader*, where that court held that if an alleged inaccuracy "evades objective verification"—like inaccuracies that turn on legal disputes—it is not cognizable under the FCRA. *Id*. at *16-17 (citing *Mader* at 269-70). It explained that this reading is faithful to the statutory text and the legislative purposes behind the FCRA. *Id*. at *17. Although the FCRA "requires the prompt deletion if the disputed information is inaccurate or unverifiable," that step is not reached unless the alleged inaccuracy reported by the consumer reporting agency is first determined to be "sufficiently objectively verifiable" to be actionable under the FCRA. *Id*. (citing *Mader* at 270) and *Sessa*, 74 F. 4th at 40 ("[A]n FCRA claim alleges an 'inaccuracy'

so long as the challenged information is objectively and readily verifiable."); *cf.* *Roberts v. Carter-Young, Inc*., 131 F.4th 241, 251 (4th Cir. 2025) ("Inaccuracies that are objectively and readily verifiable do not include claims of tortious conduct that require a furnisher to evaluate the subjective nature of the parties' actions—such as claims of fraud or retaliation.")). Moreover, reading the FCRA to require the deletion of debt information because of inaccuracies which "cannot be verified" until all legal disputes are fully adjudicated would frustrate the FCRA's goal of ensuring "fair and accurate credit reporting." *Reyes* at *18.

Based on the reasoning advanced herein and the holdings in *Mader*, *Sessa*, *Holden*, *Roberts* (discussed in more detail at Section IV.A), and *Reyes*, the Tenth Circuit should adopt the "objectively and readily verifiable" standard when requiring an FCRA plaintiff to establish an actionable inaccuracy.

## II.    Ward failed to make a prima facie showing that the disputed information was "inaccurate" under the FCRA.

This Court reviews the trial court's threshold determination of accuracy de novo. *Llewellyn*, 711 F.3d at 1178. This review includes determinations about the existence of genuinely disputed material facts and whether, in this case, NCS is entitled to judgment as a matter of law. This standard requires the appellate court to apply the same legal standard as the district court without deference to the lower court's conclusions. *Id.*

27

As set out in Section I.A, an FCRA plaintiff first "must make a prima facie showing of inaccuracy" to maintain a claim under the FCRA. *Race,* 2025 U.S. Dist. LEXIS 85627, at *11 (quoting *Gross* at 1251). Ward failed to show an inaccuracy, regardless of whether evaluating the issue based on the information available to NCS at the time of the investigations, nor including the evidence admitted at trial. *See* Sections II.B and II.C below.

### A. NCS preserved the threshold "inaccuracy" issue for appeal by asking the trial court to first determine whether the information NCS furnished was inaccurate.

NCS moved for summary judgment on, among others, the issue of whether Ward could show that NCS's reporting to the consumer reporting agencies was inaccurate and whether it conducted a reasonable investigation (App. Vol. 1 at 93), which the trial court denied. (App. Vol. 1 at 114-115).

After the trial court denied NCS's summary judgment motion on the issue of inaccuracy, NCS sought permission during pretrial proceedings to argue that Ward's FCRA claim was barred because the information it reported to the CRAs was not inaccurate (both involving a legal—not factual—issue, and for the application of the objectively and readily verifiable standard). (App. Vol. 2 at 012; Vol. 10 at 42). The court erroneously denied this request, citing its prior summary judgment ruling as the "law of the case." (App. Vol. 10 at 144; Vol. 2 at 35-37). It also concluded that Ward's FCRA dispute was a factual one, focused solely on whether he was a victim

of identity theft (App. Vol. 2 at 36). However, in post-trial proceedings, the court later acknowledged that the dispute also turned on whether Ward authorized his daughter to use his information to obtain the lease (App. Vol. 3 at 163)—a determination that depended purely on Ward's credibility and was not objectively and readily verifiable (as argued in Section II.D, III, and IV).

NCS again asked the trial court during the charge conference to reconsider its prior ruling regarding whether Ward's dispute involved an actional inaccuracy under the FCRA, arguing the trial court's duty as a "gatekeeper" on the issue of inaccuracy. (App. Vol. 10 at 42). The trial court agreed that it was not an issue for the jury but then decided that objectively and readily verifiable was "subsumed" with respect to the jury question on inaccuracy. (App. Vol. 10 at 42-43). This decision was error. The issue was not "subsumed" in the jury question on accuracy. Instead, the law required the trial court to make a threshold determination of whether the information NCS reported to the credit bureaus was inaccurate at all. *See* Section I.A.

In a Rule 50(a) motion before the case was submitted to the jury, NCS implored the trial court to reconsider the question of whether Ward had met his burden to show that the disputed information NCS furnished to the CRAs was inaccurate. (App. Vol. 10 at 256-258). The trial court denied the Rule 50(a) motion based on "law of the case" and that there was no Tenth Circuit authority applying

the objectively verifiable standard to inaccuracies under the FCRA, despite the growing consensus of the applicability of that standard. (App. Vol. 11 at 10)

After trial, NCS raised the trial court's error again in its motion for judgment notwithstanding the verdict. (App. Vol. 2 at 111). The trial court erred again by denying the motion. (App. Vol. 3 at 160-163).

**B. Information and documents available to NCS at the time of its investigations.[3]**

At the time of the investigations, NCS had the following documents and information from the landlord:

- Lease application for a home in Dallas, Texas with Ward as the applicant, using his SSN, Colorado address (suggesting that he was relocating for job and family), and his daughter, Quen Green, located in Dallas as the emergency contact. (App. Vol. 5 at 110-117).

- The application was accompanied by a color copy of Ward's Colorado driver's license, income verification documents (paystubs with Neiman Marcus as the employer and Ward as the employee), and a Social Security benefits letter from the SSA bearing Ward's name and address. (App. Vol. 5 at 117, Vol. 3 at 209-212).

- Lease electronically signed by Ward as the tenant. (App. Vol. 5 at 216-231).

- Move Out Statement for the subject debt. (App. Vol. 10 at 186)

---

[3] With each indirect dispute (Ward's disputes made to the CRAs) forwarded to NCS for investigation, additional information and documents were accumulated. For purposes of the arguments here, NCS uses all the information and documents received and known at the time of the last dispute received.

At the time of the investigations, NCS had the following documents and information from Ward (and Ward's girlfriend at the time, Megan Henderson):

- Emails from Ward claiming he was a victim of identity theft regarding the landlord's account (App. Vol. 3 at 213-237), including the following:

  - June 12, 2020, email attaching an ID Theft Affidavit and FTC Identity Theft Report (discussed below) and a color copy of Ward's driver's license (App. Vol. 3 at 213-222); and

  - Emails from June 20-29, 2020, email admitting that (a) Ward was unsure how his identifying information was acquired for the alleged fraud (b) Ward provided his SSN and other information to his daughter, Quen Green,[4] (c) his daughter works at Neiman Marcus, and the paystubs are hers, with Ward's name affixed, and (d) the telephone number on the application is his daughters. Despite acknowledging those facts, Ward indicated that he believed the "thief" stole both his and his daughter's documents to commit the fraud. (App. Vol. 3 at 223-237).

- Attached to the emails were Ward's paystubs from his Colorado employer, a letter from Colorado employer, and Ward's mortgage statements for his address in Colorado. (App. Vol. 3 at 225-228, 232-234).

- With respect to the ID Theft Affidavit and Identity Theft Report (and emails from Ms. Henderson on Ward's behalf), while Ward claims identity theft, admissions exist which cast doubt on his conclusory statements, e.g., his admissions that his information was not stolen or lost, that he provided his information to his daughter, and his daughter's information and paystubs that amplify the likelihood that Ward's daughter procured the lease using Ward's information. (App. Vol. 3 at 214-215, 222-223).

---

[4] Notably, in the July 10, 2020, email Ward stated he gave a copy of his driver's license to his daughter "last fall" which would have been almost a year *after* his daughter used the ID with the lease application submission, meaning that Ward would have provided his driver's license to his daughter twice. (App. Vol. 3 at 223).

At the time of the investigations, NCS had the following documents and information from the consumer reporting agencies ("CRAs") through automated consumer dispute verifications ("ACDVs"):

- The initial ACDVs included dispute codes for "not his/hers" and "not aware of collection" without supporting documentation (*see e.g.*, App. Vol. 4 at 2). Later ACDVs included dispute codes for "identity theft" and included Ward's FTC Identity Theft Report. (App. Vol. 4 at 24-32).

**C. Additional evidence admitted at trial related to the dispute and investigations of the dispute.**

Trial evidence included the following additional information and admissions:

- Ward and his wife, Ms. Henderson, both acknowledged that the application and documents submitted to the landlord indicate that his daughter was living in the landlord's home, but that they did not believe that fact until they were provided with a video of his daughter posted online living in the landlord's house, which NCS had produced in discovery. (Henderson: App. Vol. 9 at 20-22; Ward: App. Vol. 10 at 63. 75-76, 96).

- Ward admitted that NCS requested them to supply a police report in support of the identity theft allegation, but that they did not obtain one, claiming neither Dallas, Texas nor Colorado police would perform an investigation or take a report. (App. Vol. 10 at 104-106).

- The landlord testified that it had no reason to believe the lease was procured by identity theft, as the lease application and accompanying documents did not show irregularities that they would have examined pre-Covid when identity theft for a lease was rare. (App. Vol. 10 at 161-162, 192). The color copy of Ward's driver's license submitted with the application indicated to the landlord that it was used with Ward's permission, and that it is "fairly common" to see parents allowing their

adult children to use their information to obtain a home. (App. Vol. 10 at 168, 192-93).

- The landlord obtained an eviction judgment against Ward that included a monetary judgment for the debt that was still an active judgment. (App. Vol. 10 at 178-179, 184-85; Vol. 5 at 172). The judgment, on its face, states that the service of citation was "in person." (App. Vol. 5 at 172; Vol. 10 at 185).

- In response to emails from NCS asking for verification of the debt that included a copy of Ward's dispute and his ID Theft Affidavit and FTC ID Theft Report, the landlord testified it is their policy to verify the debt by reviewing their file that showed the amount owed, the monetary judgment against Ward for the debt, a color copy of the driver's license, lack of any police report, and lack any third party contact trying to invalidate the debt, and then respond to NCS and provide the documents in its file. (App. Vol. 10 at 159-161; Vol. 10 at 187-193).

- The landlord also testified that the color copy of the driver's license provided with the ID Theft Report was a "match" to the copy in its leasing file. (App. Vol. 10 at 192).

- The landlord believed, based on the application and exact match of the driver's license, that Ward and his daughter collaborated to obtain the lease. (App. Vol. 10 at 190-193, 200).

### D. Ward did not meet his burden to show that the information furnished to the CRAs was *objectively* and *readily* verifiable.

Ward claims that NCS's reporting was inaccurate because he is not liable for the debt. His liability depends on whether: (1) he signed the lease, or (2) he gave his daughter permission to sign his name on the lease or use his information in the leasing process. The following is a list of objective evidence that was available to NCS when it conducted its investigations:

- Ward's name was used as the lease applicant on the landlord's lease application; (App. Vol. 5 at 110-117)

- Ward's personally identifying information matched the information in the landlord's lease application file (social security and driver's license numbers); (App. Vol. 5 at 110-117; Vol. 10 at 192)

- The driver's license provided with Ward's disputes (App. Vol. 3 at 219) identically matched the driver's license submitted to the landlord with the lease application (App. Vol. 5 at 117);[5]

- The signature on Ward's Identity Theft Affidavit (App. Vol. 3 at 220) matched the signature on the driver's license submitted to the landlord with the lease application; (App. Vol. 5 at 117)

- Social Security benefits letter in the landlord's lease application file contained Ward's name and correct address in Colorado; (App. Vol. 3 at 209, 220)

- The ID Theft Affidavit provided to NCS indicated that Ward's ID had not been lost or stolen; (App. Vol. 3 at 215)

- The phone number in the landlord's lease application file for the lease applicant (Ward) belonged to Ward's daughter as admitted by Ward in the ID Theft Affidavit (App. Vol. 3 at 216) and FTC Identity Theft Report (App. Vol. 3 at 222);

- Ward's daughter (with her phone number) was listed as the emergency contact on the landlord's lease application; (App. Vol. 5 at 111)

---

[5] Ron Sapp, Kerry Sullivan, and John Ulzheimer all testified regarding the significant impact of a matching unaltered color copy of a driver's license as it would not be common in any actual identity theft which led the investigators to indicate that the account was valid). (Ulzheimer: App. Vol. 10 at 247-248; Sapp: App. Vol. 9 at 53, 136, 151, 157; Sullivan: App. Vol. 10 at 192).

- The pay stubs in the landlord's lease application file were from Neiman Marcus, the employer of Ward's daughter, although they bore Ward's name;[6] (App. Vol. 3 at 210-212; Vol. 10 at 99-100; Vol. 3 at 216)

- Ward provided documents indicating he was responsible for a mortgage in Colorado; (App. Vol. 3 at 228)

- Ward provided documents that he was employed in Colorado (App. Vol. 3 at 225-227), and not by Neiman Marcus, as had been indicated by the paystubs submitted with the lease application; (App. Vol. 3 at 210-212)

- Ward admitted that he "provided his social and other information" to his daughter; (App. Vol. 3 at 223)

- In response to NCS's debt verification inquiries to the landlord with a copy and description of Ward's disputes, the ID Theft Affidavit, and FTC Identity Theft Report, the landlord did not indicate any identity theft but affirmed the documents were accurate and that the ID in the leasing file matched the ID provided with the disputes. (App. Vol. 10 at 160, 187-193)

None of this information objectively exculpates Ward from liability under the lease. *See e.g.*, Sapp testimony regarding NCS's investigations at Vol. 9 at 87-88, 128-137, 147-158.   In contrast, the only "evidence" supporting Ward's dispute consisted of his protestations of innocence in his wife's emails, Ward's ID Theft

---

[6] Ward's name and address appeared to be slanted on the Neiman Marcus pay stubs, which Ward claimed should have been a red flag of fraud. (App. Vol. 3 at 210-212) But the only evidence at trial regarding whether this should have been an indication of fraud was the testimony from Stacey Holmes at the landlord that it was not a red flag, because it could have been slanted by a copy machine. (App. Vol. 10 at 191) Even if it was an indication of fraud, it would have only suggested that some fraud was being committed against the landlord, not fraud against Ward. (App. Vol. 10 at 193)

Affidavit, his Personal Statement in the FTC Identity Theft Report, and documents submitted with his disputes. In those documents, Ward claimed the following:

- He never lived in Texas, only Colorado (App. Vol. 3 at 228, 232-234);

- The phone number in the application was his daughter's (App. Vol. 3 at 222);

- He admitted that his daughter lives in Dallas and works at Neiman Marcus, and that the Neiman Marcus paystubs included with the application were his daughter's paystubs at her work address, but with his name (App. Vol. 3 at 216);

- He did not know what the Social Security benefits letter was (App. Vol. 3 at 216); and

- His daughter was allegedly affected by an unrelated ID theft issue (App. Vol. 3 at 222).

While it may be objectively verifiable whether Ward's daughter committed fraud on the landlord, it was not objectively verifiable whether Ward was complicit in that fraud.[7] *See e.g., Rozov v. Bank of Am., N.A*., No. 24-13034, 2025 U.S. App. LEXIS 14033, at *8 (11th Cir. 2025) ("[The CRA] would still need to confirm the veracity of the allegations Plaintiffs provided to the FBI. And the same is true for the information plaintiffs provided [to the furnisher/original creditor]; without simply taking [plaintiff] at his word, his protestations of innocence do not

---

[7] For example, Ward argued that an analysis of the IP address used to sign the lease and application would show that Ward did not sign the lease. However, as the IP address originated from Neiman Marcus, where Quen Green worked, it is equally likely that Ward provided his daughter permission to sign with his permission. App. Vol. 9 at 46.

demonstrate that his innocence is objectively and readily verifiable.") (discussed in more detail, *supra*).

The additional evidence admitted at trial established that a matching driver's license would rarely, if ever, indicate identity theft (App. Vol. 9 at 136, 151, 157; Vol. 10 at 190-193), that family members often provide their information to assist relatives in obtaining housing (App. Vol. 9 at 54, 160-61; Vol. 10 at 168, 192-93), and most importantly, that Ward was legally responsible for the debt by virtue of an eviction judgment including money damages the landlord obtained against Ward. (App. Vol. 5 at 172; Vol. 10 at 179, 184-85) (discussed in more detail, *supra*).

Notably, this case is in stark contrast to typical apartment lease identity theft cases where the inaccuracy is objectively and readily verifiable. For example, those cases generally include the following:

- Difference(s) between the ID of the debtor/ID theft victim and the purported ID theft perpetrator (as the ID provided during lease process typically has a different picture, different signature, etc.);

- Report by the debtor/alleged ID theft victim of lost or stolen ID;

- Police report providing verifiable details of the ID theft;

- Multiple fraudulent accounts, as opposed to a singular account;

- Some information on the lease application that clearly does not match the debtor/alleged ID theft victim; and/or

- Signature on leasing documents does not match signature of debtor/alleged ID theft victim's documentation.

These would be objectively verifiable indicators of ID theft/fraud in a typical case, none of which were present here.

As a matter of law, the trial court's analysis of Ward's dispute misapplied the legal standard applicable to measuring FCRA disputes because Ward's dispute was not objectively or readily verifiable by NCS under these facts and evidence.

"[P]urely factual or transcription errors" or a "straightforward application of law to facts" may constitute "objectively and readily verifiable" information; however, allegedly inaccurate information that "stems from a ... dispute without a straightforward answer" does not. *Holden*, 98 F.4th at 1368-69. Resolving the clash between the documentary evidencing linking Ward to the lease and his competing testimonial rejection of responsibility requires the application of a subjective credibility determination, which the FCRA does not require of furnishers. *Roberts*, 131 F.4th at 251. Not only was the dispute not objectively verifiable; the dispute was not readily verifiable, i.e., verifiable without hesitation, delay, or difficulty.

The evidence available to NCS at the time of Ward's dispute/investigation supported NCS's conclusion that Ward was responsible for the debt. That evidence reasonably pointed to the possibility that Ward's daughter used his driver's license and personal information to lease the home with Ward's knowledge or authorization. The evidence supporting Ward's complicity in what we now know was his

daughter's fraud[8] was conflicting. The determination of whether Ward was involved in his daughter's tortious conduct was not objectively and readily verifiable by NCS.

**III.    The trial court erroneously submitted the case to the jury because the Texas judgment conclusively proved Ward's liability for the debt and that the information NCS reported to the CRAs was accurate.**

A Texas judgment against Ward established, *as a matter of law*, that Ward owed the debt that NCS was reporting to the CRAs.[9] (App. Vol. 5 at 172)  Prior to the account being assigned to NCS for collection, the landlord obtained an eviction judgment against Ward from a court in Dallas County, Texas, which included an award of monetary damages. (App. Vol. 5 at 172). This judgment was entered on June 25, 2019 long before NCS reported the account to the CRAs in February, 2020. The judgment was admitted into evidence (App. Vol. 5 at 172), and NCS cited it multiple times in its motion for judgment notwithstanding the verdict. (*See* App. Vol. 2 at 111, 115, 118, 122-126, 130).

Because a court had already adjudicated Ward's liability for the debt, NCS's reporting was not inaccurate as a matter of law, precluding any FCRA violation. A

---

[8] Ward admitted that it was his daughter who used his information to obtain the lease, although he claimed that he did not realize that until trial. (App. Vol. 10 at 175-176)

[9] Notably, the full faith and credit clause mandates that this Court must afford the state judgment full faith and credit, "giving it the same preclusive effect as would the courts of the state issuing the judgment." *Momou v. SSM Healthcare of Wis., Inc.*, No. 23-3167, 2024 U.S. App. LEXIS 12140, at *6 (10th Cir. May 21, 2024).

state court judgment on the debt conclusively resolves the issue of accuracy, even if the *Rooker-Feldman* doctrine is inapplicable. *See Doyle v. Trans Union*, 638 F. App'x 559, 560 (8th Cir. 2016). Although NCS may not have known about the judgment when it investigated the dispute,[10] the court was aware of it at trial, and it definitively established that Ward was legally responsible for the account.

Without any inaccuracy in the reporting, there was no basis for the jury to assess whether NCS conducted a reasonable investigation. The issue should never have been submitted to the jury as no additional investigation would have revealed any inaccuracy, because there was none. *See Cahlin*, 936 F.2d at 1160. A judgment notwithstanding the verdict is appropriate where the evidence overwhelmingly supports one conclusion. *See Zuchel v. Denver*, 997 F.2d 730, 734 (10th Cir. 1993). Any challenge to the effect of the judgment must be brought in the appropriate Texas state court.

Accordingly, the trial court erroneously denied NCS's motion for judgment notwithstanding the verdict, and this Court should reverse and render judgment in NCS's favor.

## IV.    The trial court erred because Ward's dispute required a subjective evaluation of his credibility and was, therefore, not *objectively* or *readily* verifiable as a matter of law.

---

[10] Notably, the judgment was in the landlord's possession and would have been part of the landlord's review of the dispute documents submitted by NCS and would have influenced the landlord's verification of the debt to NCS. (App. Vol. 10 at 118-189)

Ward's dispute required NCS to evaluate his credibility and choose to believe him, despite contrary evidence linking him to the landlord's lease. Evaluating a witness's testimony is, necessarily, a subjective determination. *See, e.g., Thompson v. Sullivan*, 987 F.2d 1482, 1488-89 (10th Cir. 1993) ("'Objective'" evidence is any evidence, whether physiological or psychological, that can be discovered and substantiated by external testing. 'Subjective' evidence, on the other hand, consists of statements by a claimant or other witnesses that can be evaluated only on the basis of credibility.") (internal citations omitted); *see also United States v. Thomas*, No. 1:22-cr-00462-DHU, 2022 U.S. Dist. LEXIS 138460, at *6 (D.N.M. 2022) ("[E]vidence relating to witness credibility is often subjective."). This was especially true in this case, where Ward had an incentive to avoid the debt for himself and his daughter.

### A. Ward's denial of responsibility for the debt depended solely on his veracity, which was not *objectively* verifiable as a matter of law.

The Fourth Circuit's recent opinion in *Roberts v. Carter-Young, Inc.* is instructive as authority that NCS was not required to simply accept Ward's subjective claims that he was not responsible for the account. In *Roberts*, the plaintiff disputed an account on her credit report, claiming it was fraudulent because she believed her former landlord fabricated a debt for the purchase of a new stove and other unspecified damages just because she exercised her rights under the lease.

*Roberts* at 245-46. Carter-Young moved to dismiss the complaint, claiming that Roberts had failed to state a claim for failure to conduct a reasonable investigation of her indirect dispute because her dispute was legal rather than factual. *Id*. at 248. Carter-Young pointed to Roberts' characterization of the debt as fraudulent and retaliatory, arguing that those allegations required it to "make legal conclusions that the [landlord] retaliated against Roberts or committed fraud." *Id*. On appeal, Carter-Young argued that Roberts failed to state a valid FCRA claim because the term 'accuracy' used in Section 1681s-2(b) of the FCRA requires that disputes under that section be "objectively and readily verifiable" to trigger a furnisher's obligation to conduct an investigation of that dispute. *Id*. at 248-49.

The Fourth Circuit adopted the "objectively and readily verifiable" interpretation of "accuracy" under the FCRA, explicitly approving the Eleventh Circuit's opinion in *Holden* and the Second Circuit's opinion in *Sessa*. *Id*. at 251-52. The *Roberts* court explained that "[t]his understanding is consistent with our previous holding that an investigation into the accuracy and completeness of information in a credit report must be reasonable." *Id*. at 251 (citing *Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426, 430-31 (4th Cir. 2004) (holding that "creditors… [must] conduct a reasonable investigation" which involves "some degree of careful inquiry" into "their records to determine whether the disputed information can be verified"). "Requiring investigations that resemble full court

proceedings would not be reasonable." *Id*. The *Roberts* court further expanded on "objectively and reasonably verifiable" standard as follows:

> What it means for a dispute to be objectively and readily verifiable requires some fleshing out. Inaccuracy or incompleteness under the FCRA is not synonymous with legally recoverable or legally valid. For instance, a dispute that involves complex fact-gathering and in-depth legal analysis of the sort that courts would typically perform is not objectively and readily verifiable. ***A dispute that implicates unsettled questions of law and requires credibility determinations and quasi-discovery isn't either. Inaccuracies that are objectively and readily verifiable do not include claims of tortious conduct that require a furnisher to evaluate the subjective nature of the parties' actions—such as claims of fraud or retaliation.***

*Id*. (emphasis added).

Ward's dispute based on allegations of identity theft and tortious conduct by an allegedly unknown Neiman Marcus employee, and ultimately, the tortious conduct of his daughter, were not objectively and readily verifiable. Those allegations necessarily teetered the balance of evidence whether Ward consented to his daughter's use of his information versus the credibility of his denial as narrated in his disputes, which could not be objectively verified.

In *Suluki*, the plaintiff alleged that her mother stole her identity to fraudulently open and use a credit card account with Credit One Bank, although her mother stated that they opened the account together and the mother was paying and would continue to pay the balance. 138 F.4th at 715. Suluki disputed the account and provided an affidavit but did provide a police report as requested by Credit One. *Id*. at 716. Suluki

sued Credit One for violation of the FCRA for failing to conduct a reasonable investigation. *Id*. at 713. The district court denied Suluki's motion and granted summary judgment in favor of Credit One. *Id*. The *Suluki* court concluded that even assuming there were genuine issues of fact as to the reasonableness of Credit One's investigation, Suluki had not shown the existence of a genuine issue of fact as to whether a reasonable investigation would have uncovered additional evidence that would have led Credit One to determine that Suluki's mother opened the account in Suluki's name without her permission. *Id*. at 720-21 (citing *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018)). Just as in this case, there could be no FCRA violation by NCS, because there was no evidence that would have allowed NCS to objectively verify that Ward had not given his daughter permission to use his driver's license and personal information for the lease application. In contrast, a deeper investigation would have led to NCS obtaining the judgment from the landlord and further reinforcing that the debt was valid.

Equally instructive, *Rozov v. Bank of America, N.A.* highlights the difficulty investigating fraud disputes. *See Rozov* at *8 ("Fraud schemes are often complex and sifting perpetrator from victim is no easy process."). In *Rozov*, Bank of America reported to a CRA that the plaintiff had fraudulently deposited a check in his account. *Rozov* at *2. The plaintiff disputed the reporting, claiming that he was the victim of fraud, not the perpetrator. *Id*. at *2. He alleged that an acquaintance who had offered

him a job defrauded him into depositing a bogus check and requested that he make a wire transfer from the funds before the check cleared. *Id*. at *2-3. The plaintiff got suspicious, canceled the deposit, and reported the fraud to Bank of America and the FBI. After reviewing the dispute, Bank of America and the CRA verified their reporting of the fraud as accurate, and the plaintiff sued for violation of the FCRA. *Id*. at *3.

The Eleventh Circuit explained that it could not see how the CRA could objectively and readily verify whether the plaintiff intended to defraud Bank of America when he deposited a fraudulent check, especially when the original creditor, Bank of America, confirmed the accuracy of the account. *Id*. at *7. The plaintiff insisted that that the disputed information was objectively and readily verifiable because there was a "clear delineation" between a "perpetrator of a fraud and a victim of that same fraud." *Id*. The plaintiff argued that providing the CRA and Bank of America with his FBI victim report demonstrated that this determination was objectively and readily verifiable. *Id*. at *8. The Eleventh Circuit disagreed and explained that the CRA would still need to confirm the veracity of the allegations the plaintiff provided to the FBI and to Bank of America; and ruled that, without simply taking the plaintiff at his word, his dispute did not demonstrate that his innocence was objectively and readily verifiable. *Id*. The *Rozov* court held that:

fraud schemes are often complex and sifting perpetrator from victim is no easy process. While we must take Plaintiffs' version of events as true at the pleadings stage, [the CRA] had no such obligation. And confirming Martino's purported innocence was *not* the type of 'straightforward application of law to facts' that [the CRA] could objectively and readily verify.

*Id.* (emphasis added).

Just as the CRA in *Rozov* was not required under the FCRA to take the plaintiff at his word, neither was NCS. By doing so, NCS would have to ignore the objective evidence, indicating that Ward was responsible for the debt. Ward's "protestations of innocence do not demonstrate that his innocence is objectively and readily verifiable." *Id.* Therefore, as a matter of law, Ward's dispute was not objectively verifiable, and the trial court erroneously found that Ward had met his burden to prove that the information reported by NCS was inaccurate before submitting the case to the jury.

**B. Ward's subjective denial of responsibility for the debt was not *readily* verifiable information as a matter of law.**

The trial court erred in concluding that Ward's dispute was objectively verifiable. It found that Ward's daughter's use of his personal information to complete a lease application without his authorization was an objectively and readily verifiable fact—but failed to explain how NCS could have easily verified this. *See Rozov* at *8. The record shows that even after extensive litigation and a jury trial, far exceeding the investigative standard required under the FCRA, there was no clarity

for NCS to confirm whether Ward had authorized his daughter's use of his information. Thus, the trial court also overlooked the second prong of the accuracy standard: that the disputed information must be *readily* verifiable.

The word "readily" has been defined as "a: with prompt willingness; without hesitating, quibbling, or delaying …b: with fairly quick efficiency; without needless loss of time; reasonably fast; speedily." Webster's Third International Dictionary at 13-14 (1961). More recent definitions are the unchanged, for example, "a: without hesitating: WILLINGLY . . . b: without much difficulty: EASILY." Readily, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/readily (last visited July 19, 2025).

NCS could not have *readily* verified whether Ward's daughter used his driver's license and information with his knowledge or permission, because that required NCS to make a purely subjective determination of Ward's credibility. The FCRA does not require, or even allow, furnishers to make credibility determinations when evaluating disputes. *See Roberts* at 251. Furnishers are not tribunals. There was no evidence readily available that anyone with access to Ward's, Quen Green's, and Neiman Marcus' records were involved. Therefore, the only thing contradicting the objective information pointing to a combination of Plaintiff and his daughter obtaining the lease was his subjective denial of his involvement and unsubstantiated claim that someone at Neiman Marcus had to be responsible. Simply, NCS had no

means to verify Ward's unsubstantiated veracity "without hesitating, quibbling, or delaying … with fairly quick efficiency; without needless loss of time; reasonably fast; speedily." Therefore, as a matter of law, Ward's dispute was not *readily* verifiable.

### C. The trial court erroneously denied NCS's motion for judgment notwithstanding the verdict based on the wrongful conclusion that the jury had "implicitly" decided the facts regarding the lease in Ward's favor.

The trial court erroneously denied NCS's motion for judgment notwithstanding the verdict by concluding that "[w]hether Mr. Ward filled out the lease application or not—or whether his daughter filled it out with his permission—are objectively verifiable facts" that were "implicitly decided by the jury" in Ward's favor. (App. Vol. 3 at 163). This was a misapplication of FCRA standards.

First, whether information is inaccurate under the FCRA is a threshold legal question for the court—not the jury. *See Wright* at 1242 (plaintiff must prove "inaccuracy of the report" under § 1681i(a)); *Race at *11* (FCRA plaintiff must make a "prima facie showing of inaccuracy") (quoting *Gross* at 1251).

Second, the jury did not decide—implicitly or otherwise—whether Ward signed the lease or authorized his daughter to do so. The jury was asked in Question No. 1: "Did Plaintiff Robbin Ward prove that National Credit Systems, Inc. furnished inaccurate, incomplete, or misleading information to the credit reporting

agencies?" (App. Vol. 2 at 98). The only instruction it received to assist in answering

that question was "Before a furnisher, such as Defendant, has a duty to reasonably

investigate the notice of a dispute received from a CRA, Plaintiff must show that the

information furnished by NCS was inaccurate, incomplete, or misleading." (App.

Vol. 2 at 85). The jury was not instructed to determine whether the information was

"objectively and readily verifiable," nor was it given any legal framework to assess

that threshold issue, thus allowing the jury to make its own *subjective* determination.

Moreover, the trial court erred by refusing NCS's request for a jury instruction on

this point in light of the court's refusal to determine whether Plaintiff established a

prima facie case using the proper objectively and readily verifiable standard. App.

Vol. 1 at 261.

Third, the trial court fundamentally misunderstood the issue. The question

was not whether Ward or his daughter signed the lease with his permission. The

FCRA does not require furnishers to *correctly* resolve factual disputes; it only

requires them to conduct a reasonable investigation. *See Chiang* at 35; *see also,*

*Tilley v. Global Payments, Inc.*, 603 F. Supp. 2d 1314, 1322 (D. Kan. 2009)

("Significantly, Congress did not create a private right of action for violations of §

1681s-2(a). These duties can only be enforced by governmental agencies and

officials."). The threshold issue was whether the information NCS reported was

objectively and readily verifiable—before NCS's obligation to conduct a reasonable

investigation of Ward's dispute was triggered under the FCRA. *See Mader* at 269*; Roberts* at 252; *Reyes* at *17; *Holden* at 1369. If so, then the issue is whether NCS's investigation of the dispute was reasonable, regardless of whether NCS correctly determined if Ward signed the lease or if his daughter did so with his consent. *Suluki* at 714 ("The FCRA requires furnishers to conduct investigations into consumer disputes, but it does not guarantee that the results of those investigations will favor the consumer lodging the dispute. And to that end, the FCRA does not require furnishers to conduct perfect investigations -- it requires only that furnishers conduct reasonable investigations.").

Finally, the court also misapplied the appropriate standard, whether NCS could have objectively and readily verified the disputed information at the time of Ward's FCRA dispute, not whether the jury was able to do so after years of discovery and a trial. NCS, as a data furnisher under the FCRA, is not required to act as a tribunal regarding the veracity of Ward's dispute. *See e.g., Roberts* at 251 ("Furnishers are not expected to function as tribunals."). Moreover, our legal system assigns juries (or courts when acting as fact-finders) the exclusive task of determining the credibility of conflicting evidence. *See Ware v. Unified Sch. Dist.*, 881 F.2d 906, 912 (10th Cir. 1989) ("The weight given such subjective and contradictory evidence necessarily depends on an evaluation of the credibility of the witnesses, a function exclusively within the province of the jury.").

In short, the trial court's ruling rests on a flawed legal analysis. It ignored the threshold determination necessary for an inaccuracy under the FCRA, improperly shifted that determination to the jury without providing an instruction or question on the correct objective standard (*see infra* at Section VII), and misapplied the standard for a reasonable investigation. Accordingly, its denial of NCS's motion for judgment notwithstanding the verdict was clearly erroneous, and this Court should reverse the trial court and render judgment in favor of NCS.

### D. The trial court's reliance on the distinguishable case of *Paulino* was misplaced.

In denying NCS's Motion for Judgment Notwithstanding the Verdict, the trial court noted that the Second and Eleventh Circuit Courts of Appeal have held that "in determining whether a claimed inaccuracy is potentially actionable under section 1681e(b), a court must determine, inter alia, whether the information in dispute is 'objectively and readily verifiable.'" (App. Vol. 3 at 161) (quoting *Sessa* at 43 and *Mader* at 269). However, instead of following the well-reasoned guidance of the Second and Fourth Circuits, the trial court relied on a case from the Southern District of Florida in *Paulino v. Western Funding II, Inc.* (App. Vol. 3 at 162-163), which concluded that an FCRA plaintiff had plausibly alleged an inaccuracy because whether he executed disputed loan documents was objectively verifiable.

51

*Paulino* involved an identity theft victim who sought to hold an automobile lender (the original creditor and data furnisher) and several CRAs accountable under the FCRA for allegedly failing to investigate and block a fraudulently obtained auto loan from his credit reports. *Paulino v. W. Funding II Inc*., 737 F. Supp. 3d 1338, 1342 (S.D. Fla. 2024). Denying the CRAs' motion for judgment on the pleadings, the court ruled that the plaintiff had plausibly stated an FCRA claim because whether he did or did not execute the disputed loan was an objectively verifiable fact. *Id*. at 1347. However, in *Paulino*, the amended complaint specifically alleged that disputed loan account was associated with an SSN and personal identifying information *that was different from the plaintiff's*. *Id*. This allegation disposes of *Paulino's* application to this case.

The dispute in *Paulino* was objectively verifiable because the furnisher could simply compare the personally identifiable information of the person submitting the dispute (the plaintiff) with the personally identifiable information of the person who applied for and received the auto loan and determine that those persons were not the same individual. *See id*. Based on these specific allegations, the *Paulino* court concluded that the dispute was objectively verifiable. *Id*.

Here, in stark contrast, NCS repeatedly confirmed that the personally identifiable information matched (including the exact matching copies of Ward's driver's license). In addition, Ward's dispute involved suspicious information

connecting Ward and his daughter as the person procuring the lease, and that, to determine Ward was not complicit in the fraud required the acceptance of the veracity of his denial. Based on these completely incongruous facts, the trial court's reliance on *Paulino* was misplaced.

## V. Ward's dispute was also an impermissible collateral attack on the validity of the debt and was, therefore, not objectively and readily verifiable.

Ward's dispute raised legal issues that were not objectively and readily verifiable. Those issues included whether Ward was liable on the lease if his daughter used his information with his consent or knowledge; whether providing his information and copy of his driver's license for one purpose (to allegedly make him a beneficiary on a life insurance policy) but used for another (to obtain the lease) constituted theft of his identity or other tortious conduct; and whether Ward's daughter had apparent authority from Ward to use his driver's license and information for the lease application, and if so, whether he would be responsible for any resulting damages. Compounding those issues, the Texas judgment necessarily requires that Ward is legally responsible for the debt. All those issues involve legal determinations of fraud, apparent authority, contractual and tortious liability, and res judicata which prevent Ward's dispute from being objectively and readily verifiable.

"Inaccuracies that are objectively and readily verifiable do not include claims of tortious conduct that require a furnisher to evaluate the subjective nature of the

parties' actions—such as claims of fraud or retaliation." *Roberts* at 251. If an alleged inaccuracy "evades objective verification"—like inaccuracies that turn on legal disputes—it is not cognizable under the FCRA. *Reyes* at 279 (citing *Mader* at 269-70).

This court has held that a reasonable reinvestigation does not require CRAs to resolve disputes about the validity of the underlying debts they report. *Wright* at 1242 ("We agree that reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts."); *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68 (1st Cir. 2008) (holding a reasonable reinvestigation does not entail resolving legal issue[s] that a credit agency ... is neither qualified nor obligated to resolve under the FCRA")). "Because CRAs are ill equipped to adjudicate contract disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims." *Wright* at 1245.

A consumer's defense to a debt "is a question for a court to resolve in a suit against the [creditor,] not a job imposed upon [CRAs] by the FCRA." *Denan v. Trans Union LLC*, 959 F.3d 290, 296 (7th Cir. 2020) (citing *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010) ("The FCRA expects consumers to dispute the validity of a debt with the furnisher of the information or append a note to their credit report to show the claim is disputed.")). The correct way to resolve

legal defenses to alleged debts is in a lawsuit against the original creditor. *Denan* at 296. "If a court had ruled the [debt] invalid and [the CRA] had continued to report it as a valid debt, then [the consumer] would have grounds for a potential FCRA claim." *DeAndrade,* 523 F.3d at 68.

The objectively and readily verifiable standard does not require NCS to resolve the complex fact and in-depth legal issues that exist in this case between Ward, his daughter, the landlord, and the Texas judgment. *See Roberts* at 251. Because the issues raised by Ward's dispute could only be resolved by a court and fact finder, Ward's dispute was not objectively and readily verifiable by NCS and thus, not an actionable inaccuracy under the FCRA.

**VI.    Even if Ward established that the information furnished by NCS was inaccurate, the trial court erred by not finding that Ward failed to satisfy the required causation element on the issue of the reasonableness of NCS's investigation.**

**A. To prevail on an FCRA § 1681s-2(b) claim, the plaintiff must establish causation, specifically that had the furnisher conducted a reasonable investigation, the result would have been different.**

The Circuit Courts uniformly require an FCRA plaintiff to establish a causation element whether an investigation was unreasonable. Specifically, to prove an investigation was unreasonable, a plaintiff must point out facts the furnisher could have uncovered establishing that the reported information was, in fact, inaccurate. *See, e.g.*:

- *Chiang v. Verizon New Eng., Inc.*, 595 F.3d 26, 41 (1st Cir. 2010) (a Plaintiff must show that had a furnisher conducted a reasonable investigation, there would have been a different result.);

- *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018) ("Regardless of the nature of the investigation a furnisher conducted, a plaintiff asserting a claim against a furnisher for failure to conduct a reasonable investigation cannot prevail on the claim without demonstrating that *had* the furnisher conducted a reasonable investigation, the result would have been different; *i.e.*, that the furnisher would have discovered that the information it reported was inaccurate or incomplete, triggering the furnisher's obligation to correct the information."); cited by *Zamora v. Mt. Am. Credit Union*, No. 1:22-cv-89, 2023 U.S. Dist. LEXIS 13612, at *8 (D. Utah Aug. 3, 2023);

- *Frazier v. Dovenmuehle Mortg., Inc.*, 72 F4th 769, 775-76 (7th Cir. 2023) ("The federal circuit courts that have interpreted § 1681s-2(b) agree on two threshold requirements for a claim under the statute: 1. The plaintiff must make a prima facie showing that the data furnisher provided incomplete or inaccurate information. 2. The plaintiff must also show that the incompleteness or inaccuracy was the product of an unreasonable investigation—that is, had the furnisher conducted a reasonable investigation, it would have discovered that the data it provided was incomplete or inaccurate. We agree with their interpretations and adopt these requirements.") (footnote citations omitted)

- *Holden v. Holiday Inn Club Vacations, Inc.*, 98 F.4th 1398, 1367 (11th Cir. 2024 ("[T]o prove an investigation was unreasonable, a plaintiff must point out 'some facts the furnisher could have uncovered that establish that the reported information was, in fact, inaccurate or incomplete.'" (emphasis omitted) (citing *Milgram* that is quoting *Felts*, 893 F.3d at 1313);

- *Roberts v. Carter-Young, Inc.*, 131 F.4th 241, 245 n.4 (4th Cir. 2025) ("The parties do not dispute the basic elements of a FCRA claim, nor are the basic elements a topic of meaningful disagreement among our sister circuits. *See… Milgram v. Chase Bank USA, N.A.*, 72 F.4th 1212, 1218 (11th Cir. 2023) (holding that "*[f]irst*, a plaintiff cannot recover on a § 1681s-2(b) claim without identifying inaccurate or incomplete information that the furnisher provided to the reporting agency . . . [a]nd *second*, to prove an investigation was unreasonable, a plaintiff must point out 'some

facts the furnisher could have uncovered that establish that the reported information was, in fact, inaccurate or incomplete.'") (quoting *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018)) (emphasis in original).").

**B. NCS's investigation was reasonable as a matter of law, because Ward failed to establish what reasonable investigative action NCS should have completed that would have led to the discovery that the information reported was inaccurate.**

The Tenth Circuit held that a "reasonable investigation" is one that a "reasonably prudent person would undertake under the circumstances." *Maiteki* at 1275. How thorough the investigation must be depends on what information the CRA provides the data furnisher about the dispute. *Id*. (citing *Chiang* at 38). Therefore, whether NCS performed a reasonable investigation of Ward's dispute is evaluated based on what documents and information the CRA provided to NCS at the time of the investigations.

The information provided to NCS at the time of the disputes is detailed in Section II.B, including the information from the landlord, Ward, and the CRAs. Using that information, NCS performed the following actions during its investigations:

- Initial ACDV investigations (that did not include supporting documents) state that NCS "reviewed consumer's claim and information provided to us." Later ACDV investigations (after receipt of Ward/Ms. Henderson's emails and attachments) state that NCS "reviewed information submitted by consumer who claims true identity fraud." All the investigations included a comparison of personal identifiers to check for accuracy and matching information (between

ACDV information and landlord's information – all of which match),
and the investigators "reviewed the system notes for past efforts." (App.
Vol. 3 at 202-208; Vol. 9 at 72, 97-98).

- The account system information reviewed by the investigators includes
  the Account Notes (App. Vol. 3 at 202-208), and any other accounts
  with Ward's SSN. Those Account Notes and accounted system
  included:

  - a cut and paste of all email communications between Ward/Ms.
    Henderson's and NCS, including a reply from NCS providing the
    ID Theft Affidavit for Ward to fill out and return with a copy of his
    driver's license); (App. Vol. 3 at 202-208)

  - communications between NCS and the landlord (provided in more
    detail below); and

  - a prior unrelated collection account for Ward. (App. Vol. 9 at 141-
    147)

- The communications between NCS and the landlord show that, upon
  receipt of disputes from Ms. Henderson, NCS sent an email to the
  landlord with a detailed description of Ward's dispute and a copy of
  Ward's dispute. That process occurred three different times
  (06/19/2020, 07/30/2020, and 08/21/2020). (App. Vol. 3 at 203, 206,
  207). NCS asked the landlord for any information or documentation
  that would assist in the investigation such as driver's license, signatures
  for comparison, recollection of resident. (App. Vol. 3 at 203, 206, 208).
  In response, the landlord provided a copy of Ward's driver's license
  from its file (along with other documents) indicating in one response
  that "on our side the DL etc is a match" (App. Vol. 3 at 206), and in
  another response, "balance is correct and identifying docs are correct"
  (App. Vol. 3 at 208) (Landlords testimony regarding this process at
  App. Vol. 10 at 187-193)

- Specific investigators added in the Account Notes their determinations,
  including "this is not fraud" (App. Vol. 3 at 206) and "signatures are
  the same" (referring to Ward's signature on ID Theft Affidavit and his
  driver's license from the landlord). (App. Vol. 3 at 204).

- NCS's VP of Operations with 35 years of experience in rental debt collection operations and compliance, Ron Sapp, also testified regarding the following irregularities evident from the information and documents reviewed in the investigations:

  1. That it was exceedingly rare to have both the landlord and a consumer claiming identity theft supply the exact matching copy of a driver's license, which was the strongest indicator that this was not identity theft (Ulzheimer: App. Vol. 10 at 247-248; Sapp: App. Vol. 9 at 53, 136, 151, 157; Sullivan: App. Vol. 10 at 192).

  2. That Ward admits in the ID Theft Affidavit that his driver's license was not lost or stolen and that he did not know who used his information, but in the narrative of the Affidavit admits that his daughter's phone number is used as the applicant's phone number, his daughter's pay stubs are used as his, and his daughter is the emergency contact on the application – items that do not "add up" and suggest that Ward is involved in the fraud or complicit in it. (Vol. 9 Sapp testimony generally at 89, 96-98, 108-09, 112-13, 128-158, 164) (App. Vol. 10 landlord testimony generally, at 103-104, 112-113, 187-193).

  3. That this was Ward's second eviction account, which is also a red flag that would have been considered (App. Vol. 9 at 55-56).

  4. That NCS requested Ward to provide a police report, but he never received one (App. Vol. 9 at 97-98; Vol. 10 at 105-06); and

- Sapp also testified that [consistent with the landlord's trial testimony at App. Vol. 10 at 192-93], it is common for family members to allow other family members to use their identification to obtain housing (App. Vol. 9 at 160-161).

Ward contends that NCS failed to conduct a reasonable investigation. However, he failed to prove what information NCS could have uncovered in a reasonable investigation that would have allowed NCS to objectively and readily verify that the information it was reporting was inaccurate. In denying NCS's motion

for summary judgment on this issue, the trial court stated that NCS could have forensically examined internet protocol addresses (IP addresses) to determine whether the electronic lease application was submitted by Ward, his daughter, or some unknown employee at Neiman Marcus. (App. Vol. 1 at 113-114). Ward argued the same at trial. But such obligation transcends the boundaries of reasonableness under the FCRA. The FCRA does not require NCS to conduct exhaustive investigations; it only requires it to conduct reasonable investigations. *Maiteki* at 1276.

The trial court cited *Hampton v. Barclays Bank Del*., 478 F. Supp. 3d 1113 (D. Kan. 2020) to support imposing this obligation on NCS because the data furnisher in that identity theft case verified that plaintiff's account was valid by confirming the IP address on the plaintiff's loan application. (App. Vol. 1 at 144) (citing *Hampton*, 478 F. Supp 3d at 1131. However, that case is distinguishable because the data furnisher was also the original creditor. *Id*. at 1122. The original creditor, who was a party to the debt transaction and had direct dealings with the consumer, is in a much better position than a debt collector to verify the consumer's IP address. Second, it does not follow that, because the original creditor/data furnisher in *Hampton* verified the consumer's IP address, NCS has an absolute obligation to do the same for its investigation to be reasonable under the FCRA. The trial court also cited *Romero v. Monterey Fin. Servs., LLC*, No. 19cv1781 JM (KSC),

2021 U.S. Dist. LEXIS 15934, at *8 (S.D. Cal. 2021), where a trial court denied the furnisher's summary judgment motion because the furnisher did not trace the IP address used to sign the debt agreement. (App. Vol. 1 at 144). However, in that case, the plaintiff also gave the furnisher the information on the identity of the possible identity thief, which the furnisher failed to investigate, claiming that it was only obligated to search its own files. *Romero* at *8. That is in stark contrast to NCS's efforts in this case. Regardless, had NCS conducted such forensic analysis, it would have only confirmed that Ward's daughter signed the lease while at work at Neiman Marcus, not whether Ward provided consent for her to do so.

Ward failed to prove there was anything NCS could *reasonably* have done that would have made a difference in the outcome of its investigations. Therefore, there was no causal link between NCS's alleged failure to conduct a reasonable investigation and Ward's alleged injury or damage. Ward's FCRA claim, therefore, fails as a matter of law, and the trial court erred by failing to grant judgment notwithstanding the verdict.

### C. NCS's investigation was reasonable as a matter of law, because it was not required to act as the judicial arbiter of the validity of Ward's debt with the landlord.

Ward's dispute necessarily raised questions that could only be resolved by a judicial tribunal, which NCS was not required to resolve under the FCRA as a debt collector and data furnisher. As provided above and in Section II.B, the normal

61

indicia of identity theft were not present in this case. Instead, the facts and documents left the ultimate issue reliant on the veracity of Ward's dispute whether he was a victim of familial fraud or had authorized his daughter's use of his personal information, particularly when the objectively verifiable facts (matching identifiers, Ward's admission that he provided the information to his daughter, his daughter using his and as her own information to obtain the lease, the landlord verifying the debt on the matching driver's license copies, and the Texas judgment for the debt, conflicting with Ward's evidence that documents were falsified, and that he lived and worked in Colorado) do not resolve the issue of Ward's potential liability. That ultimate issue could only be resolved by judicial resolution between Ward and the landlord, and presumably, Ward's daughter.

When the dispute necessarily requires a judicial resolution, such as contested contractual liability or a question of law regarding the debt's validity, both of which exist in this case, the Tenth Circuit follows the majority view that the FCRA does not require the data furnisher to resolve that dispute and the FCRA claim fails. *See Wright* at 1242:[11]

---

[11] *See also,* the *Order Granting Motion for Summary Judgment* in Civil Action No. 1:22-cv-01048-DDD-JPO*, Coy L. Daniels v. National Credit Systems, Inc.*, 719 F. Supp. 3d 1165 (D. Co. Feb. 23, 2024). In the *Daniels* opinion, the Court explains that this rationale in favor of CRAs applies to data furnishers such as Defendant here, providing that, "[The FCRA] requires [an] investigation, and correction of mistakes and factual inaccuracies, **but does not provide a mechanism for resolving legal disputes about the status of a claimed debt**." (emphasis added) (citing *Chiang* at 27). (App. Vol. 1 at 139).

A reasonable reinvestigation, however, does not require [credit reporting agencies] to resolve legal disputes about the validity of the underlying debts they report. *See Carvalho v. Equifax Info. Servs., LLC,* 629 F.3d 876, 892 (9th Cir. 2010) ("We agree that reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts."); *DeAndrade v. Trans Union LLC,* 523 F.3d 61, 68 (1st Cir. 2008) (holding a reasonable reinvestigation does not entail resolving legal issue[s] that a credit agency ... is neither qualified nor obligated to resolve under the FCRA").

*See also Denan*, 959 F.3d at 296:

In this conclusion we join the First, Ninth, and Tenth Circuits in holding that a consumer's defense to a debt "is a question for a court to resolve in a suit against the [creditor,] not a job imposed upon consumer reporting agencies by the FCRA." *Carvalho*, 629 F.3d at 892 (quoting *DeAndrade*, 523 F.3d at 68); *accord Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1244 (10th Cir. 2015) (citing *Carvalho*, 629 F.3d at 892) ("The FCRA expects consumers to dispute the validity of a debt with the furnisher of the information or append a note to their credit report to show the claim is disputed."). The correct way to resolve legal defenses to Plain Green and Great Plains' loans was in a lawsuit against those lenders. "If a court had ruled the [loans] invalid and Trans Union had continued to report it as a valid debt, *then* [plaintiffs] would have grounds for a potential FCRA claim." *DeAndrade*, 523 F.3d at 68.

This Court has explained that:

A reasonable reinvestigation, however, does not require [credit reporting agencies] to resolve legal disputes about the validity of the underlying debts they report. *See Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir.2010) ("We agree that reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts.*"); DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68 (1st Cir.2008) (holding a reasonable reinvestigation does not entail resolving "legal

issue[s] that a credit agency ... is neither qualified nor obligated to resolve under the FCRA").

*Wright* at 1242. *Wright* and much of the caselaw on this point focuses on the role of credit reporting agencies, which NCS is not. *See, e.g., Carvalho* at 891 ("Because CRAs are ill equipped to adjudicate contract disputes, courts have been loath to allow consumers to mount collateral attacks on the legal validity of their debts in the guise of FCRA reinvestigation claims."). That is true of a credit reporting agency, which "is a third party, lacking any direct relationship with the consumer." *Id*. at 892 (cleaned up). But that step of removal from the dispute is not present here where the defendant is a "furnisher" under the law, but the rationale applies because it is not just reporting agencies that are ill-equipped to adjudicate contract disputes; so, too, is the FCRA itself. *Daniels v. Nat'l Credit Sys., Inc*., 719 F. Supp. 3d 1165, 1169 (D. Colo. 2024). The FCRA prohibits "furnish[ing] any information relating to a consumer to any [CRA] if the person knows or has reasonable cause to believe that the information is inaccurate" or "if the person has been notified by the consumer . . . that specific information is inaccurate [and] the information is, in fact, inaccurate." 15 U.S.C. § 1681s-2(a)(1). It requires investigation, and correction of mistakes and factual inaccuracies, but does not provide a mechanism for resolving legal disputes about the status of a claimed debt. *Daniels*, 719 F. Supp. 3d at 1169 (citing *Chiang* at 37). "Generally, unresolved contract disputes constitute legal disputes that are not factual inaccuracies." *Id*. Indeed, allowing reports to note that a debtor disputes a

debt is a recognition that such disputes exist, and should be taken into account by anyone looking at a credit report. *Id*. But it also shows that the FCRA process is not meant to resolve them. *Id*.; *see* 15 U.S.C. §§ 1681i(a)(6)(B)(iii), (iv); (b)-(c) ("the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information"); *Carvalho* at 892 ("In this way, potential creditors have both sides of the story and can reach an independent determination of how to treat a specific, disputed account.").

To decide whether Ward is right about his liability for the debt would potentially require, among other things, legal analysis of state contract law, choice of law doctrines, and estoppel principles, as well as factual inquiries into whose signature was on the lease. None of those things are contemplated under the FCRA. And even if they were, Ward's only response is to insist that he did not sign the lease and did not consent to his daughter's use of his information, which, even if true, leaves the rest of these questions unanswered.

**VII.    While the trial court erred by allowing the jury to determine the issue of the reasonableness of NCS's investigation, it also erred by failing to include a proper jury instruction on the causation requirement to determine reasonableness.**

The trial court refused to include a jury instruction regarding the causation element required to determine whether an investigation is determined to be unreasonable. NCS requested an instruction consistent with causation element

required, "A plaintiff asserting a claim against a furnisher for failure to conduct a reasonable investigation cannot prevail on the claim without demonstrating that had the furnisher conducted a reasonable investigation, the result would have been different." (App. Vol. 1 at 261). Regarding the element of reasonableness (Instruction 16), the trial court did not include the requested instruction, and for the element of causation (Instruction 17), the only instruction the trial court submitted to the jury was the following:

> To recover damages, Plaintiff must prove that Defendant's violation of the Fair Credit Reporting Act proximately caused his injuries. Proximate cause requires that the damage complained of by the Plaintiff is the natural, probable result of Defendant's investigation of Plaintiff's disputes.

(App. Vol. 2 at 86-87) The instructions provided ignore the fundamental requirement that objectively verifiable facts had to be readily available to NCS that could have been discovered had a reasonable investigation occurred that would have resulted in a deletion of the tradeline rather than a verification.

The Tenth Circuit reviews de novo whether, "as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 992 (10th Cir. 2019) (citations omitted). But it reviews a decision whether to give a particular instruction only for abuse of discretion. *Id*. If the instructions "as a whole adequately state[] the law, the refusal

to give a particular requested instruction is not an abuse of discretion." *Id*. (citations omitted).

The jury instructions in this case, as a whole, failed to correctly state the governing law and failed to provide the jury with an ample understanding of the issues and applicable standards because they omitted an essential requirement of Ward's FCRA claim—that a furnisher does not fail to conduct a reasonable investigation unless the consumer proves that a reasonable investigation would have yielded a different result regarding the dispute.

The trial court "rejected Defendant's request to include this language in the jury instructions because (1) there is no Tenth Circuit authority imposing such a requirement for FCRA liability and (2) such an instruction would, 'in some ways, go against' Tenth Circuit precedent establishing the requirements of a reasonable investigation under the FCRA. *See* [Day 3 Trial Tr. at 140:2-142:20]; *see also Maiteki* at 1275 (setting out the steps the furnisher must take to conduct a reasonable investigation under the FCRA)." (App. Vol. 3 at 170).

Initially, the trial court's concern regarding *Maiteki* is misplaced. In *Maiteki*, the court affirmed a summary judgment ruling where the district court determined as a matter of law that the "reasonableness of the [data furnisher's] procedures is beyond question" without the necessity for any causation analysis. *Maiteki* at 1275. And, importantly for the causation issue, this Court, in setting out the elements to

establish a reasonable investigation in *Maiteki*, relied upon the First Circuit opinion

in *Chiang*, which expressly requires the plaintiff to establish this causation element.

*See Chiang* at 41 (a plaintiff must show that had a furnisher conducted a reasonable

investigation, there would have been a different result.).

Secondly, the importance of the jury instruction requested by NCS is

explained in *Felts*:

> Absent that showing [of causation], a plaintiff's claim against a
> furnisher necessarily fails, as the plaintiff would be unable to
> demonstrate any injury from the allegedly deficient
> investigation. And, in turn, a plaintiff cannot demonstrate that a
> reasonable investigation would have resulted in the furnisher
> concluding that the information was inaccurate or incomplete
> without identifying some facts the furnisher could have
> uncovered that establish that the reported information was, in
> fact, inaccurate or incomplete.

*Felts* at 1309.

Without an instruction informing the jury of the correct causation standard,

the jury was left to determine whether NCS's investigation results verifying the

information furnished, caused Plaintiff's alleged emotional harm without the correct

analysis. Specifically, that Ward, to establish an unreasonable investigation, was

required to prove that NCS "could have uncovered some facts that establish the

reported information was, in fact, inaccurate or incomplete." As the court failed to

provide this required element of an FCRA claim in the jury instruction, the error

requires reversal of judgment. *See e.g., Advanced Recovery Sys. v. Am Agencies*, 923

F.3d 819, 827 (10th Cir. 2019) (A district court's failure to inform the jury of all the elements essential to a plaintiff's claim necessarily misleads the jury which requires reversal if the jury might have based its verdict on the erroneously given instruction) (citations omitted).

## CONCLUSION

WHEREFORE, Appellant, National Credit Systems, Inc. respectfully requests that the Court reverse the judgment of the District Court and render judgment in favor of National Credit Systems, Inc., dismissing Appellee Robbin Ward's claims with prejudice.

## RULE 28.2(C)(2) – STATEMENT REGARDING ORAL ARGUMENT

As FCRA standards have evolved over the past three years, NCS's appeal raises several novel issues for the Tenth Circuit. Unlike recent influential decisions from the Second, Fourth, Fifth, and Eleventh Circuits—which arose from motion practice—this appeal stems from a jury trial, adding unique procedural and substantive dimensions. Additionally, because the case involves identity theft—a growing concern for consumers and the credit industry—oral argument will provide the Court with an important opportunity to fully explore the implications of its potential ruling.

## RULE 32(g) CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as enlarged by this Court at Docket 21 to 15,500 words, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this Brief includes 1509 words.

By:   *s/John W. Bowdich*
JOHN W. BOWDICH

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion was served in accordance with Federal Rule of Appellate Procedure 25(b) and (c) upon Appellee's counsel of record via e-service and e-mail on this 23rd day of July, 2025.

*Via E-Service & via E-mail*
Matthew R. Osborne, Esq.
RAMOS LAW
10190 Bannock St., Suite 200
Northglenn, Colorado, 80260
Telephone: (303) 733-6353

*Via E-Service & via E-mail*
Craig Marchiando, Esq.
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 – Telephone

By:   *s/John W. Bowdich*
JOHN W. BOWDICH

No. 25-1078

# United States Court of Appeals
# For The Tenth Circuit

NATIONAL CREDIT SYSTEMS, INC.,

*Appellant,*

v.

ROBBIN WARD,

*Appellee.*

From The United States District Court for the District of Colorado
Cause No. 1:21-cv-02597-NYW-JPO
The Honorable Nina Y. Wang, Presiding

**APPELLANT'S BRIEF – RULE 28.2 APPENDIX**

John W. Bowdich
Texas State Bar No. 00796233
Bowdich & Associates, PLLC
8150 N. Central Espy., Suite 500
Dallas, Texas 75206
Telephone (214) 307-9500
Facsimile (214) 307-5137

*Attorney for Appellant National Credit Systems, Inc.*

## TABLE OF CONTENTS

| APP | Description | APP Page |
|-----|-------------|----------|
| A | Order [on NCS's MSJ] (05/12/2023) (Doc. 76) | 001 |
| B | Final Jury Instructions (06/21/2024) (Doc. 128) | 030 |
| C | Verdict Form (06/21/2024) (Doc. 130) | 064 |
| D | Final Judgment (06/25/2024) (Doc. 131) | 069 |
| E | Order on Post-Trial Motions (02/03/2025) (Doc. 153) | 072 |

Respectfully submitted,

By: _s/John W. Bowdich_____
    JOHN W. BOWDICH
    State Bar No. 00796233

BOWDICH & ASSOCIATES, PLLC
8150 N. Central Expy., Suite 500
Dallas, Texas 75206
(214) 307-9500 – Telephone
(214) 307-5137 – Telecopy
jbowdich@bowdichlaw.com

ATTORNEYS FOR APPELLANT
NATIONAL CREDIT SYSTEMS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this notice of service of this document by electronic means.

By: __s/John W. Bowdich_____
    JOHN W. BOWDICH

# APPENDIX A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No.   21-cv-2597-LTB-SKC

ROBBIN WARD,

         Plaintiff,

v.

TRANS UNION, LLC, et al.,

         Defendants.

---

## ORDER

This matter is before me on a Motion for Summary Judgment filed by Defendant National Credit Systems, Inc. ("NCS"). [**Doc #55**] Plaintiff Robbin Ward has filed a response to NCS's motion [Doc #62] opposing the relief requested, and NCS has filed a reply [Doc #63] and a supplemental brief [Doc #75]. Oral argument would not materially assist me in my determination of this motion. After consideration of the parties' briefs, and for the reasons stated, I GRANT IN PART AND DENY IN PART NCS's Motion for Summary Judgment.

## I.      BACKGROUND

Based on the briefing, the evidence submitted and the Final Pretrial Order entered in this case [Doc #61], the parties agree on the following facts, unless otherwise noted. (The Court reminds the parties that pursuant to Local Rule 56.1, "[a] motion under Fed. R. Civ. P. 56 for summary judgment or partial summary judgment shall include a statement of <u>undisputed facts</u> . . . ." D.C.COLO.LCivR 56.1(a) (emphasis added). A statement of undisputed facts is no place for a party's argument or advocacy which, unfortunately, is all too prevalent in the parties', and particularly NCS's seventeen-page Statement of Facts [Doc #55-1].)

On January 30, 2019, an online application was submitted to Main Street Renewal, LLC ("MSR" or the "Original Creditor") to rent real property located at 229 Cliff Heights Circle, Dallas, TX 75232. The online application includes the date and time for certain milestones that were completed throughout the online application process as well as the IP (Internet Protocol) address of the computer that was used to complete the application and initiate other pertinent communications. [Doc #55-3] (An "IP address" is the unique identifying number of a device connected to the internet. *Dallas Buyers Club, LLC v. Bowens*, Civil Action No. 15-cv-00010-WYD-MEH, 2015 WL 13215656, at *2 (D. Colo. Oct. 9, 2015), report and recommendation adopted, No. 15-cv-00010-WYD-MEH, 2015 WL 7738389 (D. Colo. Dec. 1, 2015).) The application was in the name of Plaintiff and contained his Colorado home address, the last four digits of his social security number, an email address (robbinward61@gmail.com) and income information. [Doc #55-3] The application lists Laquencilla Allen Antoinette Green, a.k.a. Quen Green (hereinafter "Quen Allen") as an emergency contact, noting the relationship as "Daughter." *Id*. The phone number provided on the application for Quen Allen matches her confirmed phone number. The address for Quen Allen, 624 Priscilla Lane, Desoto, TX 75115, is also provided on the application. *Id*. Color copies of Plaintiff's driver's license and social security card were provided with the application.

Plaintiff denies completing the rental application. He also denies providing anyone with his identifying information for that purpose and states that he provided his daughter with copies of his social security card and driver's license because she told him she needed them to add him as a beneficiary to a life insurance policy.

Income verification submitted with the rental application included pay stubs from the

2

**28.2 App-003**

company Neiman Marcus bearing Plaintiff's name [Doc #55-7], but Plaintiff denies having provided this information, denies ever having worked at Neiman Marcus (though he states in discovery responses in this case that his daughter, Quen Allen, was an employee of Neiman Marcus from 2015 to 2022) and asserts that the paystubs are fake. A letter from the Social Security Administration ("SSA") bearing Plaintiff's name as the addressee and indicating that disability benefits were being paid was also submitted with the rental application [Doc #55-8], however Plaintiff maintains that this document is also fake and denies having submitted such information or seeking it from the SSA. Plaintiff has stated in discovery in this case that he does not receive Social Security benefits but that his daughter, Quen Allen, does.

The rental application required disclosure of any felony convictions and pending criminal charges and the responses given on the application to these inquiries are "no." [Doc #55-3] In 2014, Quen Allen pled guilty to a felony of fraud use/possession of identity information. [Doc #55-22]

The rental application was approved and a lease was signed, with the commencement date of February 15, 2019 and expiration date of February 14, 2020 (the "Lease"). Not long after, MSR evicted the tenant at 229 Cliff Heights Circle for failure to pay rent under the Lease. (Plaintiff maintains that he was not the tenant.) MSR's attorney reported in a letter dated July 8, 2019 that on June 25, 2019 the court entered a final judgment in the eviction matter in favor of MSR and as a result a Writ of Possession was entered.

On December 12, 2019, MSR placed an account for collection of a deficiency under the Lease with NCS. At referral, the balance reported by MSR was $5,375.82. Following placement, on February 21, 2020, NCS furnished data regarding the defaulted Lease to the consumer

3

reporting agencies, Trans Union, LLC ("Trans Union"), Equifax Information Services, LLC

("Equifax") and Experian Information Solutions, Inc. ("Experian") (collectively, the "CRAs").

NCS first spoke (as opposed to a written communication) with Plaintiff and Megan

(Henderson) Ward, Plaintiff's wife, about the defaulted Lease on June 11, 2020. NCS was also

notified by the CRAs that Plaintiff disputed the debt on five separate occasions. Specifically,

NCS received dispute notices on June 10, 2020 from Experian, and on June 11, 2020 from

Equifax and Trans Union. On July 4, 2020, NCS received a second dispute from Equifax, and on

July 10, 2020, NCS received a second dispute from Trans Union.

The three June disputes did not include attachments aside from the ACDV itself.

("ACDV" stands for Automated Consumer Dispute Verification, which is an electronic form by

which CRAs and furnishers of information communicate with each other regarding consumer

disputes. *See* Expert Report of John Ulzheimer ("Ulzheimer Rep.") [Doc #55-44], at 12.) The

Trans Union June ACDV stated that "I have not opened any new credit or had any interaction

with the original creditor" and "Not Aware of Collections. Provide or confirm complete ID and

verify Account Information." The Equifax June ACDV stated "I have no idea why this is

reported. I am wondering if someone stole my identity to access Main Street Renewal LLC" and

"Not His/Hers." The Experian June ACDV stated "Not his/hers. Provide complete ID. I have no

knowledge of this account, I have not opened a new account and do not recognize this credit

lender." The July 2020 ACDVs indicated that Plaintiff "claims true identity fraud." Following

the conclusion of its investigations, NCS responded to the CRAs that it had verified the

delinquent Lease account as furnished by NCS.

Plaintiff filed this lawsuit on September 24, 2021 against the three CRAs and NCS. In his

Complaint [Doc #1], he asserts two claims against NCS that, as a "furnisher" of information, it violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), specifically § 1681s-2, by failing to conduct a reasonable investigation of Plaintiff's credit disputes and by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's dispute from the CRAs prior to the commencement of this action. In May 2022, Plaintiff stipulated to dismiss all claims against the CRA defendants. [Doc ##39, 42, 44]

## II.   THE MOTION

NCS requests summary judgment on Plaintiff's FCRA claims against it (Counts 3 and 4) arguing that: (1) Plaintiff's lack of damages precludes liability on the part of NCS; (2) Plaintiff cannot establish that NCS acted willfully with regard to Plaintiff's disputes; and (3) Plaintiff cannot show that NCS's reporting was inaccurate or that NCS's investigation was unreasonable and that Plaintiff has brought a legal, as opposed to factual, dispute.

## III.   STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if its determination might affect the outcome of the suit under the governing law. *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018).

A party seeking summary judgment bears the initial responsibility of informing the court

5

28.2 App-006

of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of genuine issues for trial. *Celotex,* 477 U.S. at 323; *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992). In so doing, a movant who does not have the burden of proof at trial need not negate the nonmovant's claim, but rather may make its prima facie demonstration by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex,* 477 U.S. at 325). Where the moving party meets this burden, the burden then shifts to the nonmoving party who may not rest on the unverified allegations of its pleadings, but must set forth specific facts, through admissible evidence, showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324; *Panis v. Mission Hills Bank*, 60 F.3d 1486, 1490 (10th Cir. 1995). In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Donahue v. Wihongi,* 948 F.3d 1177, 1187 (10th Cir. 2020).

## IV.   ANALYSIS

FCRA imposes obligations on three types of entities: CRAs, users of consumer reports and furnishers of information to CRAs. *Jarrett v. Bank of Am.*, 421 F. Supp.2d 1350, 1353 (D. Kan. 2006) (citing 15 U.S.C. § 1681, *et seq.*). A CRA is defined as any entity that "regularly engages . . . in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). A furnisher is "an entity which transmits information concerning a particular debt owed by a particular consumer to [CRAs]." *Fishback v. HSBC Retail Servs. Inc.*, 944 F. Supp.2d 1098, 1107 (D.N.M. 2013) (quoting *Jarrett,* 421 F. Supp.2d at 1352 n.1).

6

Under FCRA § 1681s-2(b)(1), when a CRA, such as Equifax, notifies a furnisher of information, such as NCS, of a dispute, the furnisher is required to:

(1) investigate the disputed information;
(2) review all relevant information provided by the CRA;
(3) report the results of the investigation to the CRA;
(4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and
(5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable.

*Llewellyn v. Allstate Home Loans, Inc*., 711 F.3d 1173, 1178-79 (10th Cir. 2013) (quoting *Pinson v. Equifax Credit Info. Servs., Inc*., 316 F. App'x. 744, 750 (10th Cir. 2009) (unpublished)). A consumer may recover actual damages caused by a defendant's negligent violation of FCRA. 15 U.S.C. § 1681o(a); *Llewellyn*, 711 F. 3d at 1179. However, under FCRA, "the consumer need not prove actual damages if the violation is willful, but may recover punitive damages and statutory damages ranging from $100 to $1000." 15 U.S.C. §1681n(a); *Llewellyn*, 711 F.3d at 1179 (quoting *Birmingham v. Experian Info. Solutions, Inc*., 633 F.3d 1006, 1009 (10th Cir. 2011)).

In this case, Plaintiff seeks actual damages, both economic and non-economic (for emotional distress), under § 1681o and statutory and punitive damages under § 1681n. Because a claim under § 1681s-2 for negligence cannot proceed unless a plaintiff can establish that he has suffered actual damages that were caused by the defendant (even if the plaintiff has presented evidence that that the defendant engaged in conduct proscribed by the FCRA), I will proceed first with NCS's argument that Plaintiff has failed to provide evidence of actual damages as a result of any negligent violation by NCS.

### A.  <u>Whether Plaintiff Has Established Actual Damages</u>

NCS claims that Plaintiff presents no factual allegations or documentation which could plausibly suggest that NCS's actions or inactions impacted him in any manner or that he would have acted differently had NCS altered any of its actions and that, therefore, Plaintiff lacks Article III standing. Relatedly, NCS argues that Plaintiff cannot sustain a claim for negligence under FCRA because he has not identified any actual damages stemming from any act taken by NCS, has not been denied any credit, and could not have been damaged because "the NCS account consistently reported with compliance code 'XB' which blocks any such account from consideration in a consumer score . . . ." Mot. at 10-11.

Plaintiff counters that he did suffer damages, both economic – as the result of being unable to refinance his mortgage to a lower interest rate in "June 2020" due to "derogatory collection account reporting on his credit report, that resulted in a low credit score of 671" – and non-economic, including for emotional distress, humiliation, and embarrassment, as a result of NCS's actions. Resp. at 11, 12. In support of his claimed economic damages, Plaintiff cites his own declaration, a discovery response and the Rule 26(a)(2) Expert Witness Report of Evan Hendricks ("Hendricks Rep.").

In his Declaration, Plaintiff states:

> In June 2020, I gave permission to run my credit to Will Hamilton at Fairway Independent Mortgage for a mortgage refinance. I learned for the first time of the NCS account "in collections" after they pulled my credit, and I learned that I would not qualify for the rate I was trying to get, which was 2.75%, due to the fraudulent NCS account appearing on my credit report. I did not receive any letter confirming that adverse action by Fairway Independent Mortgage.

Ward Decl. [Doc #62-3] ¶ 27. Plaintiff also refers to his discovery response in which he states

(presumably regarding the same refinance attempt referenced in his Declaration):

> Plaintiff was unable to refinance his mortgage from 4.35 to a lower interest rate of approximately 2.75 – 3% because of the derogatory collection account reporting on his credit report, that resulted in a low credit score of 671. Plaintiff was advised that because of his credit score he would not qualify for the best rate. One of the main risk factors was that a derogatory collection or public record had been filed. This information was provided by Experian. (Plaintiff_000001 – 000003) The reduction in interest rate would have been approximately $300 per month and over the life of the loan would have been a savings of approximately $108,000.

Resp. Ex. 70 [Doc #62-22] at 4.

Plaintiff also highlights a June 11, 2020 Experian report which he says confirms that multiple parties, including nine creditors with hard inquiries (the most recent of which, by Advantage/Fairway Independent ("Fairway"), occurred on June 8, 2020), obtained Plaintiff's credit report with the inaccurate NCS account, which Plaintiff claims is "textbook Article III injury in fact." Resp. at 10, citing Ex. 69. [Doc # 62-21] While Plaintiff does not specify the date he attempted his mortgage refinance with Fairway, other than to say it was in June 2020, and he provides no documentation regarding this attempted transaction, the June 11, 2020 Experian report (Resp. Ex. 69) confirms that on June 8, 2020, Fairway made a "hard inquiry" on Plaintiff's credit for "real estate" reasons. [Doc #62-21]

Plaintiff's expert opines that a reported status of "collection account" with a past due balance rendered Plaintiff ineligible for credit and had a negative impact on his credit score. *See* Hendricks Rep. at 18 [Doc #62-7] Mr. Hendricks adds that "the significant negative impact of the NCS collection on Plaintiff's FICO score is demonstrated by the June 2020 response of a mortgage lender" and that the credit report it pulled showed Plaintiff with FICO scores in the 600s whereas without the NCS collection, Plaintiff's FICO scores would have been well above

9

700. *Id*. Mr. Hendricks neither cites nor attaches any documentation evidencing the "June 2020 response of a mortgage lender," but his source presumably is Mr. Ward.

Plaintiff argues that NCS was responsible for this harm because it reported the debt as "in collection" to the CRAs, citing his June 10, 2020 credit reports from Experian and Trans Union and his June 12, 2020 credit report from Equifax, Exs. 52-54 [Doc ## 62-4, 62-5 & 62-6] (all showing the NCS matter as in "Collection" with a past due balance of $5,375), and the fact that, at least as to the Experian Dispute Results (Ex. 68), this reporting remained even after Plaintiff disputed the account as not belonging to him. [Doc #62-20] Plaintiff further argues that NCS falsely reported to the CRAs that the account belonged to him, citing Exs. 64-66 [Doc ## 62-16, 62-17 & 62-18] (NCS's reports to the CRAs).

The Court in *TransUnion LLC v. Ramirez*, on the issue of damages and Article III standing in a case under FCRA, made clear:

> As *Spokeo* explained, certain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms. If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.
>
> Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion.

*Ramirez*, 141 S.Ct. 2190, 2204, 2005 (2021) (citations excluded) (adding that "[a]s the Court emphasized in *Spokeo*, 'Article III standing requires a concrete injury even in the context of a statutory violation'"). And, as the Tenth Circuit held in *Llewellyn*, the plaintiff in a FCRA case has the "affirmative duty of coming forward with evidence supporting his claim" that the defendant's actions caused him harm. *Id.*, 711 F.3d at 1181 (quoting *Cahlin v. Gen. Motors*

10

*Acceptance Corp.*, 936 F.2d 1151, 1161 (11th Cir. 1991)).

The evidence presented by Plaintiff to demonstrate his economic damages centers on his "June 2020" attempt to refinance his mortgage with Fairway. To recap that evidence: Plaintiff learned for the first time of NCS's negative credit reporting when he attempted to refinance his mortgage with Fairway and they pulled his credit at which time Plaintiff learned that he would not qualify for the interest rate he was trying to get. Ward Decl. [Doc #62-3] ¶¶ 17, 27. The June 11, 2020 Experian report referenced above (Resp. Ex. 69) confirms Plaintiff's refinance attempt with Fairway and indicates that it occurred on June 8, 2020. [Doc #62-21] It is undisputed that <u>after</u> learning of the negative credit report from Fairway and being denied the lower interest rate, Plaintiff then submitted his first dispute to all three CRAs. It is also undisputed that on June 11, 2020, Plaintiff contacted NCS (or its law firm) directly and that on June 10 and 11, 2020, the CRAs notified NCS of Plaintiff's disputes. There is no evidence to suggest that Plaintiff's credit report was pulled by a potential lender or that he was denied credit (or received less favorable terms) <u>after</u> the CRAs notified NCS on June 10 and 11 of Plaintiff's disputes.

The law is clear that a furnisher's duty to investigate a dispute under FCRA "arises only after a CRA notifies the furnisher of a dispute . . . ." *Willis v. Capital One Corp.*, 611 F. App'x 500, 502 (10th Cir. 2015) (unpublished); *see also Llewellyn*, 711 F.3d at 1178 (noting that § 1681s-2(b) of FCRA imposes certain requirements on a furnisher of information "who has received notice of a dispute from a CRA"); *Lowe v. Surpas Res. Corp.*, 253 F. Supp. 2d 1209, 1254 (D. Kan. 2003) ("[c]ourts have consistently held that this duty is triggered 'only after the furnisher . . . receives notice of the dispute from a consumer reporting agency, not just the consumer'") (citations omitted)). Moreover, a lowered FICO score is not enough to support a

11

28.2 App-012

claim for economic damages based on a furnisher's FCRA violation. Rather, a plaintiff must show that he was denied credit or received less favorable terms based on the challenged conduct. *See Llewellyn*, 711 F.3d at 1180 (plaintiff was required at summary judgment stage to come forward with evidence that he had applied for and been denied credit due to the defendant's FCRA violations); *Peterson v. Experian Info. Sols.*, 44 F.4th 1124, 1127 (8th Cir. 2022) ("[t]o the extent Peterson alleges injury solely from diminution in her credit score, that type of abstract harm does not support actual damages"); *Remaly v. Wyndham Resort Dev. Corp.*, No. 20-cv-3028-LTB-NYW, 2021 WL 5504628, at *4 (D. Colo. Nov. 23, 2021) (in the absence of evidence that plaintiff applied for credit, a lowered FICO score alone is not enough to support a claim for economic damages as a result of a FCRA violation).

Plaintiff's only evidence of economic damages – that he applied for and was denied favorable credit terms from Fairway – is not sufficient to support his claim for economic damages because the attempted refinance occurred <u>before</u> he submitted his dispute to the CRAs and before NCS received notice from the CRAs of his dispute, i.e. before FCRA liability could attach. Because there is no evidence that Plaintiff applied for and was denied credit <u>after</u> the CRAs notified NCS of Plaintiff's dispute, I conclude that Plaintiff has not met his burden of demonstrating that NCS's actions caused him to suffer economic damages. I therefore grant this portion of NCS's motion.

Plaintiff's non-economic damages, however, are another matter. Plaintiff supports his claim for non-economic damages with only his declaration [Doc #62-3] in which he states, under penalty of perjury, and with some detail, that he experienced embarrassment in March 2022 when he applied for a home equity loan at Bellco Credit Union and in September 2020 when he

12

needed to be a co-signor for his wife's car and had to explain, in both cases, the issues with his credit over NCS's reporting. *Id*. ¶ 28, 29. He also explains that NCS's actions caused him to feel devastated over the damage done to his credit score (which he had worked hard to rebuild) as well as frustrated, angry, depressed and hopeless in disputing the claim with NCS, which also caused him to gain over 30 pounds, affected his sleep, increased his stress level and negatively impacted his work performance. *Id*. ¶ 30.

NCS argues that recovery of damages for emotional distress typically requires some type of compelling evidence, such as medical records or evidence of counseling, and not just conclusory testimony. Reply at 2, citing *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503-04 (4th Cir. 2007). In the Tenth Circuit, however, a FCRA plaintiff is not required to produce corroborating evidence to establish emotional distress damages so long as the plaintiff describes his or her emotional distress in sufficient detail and does not rely on conclusory statements. *See Llewellyn*, 711 F.3d at 1182, 1183.

While not quite as compelling or detailed as the statements offered by the plaintiff in *Llewellyn*, I do not find Plaintiff's statements to be outright conclusory and his assertion that NCS's actions caused those symptoms is not so incredible or conclusory that it can be ignored. Therefore, viewing the evidence of Plaintiff's emotional distress in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, I conclude that Plaintiff has described his emotional injury in sufficient detail to create a genuine issue of material fact that NCS's actions caused him to suffer emotional damages. I, therefore, deny this portion of NCS's motion.

13

**28.2 App-014**

**B.  Whether Plaintiff Can Establish that NCS Acted Willfully**

Under FCRA § 1681n(a), as noted above, "the consumer need not prove actual damages if the violation is willful, but may recover punitive damages and statutory damages ranging from $100 to $1000." *See* 15 U.S.C. § 1681n(a); *Llewellyn,* 711 F. 3d at 1179. A "willful" violation is either an intentional violation or a violation that is committed in reckless disregard of a defendant's duties under FCRA. *See Birmingham*, 633 F.3d at 1009 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57–58 (2007)).

> Recklessness is measured by an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known. A company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

*Llewellyn*, 711 F.3d at 1183–84 (internal quotations and citations omitted).

NCS argues that it is entitled to summary judgment because Plaintiff cannot establish that NCS acted willfully with regard to Plaintiff's dispute. NCS claims that Plaintiff proffers nothing except unsubstantiated allegations that NCS failed to implement policies that contravene the rights of consumers. To the contrary, NCS asserts, it has implemented policies and procedures to protect consumers' rights and argues that where a creditor has policies in place to ensure that it complies with FCRA's investigation requirements and, despite allegedly reaching the wrong conclusion, it complied with the policies, it can be said as a matter of law that the creditor did not act recklessly under FCRA. NCS adds that Plaintiff must, but cannot, show something beyond mere carelessness to support his claim under § 1681n. Mot. at 11 (citing, *inter alia*, *Llewellyn*, 711 F.3d at 1183-84 (stating that evidence showing more than mere carelessness is required to

14

demonstrate a willful violation)).

Plaintiff counters, first, that there is "substantial evidence" that NCS knowingly violated FCRA because "NCS had multiple reasons to know that a more robust investigation was necessary because of Plaintiff's disputes that the account resulted from the theft of his identity, yet all NCS did was compare data that it was already reporting yet was on notice was suspect. And NCS's corporate representative confirmed that the dispute investigators followed NCS's dispute-investigation policies, PSOF ¶ 4, meaning NCS knowingly fell short of a reasonable identity-theft investigation when all it did was match data used fraudulently." Resp. at 26-27 (citing Plaintiff's Statement of Undisputed Facts ("PSOF") ¶ 4 [Doc #62-2]).

Plaintiff also claims that NCS failed to mark his account as "in dispute" or include the compliance code "XB" to the results it posted to the CRAs in ACDVs processed in June 2020, even though NCS was aware, based on communications "independent of the communications from the CRAs," including with Plaintiff starting June 11, 2020 that he was the victim of identity theft and other information from other non-CRA sources. Resp. at 27, citing PSOF ¶¶ 50, 51. Plaintiff argues that NCS, therefore, knew of Plaintiff's dispute independent of the communications from the CRAs, and failed to accurately report the same in its ACDV responses. Resp. at 27, citing *Miller v. Westlake Servs. LLC*, __ F. Supp. 3d __, No. 8:21-cv-00692-JLS-KES, 2022 WL 16556836, at *10 (C.D. Cal. Oct. 28, 2022).

Finally, Plaintiff alleges that NCS disregarded key evidence appended to Plaintiff's disputes, wrongly insisted on a police report and failed to consider or give enough weight to information and documents Plaintiff did provide, including Plaintiff's FTC Affidavit, all of which, Plaintiff claims, is evidence of "perfunctory investigations that recklessly violate the

FCRA." Resp. at 28. In support, Plaintiff points to the deposition testimony of Ronald V. Sapp (NCS's Vice President of Operations) and NCS's investigators. *Id*. at 28-29. Plaintiff is also critical of the fact (which NCS does not dispute) that NCS's policies do not allow NCS investigators to contact employers to verify a claimant's employment due to NCS's concerns over violating the FDCPA. Resp. at 29, citing Rule 30(b)(6) deposition testimony of Mr. Sapp [Doc #62-24] (explaining that it's risky for NCS to contact third parties about a debt). Plaintiff argues that NCS's alleged reason for this policy is unjustifiable, citing *Marx v. Gen. Revenue Corp*., 668 F.3d 1174, 1177 (10th Cir. 2011), in which the court held that there was no violation of the FDCPA where the debt collector sent a fax to the plaintiff/debtor's employer to verify the debtor's employment, but gave no indication or implication in the fax that the communication had anything to do with a debt. *Id*. Plaintiff also highlights a case against NCS from the Northern District of Georgia, *Bumpus v. National Credit Systems*, No. 1:16-cv-01209-TWT, in which the jury assessed $105,000 in punitive damages against NCS based on its willful violations of FCRA. Resp. at 26, 30.

As to his first point, I note that the support Plaintiff cites, PSOF ¶ 4, does not address his allegations that NCS knowingly fell short of a reasonable identity theft investigation. *See* PSOF ¶ 4 [Doc #62-2] (regarding the rental application and Plaintiff's denial that he submitted or authorized it). Plaintiff likely intended to cite PSOF ¶¶ 44 or 45 (discussing Mr. Hendricks' report (at 5-7) wherein he opines that NCS "failed to give due regard to . . . compelling information" and "did not follow its own procedures for investigating identity theft," and "essentially disregarded" red flags such as Plaintiff's FTC fraud affidavit), or possibly PSOF ¶¶ 46 or 55 (discussing and citing Mr. Sapp's Rule 30(b)(6) deposition testimony that NCS's

16

**28.2 App-017**

investigators followed company protocols, including, among other things, by circling back to MSR and requesting additional documents). While it is not my job to comb the record to make a party's case, *see Adler*, 144 F.3d at 672, even considering this additional support, there is still no evidence that NCS knowingly violated FCRA or recklessly disregarded its FCRA duties. At most, Plaintiff raises a question of negligence. Moreover, Plaintiff's mere argument that "NCS knowingly fell short of a reasonable identity-theft investigation when all it did was match data used fraudulently" (Resp. at 27) does not satisfy Plaintiff's burden to support his claim with admissible evidence.

Plaintiff's second point, that NCS knew, starting June 11, 2020, based on its communications "independent of the communications from the CRAs," that Plaintiff claimed he was the victim of identity theft, yet failed to mark its June ACDV responses as "in dispute" or with the proper compliance code, at most raises a question as to negligence. I say "at most" because there is no evidence that NCS's failure (if any) to apply the XB compliance code was willful or reckless and because, as discussed above, there can be no liability under FCRA on the part of a furnisher until it receives notice of a dispute from a CRA. *Willis*, 611 F. App'x at 502; *Llewellyn*, 711 F.3d at 1178. (It goes without saying that there can be no liability on the part of a furnisher for <u>intentional</u> violation of FCRA without an underlying FCRA violation. *See Llewellyn*, 711 F.3d at 1183-84.) In addition, *Miller* does not advance Plaintiff's argument that NCS acted intentionally. In *Miller*, on plaintiff's motion for summary judgment, the court held only that the furnisher was negligent as a matter of law for not reporting to the CRAs that the plaintiff's claim was in dispute. *Id.*, 2022 WL 16556836, at *9. However, as to the plaintiff's willful violation claim, the *Miller* court denied summary judgment holding that "[a]lthough the

17

**28.2 App-018**

record here compels the conclusion that Defendant failed to conduct a reasonable investigation in response to Plaintiff's disputes, it does not compel the conclusion that it did so knowingly or recklessly. Defendant's requests to Plaintiff for additional documentation and [defendant's director of compliance] testimony that it would be impossible to follow every lead Defendant receives about an account dispute can support a finding that Defendant did not knowingly or recklessly disregard its obligations under the FCRA." *Id.*, at *11.

As to Plaintiff's final point, regarding NCS's insistence on a police report, its failure to adequately consider the information provided by Plaintiff and its failure to contact Neiman Marcus, again, the evidence might support a claim for negligence, but provides no evidence demonstrating that NCS's actions were intentional or reckless. In addition, as NCS points out regarding its admitted failure to contact Neiman Marcus, the Tenth Circuit in *Marx* stated that under different circumstances, a debt collector's communication with a third-party could constitute a violation of the FDCPA where the communication conveys information regarding a debt or could be construed to imply a debt. *Id.*, 668 F.3d at 1177. Finally, Plaintiff's reference to *Bumpus v. National Credit Systems*, is equally non-compelling. *Bumpus* was a 2016 FCRA case against NCS in the Northern District of Georgia in which, after a 2018 trial, the jury found that NCS violated Section 1681s-2(b) by failing to conduct a reasonable investigation and that its violations were willful, prompting the jury to award $105,000 in punitive damages. There is no showing by Plaintiff that the circumstances in *Bumpus* are analogous to the facts here. For example, *Bumpus* did not involve allegations of identity theft, but rather involved a dispute with the creditor, the plaintiff's landlord, concerning move-out fees.

In conclusion, the evidence Plaintiff submits regarding alleged willful or reckless conduct

18

on the part of NCS, while it might support his claim that NCS negligently violated its § 1681s–2 obligations, does not support his claim that NCS acted willfully or recklessly in its investigation or reporting of Plaintiff's dispute. *See Llewellyn*, 711 F.3d at 1185 (finding that the district court did not err in granting summary judgment to defendant where there was no evidence of willfulness or recklessness); *Birmingham*, 633 F.3d at 1012 (affirming grant of summary judgment to defendant on the issue of willfulness because there was no evidence that defendant's specific actions with respect to plaintiff were reckless). For these reasons, I grant this portion of NCS's motion.

### C.  <u>Whether NCS Conducted a Reasonable Investigation</u>

Having concluded above that Plaintiff's claimed emotional distress damages survive this motion, I now must consider whether Plaintiff has made a sufficient showing that NCS negligently failed to conduct a reasonable investigation.

When a furnisher receives a dispute notice from a CRA, it must undertake a reasonable investigation of the dispute. *Maiteki v. Marten Transp. Ltd.*, 828 F.3d 1272, 1275, 1276 (10th Cir. 2016) (adding that an investigation need not be exhaustive to be reasonable). The Tenth Circuit has defined a "reasonable investigation" as "one that a reasonably prudent person would undertake under the circumstances." *Id.* (quoting *Seamans v. Temple Univ.*, 744 F.3d 853, 864 (3d Cir. 2014)). The reasonableness of an investigation is to be determined by an objective standard and "[t]he burden of showing the investigation was unreasonable is on the plaintiff." *Id.* (quoting *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 37 (1st Cir. 2010)).

NCS argues that it is entitled to summary judgment because Plaintiff cannot demonstrate any actual inaccuracies in NCS's reporting and because its investigation was objectively

19

reasonable. NCS claims (twice, on the same page) that "[r]ather than simply confirming that the disputed information were [was] consistent with their reporting – which was all that NCS was obliged to do, under *Howard* – NCS instead conducted a full audit to confirm that there were no errors and reviewed *all* information it had on file, requested information from the original creditor, and even confirmed with the original creditor that the balance was, in fact, correct." Mot. at 16 (referring to *Howard v. Pinnacle Cred. Svcs., LLC*, No. 4:09-cv-85 (CDL), 2010 WL 2600753 (M.D. Ga. June 24, 2010)). NCS's statements on this subject are not supported with any detail or specific citation to record evidence, such as an affidavit or deposition testimony, or any of the parties' nearly 90 exhibits. Instead, NCS discusses case law regarding what constitutes a reasonable investigation under FCRA and the investigation it conducted during discovery *after* this case was filed. *See* Mot. at 12-21. (I do not consider NCS's investigation during discovery in this case to be relevant for purposes of this motion. NCS's investigation during discovery into, among other things, IP address(es) from computers that were used to communicate with MSR about the Lease, which was the subject of Plaintiff's Motion to Exclude the Declaration and Testimony of Neal Maynard [Doc #64] and NCS's supplemental brief regarding the within motion [Doc #75], has no bearing on the dispute investigation NCS undertook in 2020.)

For his part, Plaintiff, who has the burden of demonstrating that the investigation was unreasonable, claims that NCS acted negligently by: (1) reporting the account as belonging to Plaintiff and, for a time, not designating it as being in dispute; and (2) failing to conduct a reasonable investigation of the disputes it received from the CRAs, but instead simply matching data, which is not acceptable when there are allegations of identity theft. In support of Plaintiff's claim, record evidence indicates that Plaintiff disputed that the debt was his and reported to a

20

CRA that someone may have stolen his identity in June 2020, as reflected in Equifax's June 11, 2020 ACDV. [Doc #62-17] NCS's Account Notes also contain two entries reflecting Plaintiff's direct communications with NCS on June 11, 2020. Mot. Ex. 23 [Doc #55-24] at 1 ("Debtor called in Talked to Debtor/ Gave MM Negotiating Debt. dtr called in says fraud affidavit 2 signature" and "Debtor called in Talked to Debtor/ Gave MM Negotiating Debt. Megan Henderson ok to speak with her spouse ///id theft"). In the two July ACDVs, Equifax and Trans Union both noted that Plaintiff "claims true identity fraud." [Doc ## 62-17, 62-16] Plaintiff also points to documents that NCS had in its possession, but allegedly disregarded in its investigation, such as his notarized Identity Theft Affidavit [Doc #62-12] (also noted in NCS's Account Notes [Doc #55-24 at 2] as being received on or around June 18, 2020) in which Plaintiff discloses, among other things, that he reported the events described in the Affidavit to the police but the police did not write a report, and the conflicting pay stubs (the "fake" Neiman Marcus stubs with Plaintiff's name and Colorado address in a different font and slanted, but showing Texas as the state for purposes of tax exemptions versus Plaintiff's pay stubs from his actual employer, EMJD Corporation ("EMJD"), in Colorado. [*See* Doc ##62-11, 62-13, 62-8 & 55-7]

In addition, Plaintiff's expert opines in his report that NCS disregarded an established set of industry-standard red flags during its investigation of Plaintiff's disputes, which included: (1) the presentation of suspicious documents with the application for a residence in Texas, including contradictory pay stubs (pay stubs from a Texas employer – Neiman Marcus – showing the alleged employee's Colorado address); (2) the use of suspicious personal identifying information, such as a suspicious address change, which is inconsistent when compared with paystubs that Plaintiff provided from his employer EMJD in Englewood, Colorado; (3)

21

disregarding the consumer's claims of identity theft (from Plaintiff and the CRAs) and not accounting for documents like the FTC Dispute and Identity Theft Affidavit; and (4) not heeding the suspicious fact that the fraudster made only the first payment but no subsequent payments. Hendricks Rep. at 5-7. [Doc #62-7] Mr. Hendricks further opines that NCS's review was "robotic" and insufficient in this case where there were concerns of identity theft in that NCS essentially only compared data on the ACDVs to the information in its computer system, rather than using other relevant information available to it. *Id*. at 2 (adding that in cases of identity fraud, the identifying information in the furnisher's records predictably will "match" the identifying information of the disputing consumer/victim). It is Mr. Hendricks' opinion that NCS failed to give due regard to the compelling information that it had in its possession when it reported to the CRAs that the disputed information was accurate. *Id*. at 6, 7.

I find that Plaintiff has come forward with enough evidence to satisfy his burden of showing that there is a genuine issue for trial as to whether NCS, after receiving the June and July 2020 ACDVs, conducted a reasonable investigation.

As noted above, a furnisher's § 1681-s2(b) investigation must be "reasonable," that is, "one that a reasonably prudent person would undertake under the circumstances." *Maiteki*, 828 F.3d at 1275. Whether a defendant's investigation is reasonable is a factual question normally reserved for trial. *Id*. (citing *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005)). However, summary judgment may be proper if "the reasonableness of the defendant's procedures is beyond question." *Id*. How thorough an investigation must be in order to be "reasonable" turns on what relevant information was provided to the furnisher by the CRA giving notice of a dispute. *Id*. (quoting *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th

22

28.2 App-023

Cir. 2012) and citing *Chiang*, 595 F.3d at 38 ("[A] more limited investigation may be appropriate when CRAs provide the furnisher with vague or cursory information about a consumer's dispute.")). When a furnisher ends its investigation by reporting that the disputed information has been verified as accurate, "the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303, 1306 (11th Cir. 2016) (denying summary judgment to defendant on the issue of the furnisher's reasonable investigation and holding, in part, that the plaintiff's failure to send a police report or fraud affidavit to the furnisher does not entitle the furnisher to cease its investigation and inform the CRAs that the debt was verified as accurate).

It is undisputed, as noted above, that NCS received dispute notices (with no attachments) on June 10 from Experian and on June 11, 2020 from Equifax and Trans Union. NCS responded to the Experian and Trans Union ACDVs on June 11, 2020 that the disputed information was accurate. [Doc ##62-18, 62-16] NCS similarly responded to the Equifax ACDV on June 12, 2020. [Doc #62-17] Whether these June notices, particularly the Equifax June 11th ACDV conveying Plaintiff's concern as "wondering if someone stole my identity," combined with Plaintiff's direct communications with NCS (or its law firm) on June 11, 2020 (as noted above), were enough to trigger a higher level of review is an issue for the jury. I cannot say that it is beyond question that NCS, with the knowledge and information it had, conducted a reasonable investigation as a matter of law when it merely confirmed the identification associated with the account and responded that the disputed information was accurate.

A higher level of review was clearly warranted after the July ACDVs (with attachments)

23

were received by NCS. As noted above, the July 2020 ACDVs from Equifax and Trans Union indicated that Plaintiff "claims true identity fraud" and "account fraudulently opened." [Doc ## 62-16, 62-17] NCS responded to Equifax on July 13 and to Trans Union on July 16, 2020 stating in both that the disputed information was accurate. *Id*.

Relevant to NCS's conclusory statement that it conducted a "full audit" regarding Plaintiff's dispute, Mot. at 16, is this statement from Mr. Sapp's Declaration:

> Based upon the information from the Original Creditor, which included Plaintiff's lease, correspondence between the Plaintiff & the Original Creditor, a move-out statement, a verification of the amount as due-and-owing (with which NCS confirmed the amount as due-and-owing), color copies of Plaintiff's driver's license and social security card, and, as supplied by Plaintiff's wife Megan Ward, the Plaintiff's FTC theft affidavit, paystubs from Plaintiff's employer[,] Plaintiff's allegations that the Neiman Marcus pay advices and social security statement were "fake" and "slightly slanted", both the Original Creditor and NCS determined that the account was not opened based upon "identity theft" or "fraud." See Account Notes at Exhibit 23 to Motion for Summary Judgment, pgs. 3-6.

Sapp. Decl. [Doc #56-2] ¶ 48. This statement, however, does not describe what NCS actually did during its investigation. For example, Mr. Sapp does not state that NCS (or MSR) actually analyzed or reviewed the Neiman Marcus pay stubs (on which Mr. Ward's name appears slanted and in a different font [Doc # 55-7]) for possible forgery (or whether NCS compared them to Mr. Ward's EMJD pay stubs), or whether NCS analyzed or reviewed the SSA letter to determine whether it might be fake. In addition, Mr. Sapp does not state that NCS actually reviewed Plaintiff's notarized FTC theft affidavit [Doc #55-37], which NCS received on or around June 18, 2020 [Doc # 55-24 at pg. 2] or any of the documents mentioned. NCS Account Notes provide a little more detail. *See* NCS Account Notes, Ex. 23 [Doc #55-24] at 3 (on 7/21/20, "reviewed information submitted by consumer who claims true identity fraud/account fraudulently opened

24

with information supplied by client. I reviewed name, address, ssn/dob, account information, checked for accuracy and matching information. I have also reviewed the system notes for past efforts. Documentation supporting the consumer's claim was provided."); *id.* at 4, 5 (regarding Plaintiff's fraud affidavit and paystubs from EMJD, Plaintiff's employer, "we received employer paycheck stubs but this does not serve as proof of identity" and "[w]e submitted her fraud affidavit to the client last month but the client's responding by only sending us the documents they have. We need to know how the client wants us to proceed. This debtor claims he never lived in TX" and "[w]e have sent the dispute documents (Police Report and fraud affidavit) to the client in the past and they responded with confirmation that the account is not fraud"). An account note on June 25, 2020 states that "client [MSR] provided ID, pay stub, and social security benefits letter, ID's match." *Id.* at 2. The referenced pay stub is presumably the Neiman Marcus pay stub(s); however, it is not until August 21, 2020 that there is a note indicating that Mr. Ward's name and address on the Neiman Marcus paystubs are "slightly slanted." *Id.* at 6. In addition, while the Account Notes indicate that NCS received Plaintiff's ID theft affidavit/fraud affidavit around June 18, 2020, there is no indication that NCS actually reviewed it; instead, it appears that NCS may have merely forwarded it to MSR. *See id.* at 2, 3. NCS's Account Notes also indicate that Plaintiff informed NCS starting June 29, 2020 that he never worked for Neiman Marcus and never lived in Texas. *Id.* at 3, 4.

While I recognize that a furnisher's investigation need not be exhaustive to be reasonable and that MSR, the Original Creditor here, may have had better access to the tenant's information than NCS, I note that during the relevant time period it appears that NCS made no inquiry into whether MSR had identified the IP address(es) that were used by the tenant to complete the

online Lease application and failed to consider whether income verification documents submitted with the Lease application came from the Plaintiff's actual employer. Some courts, in denying a FCRA defendant's motion for summary judgment, have done so, at least in part, on the basis that a reasonable jury could find that the furnisher's failure to check IP addresses or to confirm income verification documents, where there are concerns over identity fraud, is not objectively reasonable. *See Romero v. Monterey Fin. Svcs, LLC*, Case No. 19cv1781 JM (KSC), 2021 WL 268635, at *3 (S.D.Cal. Jan. 27, 2021); *cf. Hampton v. Barclay's Bank Delaware*, 478 F. Supp 3d 1113, 1138-39 (D. Kan. 2020) (granting original creditor's summary judgment motion, finding that the creditor's investigation, which included a confirmation that the IP address on plaintiff's loan application "pinged" to Topeka, Kansas, where Plaintiff lived, and that plaintiff's income verification documents came from his actual employer, was reasonable as a matter of law), *aff'd*, 2021 WL 3237082 (10th Cir. July 30, 2021). Moreover, even if the Original Creditor had access to more information about the Lease and the apparent tenant, this would not relieve NCS of its responsibility to conduct a reasonable investigation and does not establish as a matter of law that NCS conducted a reasonable investigation.

Questions including as to whether NCS should have reviewed the documents in its possession sooner or at all (or rather than passing them on to MSR), whether NCS was reasonable in insisting on a police report, whether NCS should have sought additional documents from the Original Creditor (such as the online Lease application, which contained the tenant's IP address) and, in general, whether NCS conducted a reasonable investigation are questions for the jury. The reasonableness of a furnisher's investigation under the FCRA is a fact-intensive and context-specific inquiry that is particularly difficult to resolve as a matter of law. *See Hinkle*, 827

26

F.3d at 1303. I see no basis here to take this classic factual question away from the jury.

Finally, NCS argues that it cannot be liable for failing to conduct a reasonable investigation because Plaintiff's dispute "constitutes a question of law as whether or not the Plaintiff is, in fact, not liable on the account." Mot. at 16; Reply at 4. NCS claims that this is a matter that can only be resolved by the judiciary and not an entity like NCS who is not meant to be an arbiter of claims or equipped to decide the legal sufficiency of a debtor's allegations. *Id.* I do not agree that Plaintiff's claim against NCS is a legal dispute as to his liability on the Lease. Rather, his claim is that he reported being the victim of identity fraud and his dispute was not reasonably investigated at that time. Moreover, there is no indication that during the relevant time period, i.e. during NCS's investigation of Plaintiff's dispute before this lawsuit was filed, NCS ever suspected that Plaintiff might be legally liable on the Lease, as a conspirator or principal, thus giving NCS an excuse to relax or cease its investigation.

I therefore conclude that the evidence here is not so one-sided as to mandate a finding that NCS's investigation was reasonable as a matter of law when it reported to the CRAs that the disputed information was accurate. For these reasons, I deny this portion of NCS's motion.

**28.2 App-028**

## V.    CONCLUSION

For the reasons stated above, it is HEREBY ORDERED that NCS's Motion for Summary

Judgment [Doc #55] is GRANTED IN PART AND DENIED IN PART as follows:

1)  the motion is GRANTED on the issue of Plaintiff's economic damages;

2)  the motion is DENIED on the issue of Plaintiff's non-economic (emotional distress)

    damages;

3)  the motion is GRANTED on the issue of whether NCS acted willfully; and

4)  the motion is DENIED on the issue of whether NCS conducted a reasonable

    investigation.

DATED:    May 12, 2023 in Denver, Colorado.


                                    BY THE COURT:


                                    ___s/Lewis T. Babcock_____
                                    LEWIS T. BABCOCK, JUDGE

# APPENDIX B

**DALE A. RABE, JR.**
**Bird, Bird & Rabe**
**109 Avenue B, NE**
**P.O. Box 1257**
**Childress, Texas  79201**
**940-937-2543**
**Fax: 940-937-3431**

## CURRICULUM VITAE

### EDUCATION

B.A.(Biology), The University of Texas at Austin - 1994

J.D., Southern Methodist University - 2000

### PROFESSIONAL ACTIVITIES

Licensed – State Bar of Texas - 2000

Partner; Bird, Bird & Rabe, Childress, Texas

Member of the Rules and Website Committee, Seventh Court of Appeals – 2006

100th Judicial District Bar Association President – 2010 to Present

General Practice Firm with Approximately 25% Comprised of Real Estate Transactions.

### PUBLICATIONS, ACADEMIC APPOINTMENTS & HONORS

Author/Speaker for the State Bar of Texas Advanced Family Law Course – 2009

Author/Speaker for the State Bar of Texas Advanced Family Law Course – 2010

Amarillo Area CASA Attorney Ad Litem of the Year - 2012

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 21-cv-02597-NYW-JPO

ROBBIN WARD,

      Plaintiff,

v.

NATIONAL CREDIT SYSTEMS, INC.,

      Defendant.

---

## FINAL JURY INSTRUCTIONS

**28.2 App-032**

**INSTRUCTION NO. 1**

**INTRODUCTION TO FINAL INSTRUCTIONS**

Members of the Jury:

In any jury trial there are, in effect, two judges.  I am one of the judges, you are the other.  I am the judge of the law.  You, as jurors, are the judges of the facts.  I presided over the trial and decided what evidence was proper for your consideration.  It is also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict.

In explaining the rules of law that you must follow, first, I will give you some general instructions which apply in every civil case—for example, instructions about burden of proof and insights that may help you to judge the believability of witnesses.  Then I will give you some specific rules of law that apply to this particular case.  Finally, I will explain the procedures you should follow in your deliberations and the possible verdicts you may return.  You will be allowed to take these instructions with you to the jury deliberation room, so you need not take notes as I read them to you.

**28.2 App-033**

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 107

**INSTRUCTION NO. 2**

**GENERAL FINAL INSTRUCTIONS**

Now that you have heard the evidence and the parties' arguments, it is your duty to find the facts from all the evidence in the case. And to those facts, you must apply and follow the laws contained in these instructions, whether you agree with them or not. If there is any difference between the law stated by the lawyers and the law in these instructions, you are governed by my instructions. You must follow all of these instructions and not single out some and ignore others; they are all equally important. The decision you reach by applying the law in these instructions to the facts as you find them is called a verdict.

You must not read into these instructions, or into anything I say or do, any suggestions as to what verdict you should return. Your verdict is a matter entirely for you to decide. You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, bias, or public opinion. It is important that you discharge your duties without discrimination, meaning that bias regarding the race, color, religious beliefs, national origin, sexual orientation, gender identity, or gender of the parties, any witnesses, and the lawyers should play no part in the exercise of your judgment. All parties expect that you will carefully consider all the evidence, follow the law in these instructions, and reach a just verdict, regardless of the consequences. You have taken an oath promising to do so.

**28.2 App-034**

**INSTRUCTION NO. 3**

**UNDISPUTED FACTS**

Before trial, certain facts were determined to be undisputed by the Parties or the Court:

1)      On January 30, 2019, an online application was submitted to Main Street Renewal, LLC ("Main Street") to rent the home located at 229 Cliff Heights Circle Dallas, TX 75232 which included Plaintiff's name, DOB, SSN, Colorado address, the email robbinward61@gmail.com as well as his daughter, Quen Green's contact information.

2)      In December 2019, Main Street hired Defendant to collect a balance of $5,375.82 from Plaintiff.

3)      Defendant first furnished data regarding the account to the consumer reporting agencies on February 1, 2020.

4)      NCS was notified by the consumer reporting agencies by automated consumer dispute verifications ("ACDVs") that Plaintiff disputed the debt on five separate occasions.   Specifically, NCS received dispute notices on June 10, 2020, by way of Experian, and on June 11, 2020, from both Equifax and Trans Union that provided dispute code 1 ("not his/hers") or dispute code 6 ("not aware of collection").   On July 4, 2020, NCS received a second dispute from Equifax, and on July 10, 2020, NCS received a second dispute from Trans Union that provided dispute code 103 ("claims true identity fraud/account fraudulently opened").

5)      The first three disputes/ACDVs received in June did not contain attachments.

6)      All information furnished by NCS to the consumer reporting agencies after

4

**28.2 App-035**

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 108

Appellate Case: 25-1078     Document: 23     Date Filed: 07/23/2025     Page: 109

June 18, 2020, included information that Mr. Ward disputed the account, including NCS's upload of information to the consumer reporting agencies on or about June 21, 2020.

7)      The second disputes/ACDVs received in July contained the FTC Identity Theft Report and Mr. Ward's Social Security Card and Colorado Driver's License.

8)      Following the conclusion of the investigations of the five disputes, NCS responded to the consumer reporting agencies that it had verified the MSR account as accurate.

9)      Plaintiff continually worked in Colorado during the relevant time period.  At no time did Plaintiff work for Neiman Marcus.

10)     Plaintiff has resolved all claims he had against the Credit Reporting Agencies.

11)     Plaintiff can only recover damages for emotional distress, and cannot recover economic damages, such as the cost of a higher interest rate for his home mortgage.

28.2 App-036

**INSTRUCTION NO. 4**

**BURDEN OF PROOF**

This is a civil case.  Therefore, Plaintiff has the burden of proving each of his claims by what is called a preponderance of the evidence.  This means that no matter who produces the evidence, when you consider each of Plaintiff's claims in light of all the facts, you must believe each claim is more likely true than not true.  To put it differently, with respect to each claim, if you were to put all the evidence in favor of Plaintiff and all the evidence in favor of Defendant on opposite sides of the scale, Plaintiff would have to make the scale tip to his side.  If Plaintiff fails to meet this burden, your verdict must be for Defendant on that claim.

Defendant asserts the affirmative defense of failure to mitigate damages. Defendant has the burden of proving that the affirmative defense is more likely true than not true.  Put another way, if you were to put all the evidence in favor of Plaintiff and all the evidence in favor of Defendant on opposite sides of the scale, Defendant would have to make the scale tip to its side for an affirmative defense to apply.  If Defendant fails to meet this burden, you cannot apply the affirmative defense.

In evaluating whether Plaintiff and Defendant have met their respective burdens on their claims and defenses, you should also know that the law does not require parties to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matter in issue at this trial.  Nor does the law require parties to produce as exhibits all papers or other things mentioned in the evidence in the case.

_____

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 110

**28.2 App-037**

Appellate Case: 25-1078    Document: 23    Date Filed: 07/23/2025    Page: 111

## INSTRUCTION NO. 5

## EVIDENCE – GENERAL

You must make your decision based only on the evidence that the parties have presented to you during the trial.  That evidence consists of:

1.  the sworn testimony of witnesses on both direct and cross-examination, regardless of who called the witness;

2.  documents and other things received into evidence as exhibits; and

3.  any facts on which the lawyers agree or which I instruct you to accept as true.

Nothing else is evidence.  The following things are not evidence and you must not consider them as evidence in deciding the facts of this case:

1.  Statements and arguments by lawyers are not evidence.  The lawyers are not witnesses.  What they said in their opening statements, closing arguments, and at other times was intended to help you interpret the evidence, but it was not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of the facts controls.

2.  Questions and objections by the lawyers are not evidence.  Lawyers have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by my ruling on it.

3.  Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.

7

**28.2 App-038**

4.    Anything you may see or hear when court was not in session is not evidence, even if what you saw or heard was done or said by one of the parties or by one of the witnesses.  In addition, as I have previously told you, you are not allowed to look at, read, consult, or use any material of any kind, including any dictionaries or medical, scientific, technical, religious, or law books, the Internet, or any material of any type or description in connection with your jury service.

Although you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits; inferences you feel are justified in the light of common experience.  Inferences are conclusions that reason and common sense lead you to draw from the facts established by the evidence in the case.

**INSTRUCTION NO. 6**

**EVIDENCE – DIRECT AND CIRCUMSTANTIAL**

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case.   One is direct evidence and the other is circumstantial evidence.   Direct evidence is testimony by a witness about what that witness personally saw, heard, or did.  Circumstantial evidence is indirect evidence; that is, it is proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence.   The law simply requires that, in determining the facts, you consider all the evidence in the case, both direct and circumstantial.   It is for you to decide how much weight to give to any evidence, regardless of whether it is direct or circumstantial.

Appellate Case: 25-1078    Document: 23    Date Filed: 07/23/2025    Page: 113

**28.2 App-040**

## INSTRUCTION NO. 7

## CREDIBILITY OF WITNESSES AND SINGLE WITNESS

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about which witnesses to believe and which witnesses not to believe. You may believe everything a witness says, only part of it, or none of it.

You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was.

In considering the testimony of any witness, you may consider:

1.     The witness's opportunity and ability to see, hear, or know the things to which the witness testified;

2.     The quality of the witness's memory;

3.     The witness's manner while taking the oath and testifying;

4.     Whether the witness had an interest in the outcome of the case or any motive, bias, or prejudice;

5.     Whether the witness's testimony was contradicted by anything the witness said or did another time, by the testimony of other witnesses, or by other evidence;

6.     How reasonable the witness's testimony was in light of all the evidence; and

7.     Any other facts that bear on believability.

When weighing conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail. And you should

10

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 114

keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

If you believe a witness has willfully lied regarding any fact, you have the right to disregard all or any part of that witness's testimony.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify to that fact.   Even though a number of witnesses may have testified to the contrary, if, after consideration of all the evidence in the case, you hold greater belief in the accuracy and reliability of that one witness's testimony, that testimony is sufficient for the proof of any fact, and would justify a verdict in accordance with such testimony.

Appellate Case: 25-1078     Document: 23     Date Filed: 07/23/2025     Page: 115

**INSTRUCTION NO. 8**

[INTENTIONALLY OMITTED]

28.2 App-043

**INSTRUCTION NO. 9**

**ALL PERSONS EQUAL BEFORE THE LAW—ORGANIZATIONS—IMPLICIT BIAS**

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. Corporations and governmental agencies are entitled to the same fair trial as a private individual. All persons, including corporations, governmental agencies, and other organizations stand equal before the law, and are to be treated as equals. You should not be influenced by who the parties are, or who the witnesses are, i.e., whether they are rich or poor, young or old, well-educated or not.

You also should be aware of the natural human tendency to look at others, and to filter what they have to say, through the lens of our own personal experience and background. Because we all do this, we often see—and evaluate evidence—in a way that tends to favor people who are like ourselves or who have had life experiences like our own. In deciding this case, I urge you to be aware of this natural human tendency to stereotype other people and to make assumptions about them based on the stereotypes, and I urge you to avoid such stereotyping.

28.2 App-044

**INSTRUCTION NO. 10**

**CORPORATE PARTY'S AGENTS AND EMPLOYEES**

A corporation or governmental agency may act only through natural persons who are its agents or employees.  Generally, any agents or employees of a corporation or governmental agency may bind the corporation by their acts and declarations made while acting within the scope of their authority delegated to them by the corporation or governmental agency, or within the scope of their duties as employees of the corporation or governmental agency.

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 119

**INSTRUCTION NO. 11**

**EXPERT WITNESS**

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions.  There is an exception to this rule for "expert witnesses."  An expert witness is a person who by education and experience has become expert in some art, science, profession, or calling.  Expert witnesses give their opinions as to matters in which they profess to be expert, and may also state their reasons for their opinions.

You should consider each expert opinion received in evidence in this case, and give it such weight as you think it deserves.  If you should decide the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude the reasons given in support of the opinion are not sound, or if you feel the expert's opinion is outweighed by other evidence, you may disregard the opinion in part or entirely.

**28.2 App-046**

**INSTRUCTION NO. 12**

[INTENTIONALLY OMITTED]

Appellate Case: 25-1078     Document: 23     Date Filed: 07/23/2025     Page: 120

**28.2 App-047**

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 121

## INSTRUCTION NO. 13

## NATURE OF THE ACTION

That concludes the part of the instructions explaining your duties and the general rules that apply in every civil case. I will now instruct you on the law relating to Plaintiff's claim for relief for violation of the Fair Credit Reporting Act ("FCRA").

The Fair Credit Reporting Act is a federal law that governs credit reporting by the consumer reporting agencies and those who furnish information to the credit reporting agencies, like Defendant National Credit Systems, Inc. The FCRA recognizes that the modern banking system is dependent on fair and accurate reporting, and the FCRA is designed to promote an overall efficient system that leads to accurate reporting that is fair and equitable to the consumer.

"Consumers" are entitled to the protection and benefit of the FCRA. Experian, Trans Union, and Equifax are consumer reporting agencies ("CRAs") that are regulated by the FCRA. Under the FCRA, a "consumer report" is any report that serves as a factor in establishing a consumer's eligibility for credit that is used or expected to be used primarily for personal, family, or household purposes. A report sent by the CRAs directly to a consumer is called a "consumer disclosure."

When a consumer contacts a CRA to dispute information that the consumer believes is inaccurate, a furnisher of information who has received the notice of a dispute from a CRA is required to: (1) investigate the disputed information; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and (5) modify, delete, or permanently block

the reporting of the disputed information if it is determined to be inaccurate, incomplete, or unverifiable. The investigation a data furnisher undertakes must be a reasonable one.

Here, NCS furnished information to the CRAs that Plaintiff owed a balance resulting from unpaid rent for a home leased from Main Street Renewal, LLC in Dallas, Texas. Plaintiff Robbin Ward alleges that Defendant National Credit Systems, Inc. negligently violated the FCRA because, after receiving notice that Plaintiff disputed that he owed a debt to Main Street Renewal as reported by the CRAs, Defendant failed to conduct a reasonable investigation. Plaintiff claims that Defendant's negligent violation of the FCRA resulted in emotional distress to him.

Conversely, Defendant alleges that Plaintiff cannot prove that the information furnished by Defendant to the CRAs is inaccurate or incomplete. Defendant also contends that it performed a reasonable investigation of Plaintiff's disputes in light of the information provided by Plaintiff at the time of the investigations, the information and documents provided by the original creditor Main Street Renewal, and Plaintiff's failure to to provide complete information.

28.2 App-049

**INSTRUCTION NO. 14**

**VIOLATION OF THE FCRA - ELEMENTS**

For Plaintiff to recover from Defendant for a negligent violation of the FCRA, you must find that Plaintiff has established the following elements, by a preponderance of the evidence.

1.  That the information furnished by Defendant for the Main Street Renewal Account was inaccurate, incomplete, or misleading.

2.  That Defendant's investigation of Plaintiff's dispute was unreasonable.

3.  That Defendant's failure to conduct a reasonable investigation caused Plaintiff emotional distress damages.

If you find that any of the elements has not been proven, then your verdict must be for Defendant.  On the other hand, if you find that all of the elements have been proven, then your verdict must be for Plaintiff.

28.2 App-050

**INSTRUCTION NO. 15**

**FCRA VIOLATION – ELEMENT 1:  INACCURATE, INCOMPLETE, OR MISLEADING**

Before a furnisher, such as Defendant, has a duty to reasonably investigate the notice of a dispute received from a CRA, Plaintiff must show that the information furnished by NCS was inaccurate, incomplete, or misleading.

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 124

**28.2 App-051**

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 125

## INSTRUCTION NO. 16

## FCRA VIOLATION – ELEMENT 2:  REASONABLENESS

A "reasonable" investigation is one that a reasonably prudent person would undertake under the circumstances.  A person or entity acts negligently if the person or entity fails to do something that a reasonably prudent person would do, or does something that a reasonably prudent person would not do, under the circumstances that existed at the time.

How thorough an investigation must be to be "reasonable" turns on what relevant information was provided to a furnisher by the CRA giving notice of a dispute.  A more limited investigation may be appropriate when CRAs provide the furnisher with vague or cursory information about a consumer's dispute, and Congress could not have intended to place a burden on furnishers continually to reinvestigate a particular transaction, without any new information or other reason to doubt the result of the earlier investigation.  The reasonableness of the investigation is to be determined by an objective standard and the burden of showing the investigation was unreasonable is on the plaintiff.  An investigation does not have to be exhaustive to be reasonable; a data furnisher may balance the costs and benefits of engaging in additional procedures.  If the circumstances warrant, a company may rely on its own records.

**INSTRUCTION NO. 17**

**FCRA VIOLATION – ELEMENT 3:  CAUSATION**

To recover damages, Plaintiff must prove that Defendant's violation of the Fair Credit Reporting Act proximately caused his injuries. Proximate cause requires that the damage complained of by the Plaintiff is the natural, probable result of Defendant's investigation of Plaintiff's disputes.

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 126

**INSTRUCTION NO. 18**

**ADDITIONAL INFORMATION**

Data furnishers, such as Defendant, may contact consumers and/or third parties

as part of an investigation of a consumer's dispute.

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 127

**28.2 App-054**

**INSTRUCTION NO. 19**

**INTRODUCTION TO DAMAGES INSTRUCTIONS**

That concludes the part of my instructions relating to Plaintiff's claim for relief. I will now instruct you on the law relating to damages.

The fact that I am instructing you as to the proper measure of damages should not be considered as indicating any view of mine as to which party is entitled to your verdict in this case. Instructions as to the measure of damages are given for your guidance only in the event you should find in favor of Plaintiff from a preponderance of the evidence in the case in accordance with the other instructions.

Difficulty or uncertainty in determining the precise amount of any damages does not prevent you from deciding an amount. You should use your best judgment based on the evidence.

**28.2 App-055**

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 129

## INSTRUCTION NO. 20

### DAMAGES FOR EMOTIONAL DISTRESS

If you find in favor of Plaintiff, you must determine the total dollar amount of his damages, if any, that were caused by the inaccurate information included in Plaintiff's credit file with the CRAs following his disputes to the CRAs.  In determining Plaintiff's damages, you shall only consider whether Plaintiff suffered damages from emotional distress.  Plaintiff has the burden of proving the nature and extent of his damages by a preponderance of the evidence.

The FCRA permits emotional distress damages to be awarded when a violation has been established.  If you find in favor of the Plaintiff, then you may award emotional distress damages, if proven by a preponderance of the evidence.  These should not compensate Plaintiff for any other type of damages, such as economic damages, adverse credit decision damages, or attorneys' fees, if any.  Plaintiff can only recover the emotional distress damages that he proves he suffered and that were caused by Defendant's negligence.

You should assess the monetary amount that a preponderance of the evidence justifies as full and reasonable compensation for all of Plaintiff's emotional distress damages—no more, no less.  You must not impose or increase damages to punish or penalize Defendant, but only to compensate Plaintiff for damages incurred.  And you must not base these emotional distress damages on speculation or guesswork.  You are not required to award any damages for emotional distress, if they are not proven.

To recover damages for emotional distress, Plaintiff must prove that he has suffered a specific discernable injury with credible evidence presented at trial.  Damages

28.2 App-056

may not be based on speculation or sympathy.  Evidence of emotional distress need not be corroborated by out-of-pocket expenses, doctors, psychologists, or other witnesses, but Plaintiff must support his claims with competent evidence of the nature, extent, and duration of the harm.

.

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 130

**28.2 App-057**

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 131

## INSTRUCTION NO. 21

### AFFIRMATIVE DEFENSE – FAILURE TO MITIGATE

That concludes the instructions about Plaintiff's allegations and elements needed to prove an FCRA violation by Defendant and the methods for calculating any damages related to those allegations. I will now instruct you about the law applicable to Defendant's affirmative defense of mitigation of damages.

If you find that Plaintiff has had actual emotional distress damages, then you must consider whether Defendant has proved its affirmative defense of Plaintiff's failure to mitigate or minimize damages. Plaintiff has a duty to take reasonable steps under the circumstances to mitigate or minimize his damages.

The affirmative defense of mitigation of damages is proved if Defendant has established, by a preponderance of the evidence, that (1) Plaintiff failed to take reasonable steps to mitigate or minimize his damages; and (2) Plaintiff has incurred increased damages because he did not take the reasonable steps to mitigate or minimize his damages. If Defendant proves this defense, then you must determine the amount of damages caused by Plaintiff's failure to mitigate. This amount must be excluded from your award of damages. On the other hand, if you find that Defendant has not proven one or both of these two elements by a preponderance of the evidence, then you shall make no deduction from Plaintiff's damage award.

**28.2 App-058**

**INSTRUCTION NO. 22**

**JURY DELIBERATIONS – GENERAL INSTRUCTIONS**

Each of you has a copy of the instructions to consult as you find it necessary.

It is your duty to find the facts from all the evidence in the case. To those facts, you must apply and follow the laws contained in these instructions whether you agree with them or not. Your decision is called a verdict and is reached by applying these laws to the facts as you find them. You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathies. You have taken an oath promising to do just so.

You must follow all of these instructions and not single out some and ignore others; they are all equally important. You must not read into these instructions, or into anything I may say or do, any suggestions as to what verdict you should return. Your verdict is a matter entirely for you to decide.

28

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 133

**INSTRUCTION NO. 23**

**FOREPERSON AND VERDICT FORM**

After the closing arguments, the Courtroom Deputy will escort you to the jury room and will give you the original jury instructions and the original verdict form. Any exhibits admitted into evidence will also be placed in the jury room for your review. You will be allowed to take your notes and your copy of the jury instructions that I have just read with you. The original of the jury instructions and the exhibits are a part of the court record. Do not place any marks or notes on them. Your copy of the instructions may be marked or used in any way you see fit.

When you go to the jury room, you should first select a foreperson, who will help to guide your deliberations and will speak for you here in the courtroom. The second thing you should do is review the instructions. Not only will your deliberations be more productive if you understand the legal principles upon which your verdict must be based, but for your verdict to be valid, you must follow the instructions throughout your deliberations. Remember, you are the judges of the facts, but you are bound by your oath to follow the law stated in the instructions.

A verdict form has been prepared to help guide you through your deliberations. This form contains questions and directions for answering them. In answering these questions, you must apply the law in the instructions that the Court gave you to the facts that were proved by the evidence. The answer to each question must be the unanimous answer of the jury. Your foreperson will write the unanimous answer of the jury in the space provided for each response. As you will note from the wording of the questions, it may not be necessary to consider or answer every question. This is the only copy of the

**28.2 App-060**

verdict form that you will receive, so please do not write on it or indicate your answer to any questions on it until you have all agreed on the answer.

This is an important case. If you should fail to agree upon a verdict, the case is left open and must be tried again. Obviously, another trial would require the parties to make another large investment of time and effort, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you.

It is your duty, as jurors, to consult with one another and deliberate with a view toward reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

After you reach a verdict, your foreperson should ensure that the original verdict form is complete and then he/she must sign and date it. The foreperson should then advise the Courtroom Deputy that you have reached a verdict, but do not tell the Courtroom Deputy what your verdict is. The Courtroom Deputy will then inform me that you have reached a verdict. The foreperson should remain in possession of the verdict form until you return to the courtroom and I request that it be given to me.

**INSTRUCTION NO. 24**

**COMMUNICATIONS WITH THE COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a folded note through the Courtroom Deputy, signed by one of you.  Do not disclose the content of your note to the Courtroom Deputy.  No member of the jury should hereafter attempt to communicate with me except in writing and I will communicate with any member of the jury on anything concerning the case only in writing, or orally here in open court.  You are not to tell anyone—including me—how the jury stands, numerically or otherwise, until you have reached a unanimous verdict and I have discharged you.

If you send a note to me containing a question or request for further direction, please bear in mind that responses take considerable time and effort.  Before giving an answer or direction I must first notify the attorneys and bring them back to the court.  I must confer with them, listen to arguments, research the legal authorities, if necessary, and reduce the answer or direction to writing.

There may be questions that, under the law, I am not permitted to answer.  If it is improper for me to answer the question, I will tell you that.  Please do not speculate about what the answer to your question might be or why I am not able to answer a particular question.

**28.2 App-062**

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 136

# APPENDIX C

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 138

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 1:21-cv-02597-NYW

ROBBIN WARD,

      Plaintiff,

v.

NATIONAL CREDIT SYSTEMS, INC.,

      Defendant.

---

## VERDICT FORM

---

    We, the jury, being duly empaneled and sworn to try the above-captioned case, do unanimously find our Verdict as follows:

    QUESTION NO. 1: Did Plaintiff Robbin Ward prove that Defendant National Credit Systems, Inc. furnished inaccurate, incomplete, or misleading information to the credit reporting agencies?

    YES ___X___   NO _____

    **If you answered "YES," please proceed to Question No. 2.**

    **If you answered "NO" to Question No. 1, then your verdict is for Defendant National Credit Systems, Inc. and your deliberations are complete. Do not answer the remaining questions. Please stop your deliberations, then sign and date this Verdict Form.**

    QUESTION NO. 2: Did Plaintiff Robbin Ward prove by a preponderance of the evidence that Defendant's investigation of Plaintiff's disputes was unreasonable?

    YES ___X___   NO _____

**If you answered "YES" to Question No. 2, please proceed to answer Question No. 3.**

**If you answered "NO" to Question No. 2, then your verdict is for Defendant National Credit Systems, Inc. and your deliberations are complete. Do not answer the remaining questions. Please stop your deliberations, then sign and date this Verdict Form.**

QUESTION NO. 3: Has Plaintiff Robbin Ward proved, by a preponderance of the evidence, that he suffered emotional distress as a result of Defendant National Credit Systems, Inc.'s negligent violation of the Fair Credit Reporting Act?

YES ___X___     NO _____

**If you answered "YES" to Question No. 3, please proceed to answer Question No. 4.**

**If you answered "NO" to Question No. 3, then your verdict is for Defendant National Credit Systems, Inc. and your deliberations are complete. Do not answer the remaining questions. Please stop your deliberations, then sign and date this Verdict Form.**

QUESTION NO. 4: State the total amount of damages for emotional distress, quantified in terms of a dollar amount, that Plaintiff Robbin Ward proved that he suffered as a result of the violation of the Fair Credit Reporting Act.

$ _500, 000_

2

Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 140

**If you answered Question No. 4 with a dollar amount greater than $0, please proceed to Question 5.**

**If you answered Question No. 4 with $0, then your deliberations are complete. Do not answer the remaining questions. Please stop your deliberations, then sign and date this Verdict Form.**

QUESTION NO. 5: Did Defendant prove by a preponderance of the evidence that Plaintiff had an opportunity to mitigate or avoid some or all of his damages?

YES _____        NO __✗__

**If your answer is Yes, go to Question No. 6.**

**If your answer is No, then your deliberations are complete. Do not answer the remaining questions. Please stop your deliberations, then sign and date this Verdict Form.**

QUESTION NO. 6: What dollar amount did Defendant prove by a preponderance of the evidence that Plaintiff had an opportunity to avoid?

$_____

Please subtract your answer to Question No. 6 from your answer to Question No. 4, to calculate the TOTAL AWARD to Plaintiff Robbin Ward:  $_____

The jury members should sign and date the bottom of the Verdict Form and inform the Court's representative that the jury has finished deliberations.

3

**SO SAY WE ALL.**

DATED this Z\ day of June, 2024



Appellate Case: 25-1078   Document: 23   Date Filed: 07/23/2025   Page: 141

**28.2 App-068**

# APPENDIX D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-02597-NYW-JPO

ROBBIN WARD,

     Plaintiff,

v.

NATIONAL CREDIT SYSTEMS, INC.,

     Defendant.

---

**FINAL JUDGMENT**

---

     In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

     This matter was tried on June 17, 2024 through June 18, 2024 and June 20, 2024 through June 21, 2024 before a duly sworn jury of eight, United States District Judge Nina Y. Wang presiding.  The trial proceeded to conclusion and the jury rendered its Verdict Form.

     Accordingly, it is ORDERED that final judgment is hereby entered in favor of Plaintiff, Robbin Ward and against Defendant, National Credit Systems, Inc.  as to the Plaintiff's Fair Credit Reporting Act violation claims. It is

     FURTHER ORDERED that damages were rendered by the jury, and judgment is entered in favor of plaintiff, in the amount of $500,000.00. It is

     FURTHER ORDERED that post-judgment interest shall accrue at the current rate of 5.12%, as calculated pursuant to 28 U.S.C. § 1961, from the date of entry of judgment.  It is

FURTHER ORDERED that Plaintiff, Robbin Ward shall have his costs by the filing of a Bill of Costs with the Clerk of this Court within fourteen days of the entry of judgment, pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED at Denver, Colorado this 25th day of June, 2024.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By: s/Meghan Smotts
Meghan Smotts, Deputy Clerk

**28.2 App-071**

# APPENDIX E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-02597-NYW-JPO

ROBBIN WARD,

      Plaintiff,

v.

NATIONAL CREDIT SYSTEMS, INC.,

      Defendant.

---

## ORDER ON POST-TRIAL MOTIONS

---

This matter is before the Court on Defendant's Motion for Judgment Notwithstanding the Verdict and Alternatively, Motion for New Trial, or in the Alternative, Motion for Remittitur (the "Motion for JNOV," "Motion for New Trial," or "Motion for Remittitur"), [Doc. 137], and Defendant's Motion to Apply One-Satisfaction Rule, [Doc. 138]. For the reasons set forth in this Order, the Motion for JNOV is **DENIED**; the Motion for New Trial is **DENIED**; the Motion for Remittitur is **DENIED**; and the Motion to Apply One-Satisfaction Rule is **DENIED**.

### BACKGROUND

This Court and Judge Babcock have previously set out the factual and procedural history of this case, *see* [Doc. 76; Doc. 112], and the Court repeats it here only briefly. On September 24, 2021, Plaintiff Robbin Ward ("Plaintiff" or "Mr. Ward") initiated this lawsuit against Defendant National Credit Systems, Inc. ("Defendant" or "NCS"), as well

**28.2 App-073**

as three credit reporting agencies ("CRAs").[1]  [Doc. 1].  Plaintiff alleged, inter alia, that NCS failed to conduct a reasonable investigation into a disputed debt arising out of a real property lease with Main Street Renewal, LLC ("MSR" or "Main Street").  *See* [*id.* at ¶¶ 109–14]; *see also* [Doc. 107 at 7–8].  During the pendency of this case, information was discovered that tied Plaintiff's daughter to the MSR rental application.  *See* [Doc. 76 at 2–3].  Plaintiff denied completing the rental application and denied giving his daughter permission to fill out the application using his information.  [*Id.*].

After discovery, NCS moved for partial summary judgment, arguing (among other things) that Mr. Ward's claim of identity theft raised a legal dispute about the accuracy of the information NCS provided, not a factual dispute, and the legal dispute could not be resolved in the context of an FCRA claim.  [Doc. 55 at 12–21].  Judge Babcock denied this portion of NCS's motion, concluding that:

> Questions including as to whether NCS should have reviewed the documents in its possession sooner or at all (or rather than passing them on to MSR), whether NCS was reasonable in insisting on a police report, whether NCS should have sought additional documents from the Original Creditor (such as the online Lease application, which contained the tenant's IP address) and, in general, whether NCS conducted a reasonable investigation are questions for the jury.

[Doc. 76 at 26].  Judge Babcock also rejected NCS's argument that Mr. Ward's claim presented a legal dispute as to his liability on the lease, instead concluding that Plaintiff's "claim is that he reported being the victim of identity fraud and his dispute was not reasonably investigated at that time."  [*Id.* at 27].

After Judge Babcock's summary judgment ruling, the case was reassigned to the

---

[1] Plaintiff dismissed his claims against the CRAs in May 2022.  *See* [Doc. 39; Doc. 42; Doc. 44].

28.2 App-074

undersigned judicial officer.  [Doc. 83].  At the motion in limine stage, Defendant attempted

to reargue that the identity theft issue presented a legal dispute, not a factual one, but this

Court precluded Defendant from re-raising this issue based on law-of-the-case principles.

*See* [Doc. 112 at 8–11].

The case proceeded to trial on June 17, 2024.  [Doc. 118].  At the close of

evidence, the Court instructed the jury on Plaintiff's FCRA claim as follows:

> For Plaintiff to recover from Defendant for a negligent violation of the
> FCRA, you must find that Plaintiff has established the following elements,
> by a preponderance of the evidence.
>
> 1.  That the information furnished by Defendant for the Main Street
>     Renewal Account was inaccurate, incomplete, or misleading.
>
> 2.  That Defendant's investigation of Plaintiff's dispute was
>     unreasonable.
>
> 3.  That Defendant's failure to conduct a reasonable investigation
>     caused Plaintiff emotional distress damages.
>
> If you find that any of the elements has not been proven, then your
> verdict must be for Defendant.  On the other hand, if you find that all of the
> elements have been proven, then your verdict must be for Plaintiff.

[Doc. 128 at 19].  On June 21, 2024, the jury returned a verdict in favor of Plaintiff on his

claim—and on Defendant's affirmative defense of failure to mitigate damages—and

awarded Plaintiff $500,000 in emotional distress damages.  [Doc. 130].  The Court

entered final judgment on June 25, 2024.  [Doc. 131].

NCS subsequently filed the instant post-trial Motions, moving for (1) judgment

notwithstanding the verdict (or "JNOV"); (2) a new trial; (3) remittitur; and (4) a reduction

of the jury award under the "one-satisfaction rule."  *See* [Doc. 137; Doc. 138].  Plaintiff

filed an omnibus response in opposition to Defendant's requests.  [Doc. 146].  Defendant

filed a reply in support of its requests for JNOV, a new trial, and remittitur, [Doc. 150], but

28.2 App-075

did not file a reply in support of its request to apply the one-satisfaction rule. The Court addresses Defendant's various requests below.

**MOTION FOR JNOV**

## I.    Legal Standard

"A motion denominated as a motion for directed verdict or for judgment notwithstanding the verdict should be treated as a motion for judgment as a matter of law." *Craft v. Yellow Freight Sys., Inc.*, No. 97-1029, 1998 WL 72783, at *8 (10th Cir. Feb. 23, 1998). "No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b). "Judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *United States ex rel. MMS Constr. & Paving, L.L.C. v. W. Sur. Co.*, 754 F.3d 1194, 1199 (10th Cir. 2014) (quotation omitted). Stated differently, "[j]udgment as a matter of law must be denied if there is any legally sufficient evidentiary basis for a claim." *Sheldon v. Golden Bell Retreat*, No. 19-cv-01371-REB-NYW, 2022 WL 17818297, at *1 (D. Colo. Aug. 24, 2022) (citing *Hampton v. Dillard Dep't Stores Inc.*, 247 F.3d 1091, 1099 (10th Cir. 2001)).

"Arguments presented in a Rule 50(b) motion cannot be considered if not initially asserted in a Rule 50(a) motion." *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017). In ruling on a motion for JNOV, all "evidence and inferences . . . must be construed in the light most favorable to the party against whom the motion is directed," *Symons v. Mueller Co.*, 493 F.2d 972, 976 (10th Cir. 1974), and the Court may not "weigh

evidence, judge witness credibility, or challenge the factual conclusions of the jury," *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000). "[J]udgment notwithstanding the verdict should be cautiously and sparingly granted." *EEOC v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1171 (10th Cir. 1985).

## II. Analysis

### A. Whether Mr. Ward's FCRA Claim Presented a Legal or Factual Dispute

NCS's first argument is a reiteration of an argument it has made several times in this case: it contends that the underlying credit dispute presented a legal question about whether the debt was valid that NCS was not required to resolve in its investigation. [Doc. 137 at 13–16]. Judge Babcock rejected this argument at summary judgment, *see* [Doc. 76 at 27], and, pursuant to the "law of the case" doctrine, this Court has repeatedly precluded NCS from relitigating this issue, *see, e.g.*, [Doc. 112 at 9–11; Doc. 144 at 7:9–10:13]. Defendant nevertheless contends that this Court should now reverse course and rule in its favor after trial and after entry of judgment. [Doc. 137 at 6–8, 13–17].[2]

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). While this is "a rule of practice," not a limit on the Court's power, the doctrine promotes the general belief that "a litigant given one good bite at the apple should not have a second." *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir. 1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 900 (Fed. Cir. 1984)).

The Tenth Circuit has recognized three "exceptionally narrow" exceptions to the

---

[2] NCS never filed a motion for reconsideration of Judge Babcock's order.

28.2 App-077

law of the case doctrine:  (1) "when the evidence in a subsequent trial is substantially different"; (2) "when controlling authority has subsequently made a contrary decision of the law applicable to such issues"; and (3) "when the [court's prior] decision was clearly erroneous and would work a manifest injustice." *Id.*  NCS proclaims that "all three" exceptions apply in this case, [Doc. 137 at 6], but only develops an argument under the first exception, *see* [*id.* at 8, 12–13].[3]  NCS contends that "[a]dditional trial evidence" requires revisiting Judge Babcock's decision, including (1) the fact that Plaintiff's driver's license presented with the lease application matched the driver's license included in an identity theft report Plaintiff filed with the Federal Trade Commission, [Doc. 152-4 at 2–9; Doc. 152-14]; (2) a Texas state court judgment against Plaintiff for rent charges owed under the MSR lease, [Doc. 152-23]; (3) trial testimony from MSR representatives discussing the subject debt; and (4) testimony from Plaintiff at trial discussing his daughter's identity theft.  *See generally* [Doc. 137 at 12–13].  In particular, NCS contends that the Texas judgment "conclusively establishes that a legal dispute exists between Plaintiff and MSR" and asserts that NCS was not required to resolve that dispute.  [*Id.* at 15–16].

The Court rejected this argument in ruling on Defendant's Rule 50(a) motion, *see* [Doc. 144 at 9:11–10:5],[4] and makes the same ruling here.  First, this limited exception

---

[3] NCS cursorily argues that "additional evidence, along with the failure to apply controlling precedent[,] requires that the Court overturn Judge Babcock's ruling to prevent manifest injustice."  [Doc. 137 at 8].  The mere use of the phrases "controlling precedent" or "manifest injustice," without any accompanying substantive argument, is insufficient to present an issue to the Court.

[4] When citing to transcripts filed on the docket, the Court cites to the docket number assigned by the CM/ECF system and to the page and line numbers appearing on the transcript.  In addition, because the Parties did not order a complete trial transcript, in some instances, the Court cites to an internal draft version of the trial transcript.

28.2 App-078

does not apply if Defendant had the additional evidence in its possession at the time it filed its motion for partial summary judgment.  *See Wessel v. City of Albuquerque*, 463 F.3d 1138, 1143–44 (10th Cir. 2006).  Defendant does not address this requirement in its Motion.  *See generally* [Doc. 137].  The Court notes that Defendant filed evidence *referencing* the Texas judgment in support of its summary judgment motion, *see* [Doc. 55-20]; *see also* [Doc. 55-1 at ¶ 38 (Defendant referencing the Texas judgment in its statement of undisputed facts)], and Plaintiff's driver's license, including the copy provided with the FTC identity theft report, was also included in the summary judgment record, *see* [Doc. 55-5 at 2; Doc. 62-11 at 15].  The Court is thus not convinced that this evidence was not available to Defendant when it filed its summary judgment motion.  Moreover, the Court is not persuaded that the additional evidence cited by Defendant is substantially different from the evidence presented at summary judgment or that the evidence conclusively renders the dispute legal, as opposed to factual.  The additional evidence cited by Defendant provides *factual* context for the underlying dispute, but even with that additional evidence, the underlying dispute is the same:  whether Plaintiff was the victim of identity theft and whether NCS reasonably investigated the credit dispute.  For these reasons, the Court finds no basis to grant the requested relief.

## B.    Whether the Dispute was "Objectively and Readily Verifiable"

Next, NCS argues that Plaintiff's FCRA claim was not actionable because the information in dispute was not "objectively and readily verifiable."  [Doc. 137 at 18]. Relevant to this argument, the Second and Eleventh Circuits have recently rejected the legal/factual determination advanced by NCS throughout this case, holding that "there is no bright-line rule providing . . . that only purely factual . . . errors are actionable under

28.2 App-079

the FCRA," and thus "there is no threshold inquiry under the FCRA as to whether any purportedly inaccurate information is legal or factual in nature." *Sessa v. Trans Union, LLC*, 74 F.4th 38, 43 (2d Cir. 2023). "Rather, in determining whether a claimed inaccuracy is potentially actionable under section 1681e(b), a court must determine, inter alia, whether the information in dispute is 'objectively and readily verifiable.'" *Id.* (emphasis omitted) (quoting *Mader v. Experian Info. Sols., Inc.*, 56 F.4th 264, 269 (2d Cir. 2023)); *see also Holden v. Holiday Inn Club Vacations Inc.*, 98 F.4th 1359, 1363 (11th Cir. 2024) ("Whether the alleged inaccuracy is factual or legal is beside the point. Instead, what matters is whether the alleged inaccuracy was objectively and readily verifiable.").

As a preliminary matter, the Court questions the propriety of Defendant formally raising this issue and requesting relief for the first time in a Rule 50(a) motion at the close of Plaintiff's evidence. *See* [Doc. 143 at 2:10–19, 3:14–21, 4:10–12]. To be sure, Defendant referenced the issue in its Proposed Final Jury Instructions, *see* [Doc. 98 at 27 ("While included as an instruction, Defendant advocates that this is an issue to be determined by the Court to determine whether Plaintiff's claim is actionable.")], and "preview[ed]" it at the May 23, 2024 Final Pretrial/Trial Preparation Conference ("TPC"), *see* [TPC Tr. at 55:23–56:11 ("I would love to preview one thing right now. . . . I did want to make clear to the Court that I believe that those are legal issues that the Court has to decide, it is just one way for me to get these issues in front of the Court."); *id.* at 56:12–57:24 (Defendant citing *Sessa* and *Holden*)]. The Court acknowledges that neither *Sessa* nor *Holden* had been decided at the time Defendant moved for partial summary judgment on November 15, 2022, [Doc. 55], but to the extent Defendant believed that recent legal precedent established a new rule that the Court was required to follow—particularly one

**28.2 App-080**

that, in Defendant's view, would bar Plaintiff's claim outright—it was incumbent on Defendant to file a formal motion (such as a motion for reconsideration or a motion for leave to file a second summary judgment motion) putting the legal question squarely before the Court.  *See* NYW Civ. Practice Standard 7.1A(a)(5) ("All requests for the Court to take distinct actions must be contained in separate, written motions.").  Instead, Defendant waited until the close of Plaintiff's evidence to formally raise this issue in a truncated, oral motion to the Court.

Regardless, the Court finds no reason to grant relief here.  The Court is not bound by decisions from the Second or Eleventh Circuits, *see Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253, 1257 (10th Cir. 1996), and Defendant directs the Court to no binding authority applying this "new prevailing test," [Doc. 137 at 18].  Moreover, the Court is respectfully unpersuaded by the substance of Defendant's argument.  Defendant contends that the disputed information was not "objectively and readily verifiable" because there is "conflicting and suspicious evidence" about the validity of the MSR debt.  [Doc. 137 at 19].  The Court respectfully disagrees that the existence of disputed facts necessarily means that the subject debt is not objectively and readily identifiable, finding the decision of *Paulino v. Western Funding II Inc.*, 737 F. Supp. 3d 1338 (S.D. Fla. 2024), persuasive.

In *Paulino*, like here, the plaintiff alleged that he was the victim of identity theft and sought relief from his loan furnisher and several credit reporting agencies who allegedly failed to investigate an auto loan that the plaintiff claimed was fraudulent.  *Id.* at 1342.  The agencies moved for judgment on the pleadings, arguing that the question of whether the plaintiff applied for the loan was "an unresolved contractual dispute between" the

28.2 App-081

plaintiff and the loan furnisher and the claimed inaccuracy was not "objectively and readily verifiable." *Id.* at 1346. The court disagreed, holding that "the question of whether [the p]laintiff executed the Disputed Loan [was] objectively and readily verifiable" because whether the plaintiff executed the loan—i.e., whether the plaintiff filled out the loan application or someone else did without his permission—was "a factual question that [would] be answered in the affirmative or negative." *Id.* Because the dispute centered on whether the plaintiff did or did not fill out the loan application—which was a "matter of objectively verifiable fact"—the court denied judgment on the pleadings. *Id.* at 1347.

Despite the different procedural posture of the case, *Paulino* is instructive here. Whether Mr. Ward filled out the lease application or not—or whether his daughter filled out the lease application with his permission—are objectively verifiable facts. Indeed, these facts were implicitly decided by the jury when it returned a verdict in Mr. Ward's favor. Defendant has directed the Court to no case holding that the existence of unclear or uncertain facts relieves a furnisher's obligation to reasonably investigate a dispute. Accordingly, the Court will not grant JNOV on this basis.

### C. *Rooker-Feldman*

Finally, NCS argues that Plaintiff's FRCA claim is "an impermissible collateral attack" on the Texas judgment and that, as a result, this Court lacks jurisdiction over Plaintiff's claim pursuant to the *Rooker-Feldman* doctrine. [Doc. 137 at 20]. Although this argument was not raised in Defendant's Rule 50(a) motion, *see* [Doc. 143], a party may raise jurisdictional arguments at any time, "even after trial and the entry of judgment," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006).

"The *Rooker-Feldman* doctrine prevents lower federal courts from exercising

jurisdiction 'over cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Bruce v. City & Cnty. of Denver*, 57 F.4th 738, 746 (10th Cir. 2023) (footnote omitted) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The *Rooker-Feldman* doctrine acts as a jurisdictional bar over federal claims when "(1) the plaintiff lost in state court, (2) the state court judgment caused the plaintiff's injuries, (3) the state court rendered judgment before the plaintiff filed the federal claim, and (4) the plaintiff is asking the district court to review and reject the state court judgment." *Id.*

The *Rooker-Feldman* jurisdictional bar is narrow. *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 515 (10th Cir. 2023). It applies only if the federal plaintiff's claim "seek[s] to modify or set aside a state court judgment." *Id.* Indeed, "*Rooker-Feldman* does not bar a federal court claim merely because it seeks relief inconsistent with a state court judgment." *Id.* "A federal court is free to 'den[y] a legal conclusion that a state court has reached,' provided it does not exercise *de facto* appellate jurisdiction by entertaining a suit that would disrupt the final judgment entered by the state court." *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1238 (10th Cir. 2006) (alteration in original) (quoting *GASH Assocs. v. Vill. of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)). Moreover, *Rooker-Feldman* applies only when the plaintiff alleges an injury that was "caused by" the state court judgment. *Id.* at 1237 (quotation omitted). In other words, an element of the plaintiff's federal claim "must be that the state court wrongfully entered its judgment." *Campbell v. City of Spencer*, 682 F.3d 1278, 1283 (10th Cir. 2012).

Defendant argues that *Rooker-Feldman* bars Plaintiff's FCRA claim because his

"entire FCRA case is premised on the allegation that he does not owe the debt, the same debt at issue in the Texas State Court Judgment." [Doc. 137 at 22]. It asserts that "Plaintiff could not prevail in this case without this Court, effectively, reversing the Texas State Court Judgment that he owes the debt." [*Id.*]. Defendant goes on to argue in its Reply that Plaintiff's FCRA claim is "inextricably intertwined" with the state court judgment because the jury verdict in this case "would, necessarily, require [the Court] to reject the State Court Judgment that Plaintiff is liable for the debt." [Doc. 150 at 14]. Plaintiff responds by arguing that he does not challenge the state court judgment and does not claim an injury caused by the state court judgment; rather, he challenges and alleges an injury arising out of Defendant's investigation (or lack thereof). [Doc. 146 at 19–20].

The Court agrees with Plaintiff. *Rooker-Feldman* is a narrow doctrine that applies only if the plaintiff alleges an injury *caused by* a state court judgment. *Mo's Express*, 441 F.3d at 1237; *see, e.g.*, *Campbell*, 682 F.3d at 1280 (*Rooker-Feldman* barred claims alleging that seizure of the plaintiff's horses pursuant to court order violated her constitutional rights); *McDonald v. Arapahoe Cnty.*, 755 F. App'x 786, 787–89 (10th Cir. 2018) (*Rooker-Feldman* barred claims alleging that court-ordered eviction violated the plaintiff's rights). In this case, Plaintiff sought redress for NCS's failure to reasonably investigate his disputes under the FCRA and claimed injuries caused by that conduct. *See* [Doc. 1 at ¶¶ 109–14]; *see also* [Doc. 107 at 2 ("Plaintiff alleges that Defendant negligently violated 15 U.S.C. § 1681s-2(b), including by failing to perform reasonable investigations into Plaintiff's disputes.")]. He did not allege a defect in, seek any relief from, or even mention the state court judgment throughout this litigation, and his FCRA claim is not reliant in any way on the state court judgment. *Rooker-Feldman* does not

apply to claims, like Plaintiff's, "that would be identical even had there been no state-court judgment; that is, claims that do not rest on any allegation concerning the state-court proceedings or judgment."  *Bolden v. City of Topeka*, 441 F.3d 1129, 1145 (10th Cir. 2006); *see also Driskill v. Experian Info. Sols., Inc.*, No. 3:24-cv-00583-AMO, 2024 WL 3463820, at *3 (N.D. Cal. July 17, 2024) (concluding that *Rooker-Feldman* did not apply where the plaintiff sought "redress for [the credit reporting agency's] failure to reasonably investigate his disputes and correct reports of improper debts," but did not seek relief from state court decree).

Defendant's arguments to the contrary are respectfully unpersuasive.  Insofar as it argues that Plaintiff's FCRA claim is "inextricably intertwined" with the state court judgment, the Tenth Circuit has backed away from this standard, instructing that the "inextricably intertwined" language is "not helpful in analyzing the applicability of *Rooker-Feldman*."  *Graff*, 65 F.4th at 516 n.18 (citing *Campbell*, 683 F.3d at 1282–83); *see also Campbell*, 682 F.3d at 1283 ("We think it best to follow the Supreme Court's lead, using the *Exxon Mobil* formulation and not trying to untangle the meaning of *inextricably intertwined*.").  The "essential point" of *Rooker-Feldman* is that it bars claims "complaining of injuries caused by state-court judgments."  *Campbell*, 683 F.3d at 1283 (quoting *Exxon Mobil*, 544 U.S. at 284).  As explained above, Plaintiff's FCRA claim does not allege an injury caused by the Texas judgment.

Moreover, Defendant's "inextricably intertwined" argument is premised on the incorrect position that *Rooker-Feldman* bars a federal court from entering a judgment that is inconsistent with a prior state court judgment.  *See* [Doc. 137 at 22 ("Plaintiff could not prevail in this case without this Court, effectively, reversing the Texas State Court

28.2 App-085

Judgment that he owes the debt."); Doc. 150 at 14 ("For Plaintiff to prevail on his claims in this action, this Court would have to reject the State Court Judgment.")].  "[T]he *Rooker-Feldman* doctrine does not bar an action just because it seeks relief inconsistent with, or even ameliorative of, a state-court judgment." *Campbell*, 682 F.3d at 1282; *see also id.* at 1284 (rejecting the notion that a federal judgment would "undo" a state judgment simply because the federal judgment would be contrary to the state judgment).  "To the contrary, a party may lose in state court and then raise precisely the same legal issues in federal court, so long as the *relief sought* in the federal action would not reverse or undo the *relief granted* by the state court." *Mo's Express*, 441 F.3d at 1237.  "To be sure, the judgments in the two cases could be inconsistent; but that is a problem to be resolved under preclusion doctrine, not *Rooker-Feldman*."  *Mayotte v. U.S. Bank Nat'l Ass'n for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates*, 880 F.3d 1169, 1174 (10th Cir. 2018).

Relatedly, Defendant's reliance on unpublished Tenth Circuit decisions using the "inextricably intertwined" standard, *see* [Doc. 137 at 22–24], which are not binding authority, does not change the Court's analysis.  *See United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005) ("In this circuit, unpublished orders are not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel, and we have generally determined that citation to unpublished opinions is not favored.").  In *LeCates v. Barker*, the plaintiff asserted a fraud claim on the basis that the defendants had fraudulently procured a state court judgment against him.  No. 00-4026, 2000 WL 1717184, at *2 (10th Cir. Nov. 16, 2000).  Using the "inextricably intertwined" standard, the *LeCates* court concluded that *Rooker-Feldman* barred the fraud claim because

28.2 App-086

adjudication of the claim "would require the [federal] court to determine that [the] state court judgment was erroneously entered or was void." *Id.* But it is clear that the *LeCates* plaintiff alleged an injury *caused by* the purportedly fraudulent state court judgment. *See id.* at *1 ("LeCates' complaint [in federal court] charged that the [defendants] had obtained the [state court] default judgment against him by fraud and deceit in collusion with Barker."). *Bisbee v. McCarty* and *Ellis v. CAC Financial Corporation*, which NCS also relies on, similarly used the "inextricably intertwined" standard. *See Bisbee v. McCarty*, 3 F. App'x 819, 822 (10th Cir. 2001); *Ellis v. CAC Fin. Corp.*, 6 F. App'x 765, 769 (10th Cir. 2001). The *Bisbee* and *Ellis* plaintiffs both complained of the methods allegedly used to obtain state court judgments against them, and in both cases, the Tenth Circuit concluded that *Rooker-Feldman* applied because it would be "impossible" to resolve the federal claims without calling the state court judgments into question. *See Bisbee*, 3 F. App'x at 823; *Ellis*, 6 F. App'x at 769. Not only do these cases rely on a standard the Tenth Circuit has disclaimed, but both cases are distinguishable because Plaintiff's FCRA claim does not challenge the validity of the state court judgment or the manner in which it was obtained. Thus, the Court disagrees that *Rooker-Feldman* bars Plaintiff's claim.

In sum, the Court finds no basis to grant relief under Rule 50(b). The Motion for JNOV is respectfully **DENIED**.

## MOTION FOR NEW TRIAL

NCS also moves for a new trial under Rule 59, primarily arguing that there was insufficient evidence to support the jury's verdict in Plaintiff's favor. [Doc. 137 at 25].

## I.    Legal Standard

After a jury trial, "[t]he court may, on motion, grant a new trial on all or some of the

**28.2 App-087**

issues . . . for any reason for which a new trial has heretofore been granted in an action

at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  "A new trial cannot be granted unless

the [asserted] error was prejudicial and affects the party's substantial rights."  *Henning v.*

*Union Pac. R.R.*, 530 F.3d 1206, 1217 (10th Cir. 2008).  A motion for new trial "is not

regarded with favor and should only be granted with great caution."  *United States v.*

*Kelley*, 929 F.2d 582, 586 (10th Cir. 1991).  Whether to grant a new trial is within the

discretion of the trial court.  *Id.*

"If a new trial motion asserts that the jury verdict is not supported by the evidence,

the verdict must stand unless it is clearly, decidedly, or overwhelmingly against the weight

of the evidence."  *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir.

2009) (quotation omitted).  The Court views the evidence in the light most favorable to

the prevailing party, keeping in mind that the jury "has the exclusive function of appraising

credibility, determining the weight to be given to the testimony, drawing inferences from

the facts established, resolving conflicts in the evidence, and reaching ultimate

conclusions of fact."  *Snyder v. City of Moab*, 354 F.3d 1179, 1188 (10th Cir. 2003)

(quotation omitted).[5]

## II.    Analysis

### A.    Causation

First, NCS argues that there was "legally insufficient evidence that Plaintiff

---

[5] Defendant asserts that, in reviewing a motion for new trial, the "trial judge need not view evidence from perspective most favorable to prevailing party [sic]."  *See* [Doc. 137 at 5]. But the Tenth Circuit has repeatedly said that the evidence should be viewed in the light most favorable to the prevailing party.  *See, e.g.*, *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1062 (10th Cir. 2016); *M.D. Mark*, 565 F.3d at 762–63; *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1156–57 (10th Cir. 2006).

28.2 App-088

established causation to support his FCRA [c]laim." [Doc. 137 at 25 (emphasis omitted)].
It contends that "[a] plaintiff asserting a claim against a furnisher for failure to conduct a
reasonable investigation cannot prevail on the claim without demonstrating that, *had* the
furnisher conducted a reasonable investigation, the result would have been different,"
citing a few non-binding cases in support. [*Id.*]. However, the Court rejected Defendant's
request to include this language in the jury instructions because (1) there is no Tenth
Circuit authority imposing such a requirement for FCRA liability and (2) such an instruction
would, "in some ways, go against" Tenth Circuit precedent establishing the requirements
of a reasonable investigation under the FCRA. *See* [Day 3 Trial Tr. at 140:2–142:20];
*see also Maiteki v. Marten Transp. Ltd.*, 828 F.3d 1272, 1275 (10th Cir. 2016) (setting out
the steps the furnisher must take to conduct a reasonable investigation under the FCRA).
In other words, Plaintiff was not required to prove, and the jury was not required to find,
that had NCS conducted a reasonable investigation, the result would have been different.
*See* [Doc. 128 at 19 (jury instruction setting out the elements for Plaintiff's FCRA claim)].
Defendant does not acknowledge this ruling whatsoever in its Motion or argue that the
Court erred in its jury instructions.[6] *See* [Doc. 137 at 25–30]. Nor does NCS point the
Court to any binding authority holding that this is a required element in an FCRA claim.
*See* [*id.*]. Because Defendant's argument is based on a rule of law this Court concluded
is not applicable to this case, there is no basis for ordering a new trial here.

---

[6] "A motion for new trial may raise errors of law arising out of jury instructions, but a new
trial is warranted only when, 'having given full respect to the jury's findings and viewing
the entire evidence, the trial judge is left with the definite and firm conviction that a mistake
has been committed.'" *United States Welding, Inc. v. TECSYS, Inc.*, No. 14-cv-00778-
REB-MEH, 2017 WL 4331061, at *1 (D. Colo. Aug. 24, 2017) (quoting *Hughes v. Regents
of Univ. of Colo.*, 967 F. Supp. 431, 437 (D. Colo. 1996)).

**28.2 App-089**

## B.    Reasonable Investigation

Defendant next asserts that "[t]he jury's determination that NCS failed to perform a reasonable investigation is against the great weight of the evidence."  [Doc. 137 at 30 (emphasis omitted)].   In  support  of  its  argument,  NCS  compares  the  testimony  of Plaintiff's expert, Evan Hendricks, about what steps NCS could or should have taken in its investigation with various evidence that shows, in NCS's view, that NCS did in fact perform those tasks.  *See* [*id.* at 25–29].  It argues that "NCS performed all the activities that  Plaintiff  advocated  should  have  occurred,"  and  so  "the  overwhelming  evidence confirms that NCS satisfied its obligations to perform a reasonable investigation."  [*Id.* at 31 (incorporating arguments made earlier in its briefing)].

NCS's  argument  is  unavailing.    Determining  the  credibility  of  witnesses  and drawing inferences and conclusions from conflicting evidence is the duty of the jury.  *Ellis v. Union Pac. R.R.*, 329 U.S. 649, 653 (1947).  "[W]here . . . there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion."  *Lavender v. Kurn*, 327 U.S. 645, 653 (1946).  "A jury verdict may be upset  '[o]nly  when  there  is  a  complete  absence  of  probative  facts  to  support  the conclusion reached.'"  *Wilson v. Burlington N. R.R.*, 804 F.2d 607, 610 (10th Cir. 1986) (quoting *Lavender*, 327 U.S. at 635) (alteration in original).  The question before the Court is whether "there is a reasonable basis in the record to support the jury's findings."  *Id.*

There is a reasonable basis in the record to support the jury's conclusion that NCS's  investigation  was  not  reasonable.    Plaintiff's  expert  testified  at  length  about industry  standards  governing  credit  investigations  and  explained  why  he  formed  his opinion that NCS did not conform with those standards.  *See generally* [Doc. 134]; *see*

**28.2 App-090**

*also, e.g.*, [*id.* at 34:23–35:16, 37:8–17, 53:8–54:2]. The jury was free to credit Mr. Hendricks's testimony and disbelieve any conflicting evidence (or at least construe that conflicting evidence differently than Defendant). Other evidence also supported the jury's conclusion on this element; for example, NCS's vice president of operations, Ronn Sapp, testified at trial that there were inconsistencies, or "red flags," in the Main Street rental application, *see* [Doc. 142 at 40:6–41:24, 44:10–14], and that NCS did not contact any third parties in its investigation, such as verifying Plaintiff's employment, *see* [*id.* at 82:8–23]; *see also* [Doc. 128 at 23 (jury instructions stating that data furnishers may contact third parties as part of their investigation of a consumer's dispute)]. In addition, Mr. Hendricks testified that the FTC report would be relevant to NCS's investigation. [Doc. 134 at 33:25–35:8]. But Cathy Boehler, an NCS employee who investigated Mr. Ward's claim, testified that she could not recall whether she reviewed Mr. Ward's FTC identity theft report in her investigation, and there was nothing in the investigation description stating that she had reviewed the report. [Doc. 142 at 177:21–24, 178:18–179:6, 185:2–8, 194:6–24, 196:1–6]. The evidence presented at trial, as a whole, provides rational and reasonable support for the jury's conclusion.

### C.   Inaccurate Information

Defendant's next argument is difficult to understand. It first asserts, in a heading, that "[t]he jury's determination that the information furnished by NCS was inaccurate is against the great weight of the evidence." [Doc. 137 at 32 (emphasis omitted)]. It then states that if the Court determines that the issue of whether the information was inaccurate is a fact question for the jury (as opposed to a legal one), then NCS "requests, in the alternative to the JNOV, that the Court consider the three grounds for reversal under

the JNOV [sic] to be considered under the alternative standard for a new trial pursuant to Rule 59(b)." [*Id.*]. There is no argument accompanying NCS's "alternative" request. [*Id.*].

The "three grounds" supporting Defendant's request for JNOV were all *legal* arguments—that (1) NCS was not required to determine whether the debt was valid because that presented a legal dispute; (2) Plaintiff's claim is not cognizable because the dispute was not objectively and readily verifiable; and (3) the *Rooker-Feldman* doctrine bars Plaintiff's claim. [*Id.* at 1–2]. It is unclear how Defendant's arguments about applicable legal standards or doctrines are relevant to Defendant's cursory assertion that the jury's verdict was against the great weight of the evidence, and Defendant makes no substantive arguments explaining why a new trial is appropriate under any of these bases.

Nevertheless, within its JNOV arguments, Defendant provides a chart that cites trial evidence it believes supports a finding that the information it furnished was accurate, as well as evidence that supports a finding that the information was inaccurate, *see* [*id.* at 11–12], and also cites what it classifies as "ample evidence to question Plaintiff's dispute that he was a victim of identity theft," [*id.* at 14–15]. The Court assumes that Defendant is attempting to argue that, based on this evidence, the jury's verdict was against the weight of the evidence, but the Court is unpersuaded by this argument. There is a reasonable basis in the record to support the jury's conclusion that the information NCS furnished was inaccurate. Mr. Ward testified that he did not fill out the application and did not give his daughter permission to use his information to fill out the application, [Doc. 135 at 10:7–12, 26:18–27:17, 47:9–12, 79:9–10], which was consistent with his identity theft affidavit, [Doc. 152-4 at 3–4], and his wife's testimony, [Doc. 141 at 7:7–9, 23:2–15]. The jury was free to disregard any conflicting evidence. *Lavender*, 327 U.S.

at 653.   Accordingly, the Court concludes that sufficient evidence supports the jury's conclusion and a new trial is not warranted on this basis.

### D.   Failure to Mitigate

At trial, the jury found in favor of Plaintiff on Defendant's affirmative defense of failure to mitigate damages.  [Doc. 130 at 3].  Defendant contends that this determination was against the great weight of the evidence.  [Doc. 137 at 32].

Because failure to mitigate is an affirmative defense, Defendant had the burden of proof on the defense at trial.  *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1230 (10th Cir. 2000); [Doc. 128 at 27].  The jury was instructed that it should find in Defendant's favor if NCS proved by a preponderance of the evidence that (1) Mr. Ward failed to take reasonable steps to mitigate his damages; and (2) Mr. Ward incurred increased damages because he did not take those steps.  [Doc. 128 at 27].

NCS asserts that Mr. Ward "admitted" at trial that "despite subscribing to Credit Karma, . . . he did not track changes to his credit file by checking any email alerts from Credit Karma."  [Doc. 137 at 132].  According to Defendant, Plaintiff's purported failure to check his Credit Karma emails necessitates a jury verdict that he failed to mitigate his damages.  [*Id.* at 32–33].  Specifically, Defendant cites the testimony of its own expert, John Ulzheimer, explaining that NCS added an "XB" code "on the NCS collection that was appearing on Mr. Ward's credit reports," which indicated a dispute and rendered the collection "harmless in credit scoring systems."  [Doc. 136 at 22:4–11].  Defendant concludes that "[h]ad Plaintiff just opened his own emails or otherwise checked his credit," he would have realized that his credit score had recovered fewer than three weeks after he first saw the MSR account on his credit report, and "any alleged emotional distress

**28.2 App-093**

damages would have been, at a minimum, significantly reduced. [Doc. 137 at 33]. Plaintiff responds by pointing out evidence supporting the conclusion that he did mitigate his damages. [Doc. 146 at 25].

At trial, the following exchange occurred between NCS's counsel and Mr. Ward:

Q. Credit Karma is a service that you pay a monthly fee for; correct?

A. No.

Q. No. You signed up for free?

A. Yeah.

Q. When you signed up, you had to provide your contact information; correct?

A. Correct.

Q. And that involves your phone number or your email address.

A. My email address.

Q. Okay. So you received emails from Credit Karma?

A. I will tell you right now, I have 3,300 unread emails. I got my phone with me right now, I can show you that.

Q. Okay. So I guess what you are trying to tell me is that you got emails from Credit Karma, but you just didn't care to open them.

A. Well [the credit score] scrolls up, it[] scrolls it down. You know, like two points here or one point there because I bought something.

[Doc. 137-1 at 82:13–83:8].

The Court disagrees with Defendant and concludes that the jury's verdict on Defendant's affirmative defense was not clearly, decidedly, or overwhelmingly against the weight of the evidence. As a preliminary matter, the Court notes that Defendant did not rely on the Credit Karma emails to argue failure to mitigate—or reference the Credit

22

28.2 App-094

Karma emails at all—in its closing argument.  *See* [Day 4 Trial Tr. at 9:24–21:11].  Instead, Defendant argued that Plaintiff failed to mitigate his damages by not disclosing information about his daughter.  [*Id.* at 13:18–14:5].  To be clear, the Court does not suggest that this is conclusive of the issue, but the Court finds it relevant to its analysis because Defendant did not expressly ask the jury to consider this specific theory of failure to mitigate during its deliberations.

Whether Mr. Ward failed to reasonable steps to reduce his damages, including whether checking his email for alerts from Credit Karma would be "reasonable," is a question of fact for the jury to decide.  *See Vail Summit Resorts, Inc. v. Zip-Flyer, LLC*, No. 18-cv-01763-MEH, 2020 WL 4287196, at *11 (D. Colo. July 27, 2020) ("[M]itigation of damages is an issue best decided by the trier of fact.")].  The jury was not required to construe Mr. Ward's equivocal testimony in the way defense counsel did, i.e., as an "admi[ssion] . . . that [Plaintiff] did not track changes to his credit file by checking any email alerts."  Indeed, Mr. Ward never expressly confirmed that he received Credit Karma emails or neglected to open them.  [Doc. 137-1 at 82:13–83:8].  And notably, Defendant did not introduce as evidence any Credit Karma emails received by Plaintiff that would have informed Plaintiff that his credit score had adjusted and the MSR collection was no longer on his account.  Nor were the jurors required to credit Mr. Ulzheimer's testimony. "It is the jury's exclusive province to assess the credibility of witnesses and determine the weight to be given to their testimony."  *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1158 (10th Cir. 2006).  Defendant's argument that "[h]ad Plaintiff just opened his own emails . . ., any alleged emotional distress damages would have been, at a minimum, significantly reduced," [Doc. 137 at 33], is speculative and insufficient to warrant a new trial.

28.2 App-095

### E.    Economic Damages Award

NCS next argues that there is legally insufficient evidence to support the jury's $500,000 verdict in Plaintiff's favor, so "remittitur is appropriate." [Doc. 137 at 33]. It does not raise any substantive arguments in support of its contention, instead directing the Court generally to its Motion for Remittitur. [*Id.*]. Because NCS does not raise any argument here that is not raised in its Motion for Remittitur, and requests only remittitur on this point (as opposed to an entirely new trial), the Court limits its analysis of this issue to its ruling on the Motion for Remittitur below.

### F.    Exclusion of Evidence

Finally, NCS argues that the Court erred in excluding two categories of evidence: (1) evidence of NCS's attempts to obtain Plaintiff's daughter's testimony, and (2) social media videos explaining how to remove items from credit reports. [Doc. 137 at 34].

### 1.    NCS's Attempts to Contact Plaintiff's Daughter

In Plaintiff's Motion in Limine, he asked the Court to exclude evidence of Defendant's Texas lawsuit against his daughter. [Doc. 90 at 3]. NCS opposed this request, arguing that evidence of the lawsuit was relevant "to show that Plaintiff cannot affirmatively establish that the account is inaccurate." [Doc. 93 at 6]. In support, it cited cases discussing drawing a negative inference from a refusal to testify, but those citations were not supported by accompanying argument. *See* [*id.*]. The Court ultimately granted Plaintiff's request, excluding the evidence under Rules 401 and 403 of the Federal Rules of Evidence, [Doc. 112 at 11–12], because Plaintiff's daughter's failure to respond to the Texas lawsuit "[did] not make it more or less probable that Mr. Ward's account was inaccurate or incomplete, or that NCS conducted a reasonable investigation," [*id.* at 12].

The Court also concluded that any minimal probative value from the evidence was substantially outweighed by the danger of prejudice to Plaintiff and the risk of confusing the jury by suggesting that Plaintiff did or could control his daughter's actions.  [*Id.*].

NCS now contends that "evidence that Plaintiff's daughter would not cooperate with any investigation had she been contacted is relevant to the issue of causation."  [Doc. 137 at 34].  For a number of reasons, this undeveloped argument is unconvincing.

First, this argument was not raised in opposition to Plaintiff's Motion in Limine, *see* [Doc. 93], even though Defendant had the burden of demonstrating the evidence's relevance, *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1149 (10th Cir. 2009).  "[M]otions under Rule 59 are not vehicles to 'advance arguments that could have been raised in prior briefing.'"  *Hamstein Cumberland Music Grp. v. Williams*, 556 F. App'x 698, 703 (10th Cir. 2014) (quoting *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).  Second, Defendant does not address the Court's conclusion that the evidence would be excluded under Rule 403 or argue that this was error.  *See* [Doc. 137 at 34].  And third, Defendant's argument fails on the merits.  As the Court already explained, Plaintiff's failure to respond to NCS's Texas lawsuit does not make it more or less likely that Plaintiff's account was inaccurate or incomplete or that NCS conducted a reasonable investigation into Plaintiff's dispute.[7]  A new trial is not warranted on this basis.[8]

---

[7] Because Defendant's argument is not developed, it is unclear what Defendant means when it says that this evidence is relevant to "the element of causation."  [Doc. 137 at 34]. To the extent Defendant argues that this evidence is relevant to whether Plaintiff could prove that "*had* the furnisher conducted a reasonable investigation, the result would have been different," [*id.* at 25], the Court has explained above that this was not an element Plaintiff was required to prove in this case.

[8] Insofar as Defendant argues that the Court's exclusion of this evidence "allowed Plaintiff

### 2.    TikTok Video

On the second day of trial, Plaintiff's counsel informed the Court that, during a break, defense counsel had expressed his intent to play a TikTok video as part of NCS's case.  [Day 2 Trial Tr. 102:24–103:6].  To the Court, defense counsel explained that the TikTok video depicted "some of the problems they have to deal with and some of the problems they research" and that "[t]hey use it in their practice dealing with some of the problems they have, right, so they understand what consumers are out there doing in fraud investigations."  [*Id.* at 103:11–18].[9]  Defense counsel conceded that "Mr. Ward may never have seen a video like this," but argued that because "we have this society that is basically educated by TikTok," the video was relevant to "explain[] some of the issues they deal with and direct rebuttal to Mr. Hendricks's testimony."  [*Id.* at 104:7–11].  The Court sustained Plaintiff's objection and excluded the video under Rules 403 and 901.  [*Id.* at 104:12–105:14].

NCS argues that it was error for the Court to exclude the TikTok video[10] because

---

to improperly imply at [closing] argument that NCS failed to take any action to prosecute Plaintiff's daughter," this argument is not supported by any citation to the trial transcript. [Doc. 137 at 34].  The Court has reviewed the transcript of Plaintiff's counsel's closing argument and could not ascertain which portion of the argument Defendant takes issue with.  Moreover, Defendant did not object to any part of Plaintiff's closing argument at trial, *see* [Day 4 Trial Tr. at 1:18–9:21, 21:14–24:6], and cannot raise this argument for the first time now, *see Dailey v. Hecht*, 757 F. App'x 664, 672 (10th Cir. 2018) ("A party cannot observe an error, choose not to raise it, and use it to seek relief if the verdict does not go her way."); *Glenn v. Cessna Aircraft Co.*, 32 F.3d 1462, 1465 (10th Cir. 1994) (counsel cannot "remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial" (quotation omitted)).  And the Court observes no plain error that would require review in the absence of a timely objection.

[9]  The Court believes defense counsel's use of "they" refers generally to collection agencies.  *See* [Day 2 Trial Tr. at 103:15–22, 104:3–11].

[10]  The Motion for New Trial argues that it was error for the Court to exclude "online video<u>s</u>."  *See* [Doc. 137 at 34 (emphasis added)].  But at trial, Defendant referenced only

Plaintiff testified "that he learned how to dispute a debt by watching videos online," so Defendant "should have been allowed [to introduce] evidence of the video[]." [Doc. 137 at 34]. It argues that "it was an abuse of discretion to exclude the videos that would have provided the jurors with insight to the fraudulent or 'fake' identity theft claims," [*id.*], though it raises no argument explaining how the exclusion was "a clear error of judgment," exceeded "the bounds of permissible choice," or was "arbitrary, capricious or whimsical, or result[ed] in a manifestly unreasonable judgment, *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1309 (10th Cir. 2015). Nor does Defendant address either of the Court's grounds for excluding the evidence at trial. *See* [Doc. 137 at 34].

The Court's decision to exclude the TikTok video does not entitle NCS to a new trial. Even assuming that Defendant could authenticate the video—which the Court does not find, s*ee* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce sufficient evidence to support a finding that the item is what the proponent claims it is.")—the danger of unfair prejudice substantially outweighed any minimal probative value the video had. Defendant's argument that the video was relevant because Plaintiff "testi[fied] that he learned how to dispute a debt by watching videos online," [Doc. 137 at 34], relies on an inaccurate summation of Mr. Ward's testimony. Mr. Ward testified that he looked up "how to handle fraud" on the internet, but he did not mention watching any videos on the topic. *See* [Doc. 135 at 49:18–50:5]. This, coupled with defense counsel's concession that there is no indication that Mr. Ward watched the subject TikTok video, renders the probative value of the video miniscule at best. On the other hand, introducing a video explaining how a

---

a singular video. *See, e.g.*, [Day 2 Trial Tr. at 103:8–9, 104:8–11].

**28.2 App-099**

person could fraudulently get a debt removed from their credit report, even though the video has no relation or connection whatsoever to this case, would have created a substantial risk that the jury would draw unsupported and prejudicial conclusions about Mr. Ward and his conduct in this case. A new trial is not warranted on this basis.

For all of these reasons, the Court will not grant a new trial under Rule 59. The Motion for New Trial is respectfully **DENIED**.

## MOTION FOR REMITTITUR

### I.    Legal Standard

"Trial by jury is the bedrock right of our legal system." *Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1061 (10th Cir. 2013). The right to a jury trial "is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment." *Jacob v. City of N.Y.*, 315 U.S. 752, 752 (1942). "A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts." *Id.* at 752–53.

A request for remittitur is essentially a request to alter or amend the judgment under Rule 59(e). *See In re Universal Serv. Fund Tel. Billing Prac. Litig.*, 619 F.3d 1188, 1209 (10th Cir. 2010). To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict, *Burke v. Regalado*, 935 F.3d 960, 1035 (10th Cir. 2019), viewing the evidence "in the light most favorable to the prevailing party," *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1062 (10th Cir. 2016). "The jury ha[s] wide latitude to choose an award based on the evidence," *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 668 (10th Cir. 2016), and "the amount of damages awarded by a jury can be supported by any competent evidence tending to sustain it," *Bennett v.*

**28.2 App-100**

*Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985). "[T]he jury's award is inviolate unless [the Court] find[s] it so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *M.D. Mark*, 565 F.3d at 766 (quotation omitted).

## II.    Analysis

Defendant asks the Court to remit the $500,000 jury verdict by 90%, to $50,000. [Doc. 137 at 48]. It argues that remittitur is appropriate because the award, in light of the evidence presented at trial, "creates an irresistible inference that passion, prejudice or another improper cause invaded the trial." [*Id.* at 39]. In fact, NCS argues that it inadvertently "learned that [this] in fact did take place" during deliberations. [*Id.*].

### A.    Direct Evidence of Improper Cause

NCS contends that there is "actual evidence that an[] improper cause invaded the trial" based on certain statements some jurors made to defense counsel after the trial. [*Id.* at 43].[11] Specifically, defense counsel states that three jurors told him that they "intend[ed] for [Plaintiff] to receive a 'net' of $200,000" but increased the award to account for possible attorney's fees. [*Id.*]. In addition, another juror purportedly told defense counsel that she thought NCS "needed to be punished for 'not doing more to protect consumers'" and "'needed to be slapped.'" [*Id.* at 43–44]; *see also* [Doc. 137-4 (declaration from defense counsel attesting to these statements)]. NCS contends that, based on these statements, the jury based its verdict "on improper extraneous evidence," which shows that the verdict was motivated "by improper purposes." [Doc. 137 at 44].

---

[11] After the trial, the Court permitted the attorneys to speak with the jurors if the jurors permitted.

Plaintiff responds that the Court cannot consider the alleged statements relayed by defense counsel because they are (1) hearsay and (2) barred by Rule 606(b).  [Doc. 146 at 34–35].  NCS does not respond to either of these arguments.  *See* [Doc. 150].

> Rule 606 provides that
>
> [d]uring an inquiry into the validity of a verdict . . ., a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1).  A juror may testify, however, about whether "extraneous prejudicial information was improperly brought to the jury's attention."  Fed. R. Evid. 606(b)(2).  "Generally speaking, information is deemed 'extraneous' if it derives from a source 'external' to the jury," such as "publicity and information related specifically to the case the jurors are meant to decide."  *Warger v. Shauers*, 574 U.S. 40, 51 (2014).  On the other hand, "'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room."  *Id.*  Relevant here, "evidence of discussions among jurors . . . and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict."  *United States v. Lakhani*, 480 F.3d 171, 184 (3d Cir. 2007).

The Court agrees with Plaintiff that the Court cannot consider these out-of-court statements in deciding Defendant's Motion for Remittitur.  First, the statements are hearsay, and Defendant has not identified any applicable exception to Rule 801.  *See* [Doc. 137; Doc. 150].  Second, the statements plainly fall within Rule 606 and do not fall within its exceptions.  Statements that jurors considered attorney's fees in reaching their verdict or that one juror wanted to punish NCS do not amount to extraneous prejudicial

**28.2 App-102**

information; rather, these comments reflect the "general knowledge, opinions, feelings and bias that every juror carries into the jury room." *Hard v. Burlington N. R.R.*, 870 F.2d 1454, 1461 (9th Cir. 1989). A number of courts have declined to consider such statements in ruling on post-trial motions. *See, e.g.*, *Int'l Safety Access Corp. v. Integrity Worldwide, Inc.*, No. 09-cv-00315-MBS, 2011 WL 6826855, at *6 (D.S.C. Dec. 28, 2011) (relying on Rule 606 and declining to consider hearsay statements that jurors considered attorney's fees in reaching verdict); *Procter & Gamble Co. v. Haugen*, No. 95-cv-00094-TS, 2008 WL 2518716, at *3 (D. Utah June 20, 2008) (statements during deliberation "regarding [a] juror's personal experience with the hourly rates for lawyers or the high costs of legal fees" were not "extraneous information" that the court could consider because they were "confined to discussions amongst jurors during their deliberations" and were matters "fall[ing] within the general knowledge or opinion that every juror carries into the jury room by reason of their life experiences"); *Morgan v. Woessner*, 997 F.2d 1244, 1261 (9th Cir. 1993) ("The juror's observations about sending messages to City Hall and speculation as to the amount of Morgan's attorney's fees simply do not constitute the sort of 'extraneous prejudicial information' that falls within the scope of [Rule 606(b)].").

Accordingly, because the alleged juror statements are barred from consideration by the Court under Rule 606, the Court will not consider them in ruling on Defendant's Motion for Remittitur.[12]

---

[12] Defendant did not request that the Court hold an evidentiary hearing on this issue, *see* [Doc. 137; Doc. 150], and the Court does not find it necessary to hold a hearing. A court may forgo a hearing if it "would likely have not produced any valuable information." *United States v. Cornelius*, 696 F.3d 1307, 1325 (10th Cir. 2012) (quotation omitted). Because, as discussed above, the Court can only inquire "into external forces on the jury," and

**28.2 App-103**

### B.    Whether There Is Otherwise an Inference of Improper Cause

Defendant contends that remittitur is appropriate because passion, prejudice, or another improper cause invaded the jury and affected its verdict. [Doc. 137 at 39]. It first discusses the "context of the events surrounding the emotional distress," asserting that the evidence presented at trial does not support Plaintiff's testimony about the level of importance he placed on maintaining his credit because—in Defendant's view—Plaintiff purportedly did not check his emails from Credit Karma that would have informed Plaintiff of his credit score. [*Id.* at 39–40 ("[h]ad Plaintiff actually cared enough to routinely review his credit scores or open alerts . . .")]. Then, Defendant argues that Plaintiff's evidence of emotional distress was insufficient because he relies only on his and his wife's testimony, which NCS contends was conclusory. [*Id.* at 40–42]. Defendant also cites cases in which remittitur was granted, arguing that "[t]he Tenth Circuit recognizes comparison to other cases as an appropriate measure of excessiveness." [*Id.* at 44–48].

Plaintiff responds that there is sufficient evidence supporting the jury's award in this case. First, he argues that it is "well established that an FCRA plaintiff's testimony alone regarding their emotional distress is sufficient proof for the jury." [Doc. 146 at 31]. He recounts his and his wife's testimony at trial and their discussion about how Plaintiff had worked to build up his credit and lost hours of sleep and struggled at work. [*Id.* at 31–33]. And Mr. Ward, like NCS, directs the Court to cases in which similar amounts of emotional distress were awarded in similar cases. [*Id.* at 33–34].

---

defense counsel directs the Court only to statements made in the jury's internal deliberations and discussions and their states of mind, a hearing would not provide any valuable information. *See id.* ("[A] hearing is inappropriate when the alleged influence has to do with a juror's internal state of mind.").

**28.2 App-104**

***Plaintiff's Testimony and Other Evidence.***   As for Defendant's first argument about the Credit Karma emails, the Court has already explained that the jury was not required to adopt Defendant's interpretation of Plaintiff's unclear testimony, and because the Court must view the evidence in the light most favorable to Plaintiff, *see Lompe*, 818 F.3d at 1062, the Court does not credit Defendant's framing of this evidence.  There was sufficient evidence for the jury to conclude that Plaintiff placed great importance on maintaining his credit score.  *See, e.g.*, [Doc. 135 at 7:22–8:1 (Mr. Ward testifying about how, after he recovered from drug addiction, he worked to restore his credit); Doc. 141 at 16:2–4, 18:13–25 (Ms. Ward testifying that Plaintiff "worked so hard to get his credit back")].   Accordingly, the Court's discussion is limited to NCS's challenge to the sufficiency of the testimony about Mr. Ward's emotional distress.

At trial, Mr. Ward adduced the following evidence related to his emotional distress. He testified that, due to NCS, he experienced sadness or depression that was "so bad," [Doc. 135 at 24:25–25:2], and he was embarrassed by the inaccurate report, [*id.* at 20:2–20].  He stated that he would cry in the middle of the night "[b]ecause [he] didn't know what else to do."  [*Id.* at 15:18–25].  Ms. Ward also testified about Mr. Ward's distress, explaining that he was "deflated and sad," "really just struggled with everything," was "withdrawn" and "depressed," appeared hopeless, and lacked energy.  [Doc. 141 at 16:7, 16:13–16, 18:25–19:1, 21:2–12].  She stated that Mr. Ward was "not the same person that" she first knew, as he changed from a "confident[,] . . . happy, positive person" to a "very defeated person."  [*Id.* at 16:6–8, 16–24].  She also testified that Mr. Ward gained weight and "his health started to fail . . . because of the weight gain."  [*Id.* at 20:19–25].

Mr. Ward also testified that he "wasn't sleeping" at this time.  [Doc. 135:22–24].

**28.2 App-105**

He explained that he would go to bed around 8:00 or 9:00 P.M. and would wake up around 12:00 or 1:00 A.M.  [*Id.* at 14:24, 15:17–22].  He attributed the sleeplessness to his thoughts about how to get NCS "to understand" that he "didn't do this."  [*Id.* at 16:5–7].  Ms. Ward also testified that Mr. Ward was not sleeping well.  [Doc. 141 at 19:1–3].  She stated that he was up "every night" and would wake up within a couple of hours of going to sleep.  [*Id.* at 19:6–9].  She believed that Mr. Ward's sleep issues were attributable to the NCS credit report.  [*Id.* at 19:18–23].  Mr. and Ms. Ward each testified that their sex life suffered "as a result of NCS."  [Doc. 135 at 24:25–25:3; Doc. 141 at 16:14–15].

Mr. Ward also testified that his emotional distress affected his work life.  He testified that he could not concentrate at work, because he "[was] trying to fight" the inaccurate account and that he "didn't do it, and [NCS] just kept saying [he] did."  [Doc. 135 at 15:5–13].  He was "miserable at work" and made "constant[]" mistakes on the job, which was out of character for him.  [*Id.* at 14:24–15:3, 25:4–11].  Mr. Ward's mistakes caused his boss to speak with him about how the mistakes cost the company money.  [*Id.* at 25:8–11].  Ms. Ward also testified that Mr. Ward was "not performing like he normally does in his job, all these things that he takes pride" in and that he was "frustrated at work."  [Doc. 141 at 19:1–4, 20:5–6].  She believed his issues at work were attributable to the fact that he was more focused on the "NCS portion of his life."  [*Id.* at 20:12–18].

NCS argues that this evidence is insufficient to support the jury's verdict because there is no evidence that Plaintiff sought medical or psychological treatment related to his mental distress and because the only evidence Plaintiff provided in addition to his own testimony was his wife's testimony.  [Doc. 137 at 42].  It also argues that Mr. Ward's testimony was largely conclusory because he did not testify how often he lost sleep, how

long he experienced difficulty at work, or whether his crying interfered with his daily life or how long the crying occurred.  [*Id.* at 40–41].  It raises the same argument with respect to Ms. Ward's testimony.  [*Id.* at 42].

"[I]n the Tenth Circuit, a FCRA plaintiff is not required to produce corroborated testimony to establish emotional distress damages, so long as the plaintiff describes his or her emotional distress in sufficient detail and does not rely on conclusory statements." *Remaly v. Wyndham Resort Dev. Corp.*, No. 20-cv-03028-LTB-NYW, 2021 WL 5504628, at *5 (D. Colo. Nov. 23, 2021) (citing *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1182 (10th Cir. 2013)).  "An injured person's testimony *alone* may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements."  *Llewellyn*, 711 F.3d at 1183 (quotation omitted).  The Wards' testimony, in combination, provides sufficient detail about Mr. Ward's demeanor before and after the inaccurate NCS report and how the inaccurate report and NCS's conduct affected his mood, health, and daily life.  *See Fresquez v. BNSF Ry. Co.*, No. 17-cv-00844-WJM-SKC, 2021 WL 857626, at *6 (D. Colo. Mar. 8, 2021) (denying motion for remittitur on $800,000 award where the plaintiff "did not describe his emotional distress in the most graphic or descriptive terms" but still testified about how his termination "caus[ed] him to feel stress about feeding his son, affecting his ability to sleep, causing him to gain weight, and causing him to quit taking part in activities that he loved"), *aff'd*, 52 F.4th 1280 (10th Cir. 2022); *cf. Fox v. Pittsburg State Univ.*, 257 F. Supp. 3d 1112, 1149 (D. Kan. 2017) (finding plaintiff's testimony sufficient to support a $230,000 verdict where she testified that she lost weight, lost sleep, was depressed, and scared to go to work).

**28.2 App-107**

The Court is respectfully unpersuaded by NCS's attempt to discount the weight of this evidence, which the Court must view in Plaintiff's favor.  As for NCS's suggestion that Plaintiff "offered no evidence of any medical or psychological treatment related to any mental distress," [Doc. 137 at 42], Defendant cites no authority to support the proposition that, to obtain emotional distress damages, a plaintiff must have received mental health treatment.  *But see Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1318 (10th Cir. 2022) (affirming denial of remittitur even where the plaintiff "admitted to never having seen a therapist to deal with the stress caused by his termination").  NCS also points to evidence that Plaintiff went on vacation while he was dealing with the NCS dispute and that he "could not cite any examples of activities that he was prevented from doing as a result of NCS's conduct," which NCS says "speaks to the lack of any adverse financial or emotional effect on [Plaintiff] and his ability to have stress-free time."  [Doc. 137 at 41].  This argument is simply unpersuasive; a vacation does not invalidate, or even necessarily conflict with, the testimony about Plaintiff's mental distress.  And finally, Defendant also asks the Court to consider the fact that Plaintiff did not lose any income as a result of NCS's actions.  [*Id.* at 43].  But "[t]here is no requirement that the award for mental distress bear any relationship to the financial loss incurred as the result of the tortious acts." *Osterhout v. Bd. of Cnty. Comm'rs*, 10 F.4th 978, 996 (10th Cir. 2021) (quotation omitted).

***Comparison With Other Cases.***  Both Parties direct the Court to comparator cases to argue that remittitur either is or is not warranted.  *See* [Doc. 137 at 44–48; Doc. 146 at 33–34].  However, while the Tenth Circuit previously recognized comparison cases as a factor relevant to the remittitur analysis, *see, e.g.*, *Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir. 1989), more recent cases make clear that the Tenth Circuit

**28.2 App-108**

"discourage[s] comparisons to awards from other cases," *Hill*, 815 F.3d at 670.   "In general, 'comparisons yield no insight into the evidence the jurors heard and saw or how they used it during their deliberations' and 'detract from the appropriate inquiry, which is whether the verdict is against the weight of the evidence.'" *Osterhout*, 10 F.4th at 999 (quoting *Burke*, 935 F.3d at 1036 n.60).   A limited exception to this rule "may exist when 'a previous case is similar enough to serve as a meaningful benchmark.'"   *Id*. (quoting *Hill*, 815 F.3d at 671).

The Court finds that the cases cited by Defendant are largely too dissimilar to warrant any consideration in the remittitur analysis.   *Wulf* is a 35-year-old § 1983 case that does not account for three decades' worth of shifts in our society's approach to mental health.   *See Osterhout*, 10 F.4th at 999–1000 (refusing to consider cases that were "at least 25 years old and d[id] not reflect current public attitudes or spiraling costs for medical care").   *Blangsted* is a 15-year-old § 1983 employment case in which the court relied, in part, on the fact that "the Title VII limitation for compensatory damages [was] $50,000 to $300,000, depending upon the size of the employer," as the court believed this statutory limit "support[ed] a conclusion [that] the upper limit for emotional distress damages is significantly less than awarded by the jury in this case."   *Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1258 (D. Colo. 2009).[13]

For his part, Plaintiff cites a number of cases in which similar damages awards were entered.   *See* [Doc. 146 at 33–34].   But while he attaches various documents

---

[13] In addition, *Wantz* is a now-abrogated 20-year-old case decided at summary judgment, which is a different legal standard than the one applicable here.  *See Wantz v. Experian Info. Sols.*, 386 F.3d 829 (7th Cir. 2004), *abrogated by Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007).

**28.2 App-109**

reflecting the size of the verdicts, *see* [Doc. 146-4; Doc. 146-5; Doc. 146-6; Doc. 146-7], the Court is without any information concerning the evidence presented in those cases and they provide little help here.  Similarly, the two arbitration awards cited by Plaintiff provide little detail about the emotional distress evidence presented in those proceedings. *See* [Doc. 146-8 at 17–18; Doc. 146-9 at 5].

At best, Defendant cites a Colorado district court case, *Peters v. American Pacific Mortgage Co.*, No. 22CV30141 (Colo. Dist. Ct., Larimer Cnty.), and details the testimony purportedly adduced in that case, but it does not provide any citation to the case or include a copy of the unpublished decision with its Motion.  *See* [Doc. 137 at 46–47].  The Court has located the order of remittitur independently and finds that, while *Peters* has some similarities to this case, there are also differences; for example, in *Peters*, "[t]here was no evidence that the dispute negatively impacted [the plaintiff's] employment."  *See Peters*, No. 22CV30141 (Colo. Dist. Ct., Larimer Cnty. Aug. 7, 2023).  Moreover, the *Peters* court relied on points that this Court has already deemed are unpersuasive—such as the fact that there was no evidence that the plaintiff received medical care resulting from his emotional distress.  *Id.*  And in any event, one somewhat similar case is not sufficient to convince the Court that remittitur is appropriate here.

For these reasons, the Court cannot conclude that the jury's award is against the weight of the evidence or is so excessive that it shocks the judicial conscience or raises an inference that some improper cause invaded the trial.  Accordingly, the Motion for Remittitur is respectfully **DENIED**.

## MOTION FOR APPLICATION OF ONE-SATISFACTION RULE

In the alternative, Defendant asks the Court to apply the "one-satisfaction rule" and

**28.2 App-110**

reduce Plaintiff's award by the amount he received via settlement with the CRAs.  [Doc. 138 at 1].  Plaintiff responded in opposition, [Doc. 145], but NCS did not file a reply.

## I.  Legal Standard

"[U]nder the 'one satisfaction rule,' when the conduct of multiple defendants results in a single injury with common damages, and one of the defendants settles with the plaintiff, the amount of the settlement is credited against the amount that may be recovered from the non-settling defendants."  *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1209 (10th Cir. 2009).  The rule applies "only where the defendants' conduct resulted in a single injury."  *FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1379 (10th Cir. 1998) (quotation omitted).

## II.  Analysis

NCS's Motion presents two issues for the Court:  (1) whether the one-satisfaction rule even applies in FCRA cases; and (2) if so, whether the one-satisfaction rule applies to this case specifically.  *See generally* [Doc. 138].

As for the first issue, NCS argues that the one-satisfaction rule does apply to FCRA cases.  [*Id.* at 4].  It acknowledges that the Tenth Circuit has not ruled on this issue, but directs the Court to a few district court cases applying the rule to FCRA claims.  [*Id.* at 4–7].  While NCS briefly mentions a few cases going the other way, it writes off those decisions as "dicta."  [*Id.* at 4 & n.1].  Plaintiff, however, argues that Defendant's cases represent the "minority view" and asserts that "there is no shortage of cases concluding that the one-satisfaction rule does not apply in FCRA cases."  *See* [Doc. 145 at 6].

The FCRA does not itself contain any offset language.  *See* 15 U.S.C. §§ 1601–93.  Some district courts, primarily sitting in the Eleventh Circuit, have held that the one-

satisfaction rule applies to FCRA cases.  *See, e.g.*, *Haston v. Gold Coast Fed. Credit Union*, No. 9:22-cv-80004-RS, 2022 WL 17477531, at *2 (S.D. Fla. Nov. 8, 2022); *Williams v. LVNV Funding, LLC*, No. 4:15-cv-02219-KOB, 2017 WL 1331014, at *2 (N.D. Ala. Apr. 11, 2017) (denying motion for reconsideration of prior order finding that one-satisfaction rule applies).[14]   Many of these courts rely on *BUC International Corp. v. International Yacht Council Ltd.*, wherein the Eleventh Circuit "not[ed] that ample authority supports applying the [one-satisfaction] rule to federal causes of action."  517 F.3d 1271, 1278 n.7 (11th Cir. 2008); *see, e.g.*, *Haston*, 2022 WL 17477531, at *2; *Williams*, 2017 WL 1331014, at *2; *see also Scudder v. SoFi Lending Corp.*, No. 3:21-cv-00741-TJC-SJH, 2024 WL 4443204, at *1 (M.D. Fla. Sept. 16, 2024) ("Relying on *BUC*, the Southern District of Florida and Northern District of Alabama have held that the rule does apply to FCRA cases.").  Other courts have concluded that equitable offset rules do not apply in FCRA cases.  *See, e.g.*, *Nelson v. Equifax Info. Servs., LLC*, 522 F. Supp. 2d 1222, 1239 (C.D. Cal. 2007); *Vasquez-Estrada v. Collecto, Inc.*, No. 3:14-cv-01422-ST, 2015 WL 6163971, at *2 (D. Or. Oct. 20, 2015).

---

[14] NCS cites *Wellemeyer v. Trans Union, LLC*, No. 3:20-cv-00814-DJH-LLK, 2022 WL 1651877 (W.D. Ky. May 24, 2022) ("*Wellemeyer I*"), for the proposition that the *Wellemeyer* "concluded that the plaintiff had a singular injury to which the one satisfaction rule applied."  [Doc. 138 at 6–7].  This is not an entirely accurate explanation of the *Wellemyer* case.  In *Wellemeyer I*, in the context of ruling on a discovery dispute about the discoverability of settlement agreements, the magistrate judge assigned to the case discussed the split in authority on this issue and "[found] persuasive the argument that the one satisfaction rule is a tort law principle applicable to the FCRA in the present case." *Wellemeyer I*, 2022 WL 1651877, at *5.  But the magistrate judge made no official ruling about the applicability of the rule; in fact, he expressly stated that "[u]ltimately, the District Judge will determine whether the one satisfaction rule applies to this case."  *Id.* at *6. However, the district judge assigned to the case ultimately *declined to rule* whether the one-satisfaction rule applied in FCRA cases because "the essential requirement of the one-satisfaction rule [was] missing."  *See Wellemeyer v. Trans Union, LLC*, No. 3:20-cv-00814-DJH-LLK, 2023 WL 11262971, at *12 (W.D. Ky. Sept. 22, 2023) ("*Wellemeyer II*").

From the Court's independent research and review of applicable caselaw, it appears that many courts avoid answering the question altogether.  In doing so, however, courts have largely expressed skepticism that the one-satisfaction rule applies to FCRA claims.  *See, e.g.*, *Hoerchler v. Equifax Info. Servs., LLC*, 568 F. Supp. 3d 931, 936 (N.D. Ill. 2021) (declining to resolve the question but recognizing that "[c]ase law from outside the Seventh Circuit establishes that most courts to have considered this question hold that the one-satisfaction rule, which is also referred to as an equitable offset, does not apply in FCRA cases."); *Cheetham v. Specialized Loan Servicing LLC*, No. 2:20-cv-00762-JCC-DWC, 2021 WL 2137823, at *2 & n.3 (W.D. Wash. May 26, 2021) (recognizing that "Courts in the Ninth Circuit have determined the 'one satisfaction rule' does not apply in FCRA cases" but declining to rule on the issue); *Scudder*, 2024 WL 4443204, at *1–2; *Grant v. RentGrow, Inc.*, No. 5:21-cv-01172-JKP, 2023 WL 5813140, at *7 (W.D. Tex. Sept. 6, 2023).

The Court need not decide if the one-satisfaction rule applies to FCRA claims because even if it does apply in the FCRA context generally, it does not apply here.  "The one satisfaction rule does not apply when the plaintiff has suffered separate injuries by different defendants—even when a non-settling defendant's harmful conduct relates to and overlaps with the harmful conduct of the settling defendant."  *Valle v. Westhill Exch., LLC*, No. 8:19-cv-02304-GJH, 2021 WL 6064866, at *3 (D. Md. Dec. 21, 2021).

Defendant cursorily argues that "Plaintiff had only one injury in this case—emotional distress" and that this emotional distress is "indistinguishable from the emotional distress he claims was caused by the CRAs' alleged failure to conduct reasonable investigations and/or reinvestigations of Plaintiff's dispute of the Account that

**28.2 App-113**

would lead to correction or deletion of the Account." [Doc. 138 at 7]. It insists that "[n]o conduct from the settling CRAs resulted in an injury to Plaintiff that is distinguishable from the injury he testified about at trial." [*Id.* at 8]. But as Plaintiff points out, he and his wife each testified at trial about injuries *caused by NCS's conduct specifically*. *See, e.g.*, [Doc. 135 at 15:5–13, 16:5–7, 24:25–25:11; Doc. 141 at 15:24–16:16, 19:18–23, 20:12–18]. Defendant did not file a reply brief and does not respond to Plaintiff's argument highlighting this testimony, which establishes an injury tied to NCS, as opposed to the CRAs. *See also Hoerchler*, 568 F. Supp. 3d at 938 (in FCRA case, concluding there was not a singular injury where the plaintiff "interacted with Equifax more frequently and to a greater extent than with each of the Settling Defendants" and "attempted to fix distinct errors, was prevented from fixing those errors in distinct ways, and each of these interactions caused separate and distinct instances of emotional harm").

Moreover, Plaintiff argues that the one-satisfaction rule cannot apply here because his settlements with the CRAs were all for lump-sum payments, such that it is unascertainable whether the settlement amounts were for emotional distress damages. [Doc. 145 at 10–12]. Defendant does not reply to this argument.

In *Scudder*, an FCRA case, the court held that the one-satisfaction rule did not apply in part because the plaintiff's settlement agreements "with the credit bureaus include[d] lump-sum payments" and presumably accounted for the defendants' "total risk exposure," such as "attorneys' fees, costs, statutory damages, and punitive damages." 2024 WL 4443204, at *2. Because the court could not say which portion of the settlement agreements were attributable to actual damages, the court "[could not] reduce the award under the one-satisfaction rule." *Id.*

**28.2 App-114**

The same is true here. Plaintiff's counsel represents that the settlement agreements with the CRAs were for lump-sum payments with no apportionment for emotional distress damages and contain no admissions of liability. [Doc. 145 at 11].[15] It would not be possible to determine the portion of the settlement amounts that is properly attributable to emotional distress damages. Accordingly, the Court declines to apply the one-satisfaction rule here and will not amend the judgment to reduce the jury's award.

## CONCLUSION

For the reasons set forth above, it is **ORDERED** that:

(1)   Defendant's Motion for Judgment Notwithstanding the Verdict and Alternatively, Motion for New Trial, or in the Alternative, Motion for Remittitur [Doc. 137] is **DENIED**; and

(2)   Defendant's Motion to Apply One-Satisfaction Rule [Doc. 138] is **DENIED**.

DATED:  February 3, 2025                    BY THE COURT:

Nina Y. Wang
United States District Judge

---

[15] Plaintiff states that if counsel's representations about the contents of the settlement agreements "are not sufficient, Plaintiff agrees to provide the settlement agreements to the Court for *in camera* review." [Doc. 145 at 11 n.1]. The Court accepts counsel's representations as true without the need to review for *in camera* review. *See Holloway v. Arkansas*, 435 U.S. 475, 486 (1978) ("[A]ttorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath." (quotation omitted)).

28.2 App-115